**EXHIBIT 18**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JOLY RAMIREZ AND SORANGIE )
SANCHEZ, ON BEHALF OF )
THEMSELVES AND ALL OTHERS )
SIMILARLY SITUATED, ) CASE NO.
) 5:25-CV-07569-NC
PLAINTIFFS, )
)
VS. )
)
S. MARTINELLI & COMPANY, )
)
DEFENDANTS. )
) VOLUME 1
___________________________) (PAGES 1 TO 248)

VIDEO-RECORDED DEPOSITION OF JOLY RAMIREZ
WEDNESDAY, AUGUST 19, 2026
VOLUME 1

JOB NO. CA 8293859
REPORTED BY: DAYNA HESTER, C.S.R. 9970

attorney -- 10:16
Q. Correct? 10:16
A. -- I gave him the -- the things that I used. So he's going based on what I say. 10:16
MR. KRIVOSHEY: Hang on. Wait. -- 10:16
THE WITNESS: I don't understand the question then. Are you asking -- how am I going to verify him? He's asking me what I used. 10:16
BY MS. ORD: 10:16
Q. Is it truthful? 10:16
A. It's truthful. 10:16
Q. Those -- those are the two Martinelli's products that you purchased? 10:16
A. Yes. 10:16
Q. And you have purchased those products on more than one occasion? 10:16
A. Correct. 10:16
Q. Do you like Martinelli's Orange -- Apple Juice? 10:16 10:17
A. I did. It was pretty expensive; but, yes, I did. 10:17
Q. What did you like about it? 10:17
A. The supposed to be a hundred percent free -- sorry. Sorry. 10:17
A hundred percent juice. It's supposed to 10:17

be for the kids. 10:17
Q. Anything else? 10:17
A. The kids liked it. And -- 10:17
Q. So you bought it for the kids? 10:17
A. Yeah. It was better -- a better product. 10:17
Q. Did you drink it yourself or just for the kids? 10:17
A. No. I got it for the kids, and we used it for, like, parties and stuff because, you know, recovering addicts and stuff, you know, for -- for our parties. 10:17
Q. So that would be the sparkling cider for the parties? 10:17
A. Yeah. 10:17
Q. And you did drink that; correct? 10:17
A. Yes. That's what we brought the New Year's, in our birthdays, or holidays. 10:17
Q. Like, a substitute for champagne? 10:17
A. [Witness nods head up and down]. 10:17
Q. That's a "yes"? Yeah? 10:17
A. Yes, ma'am. 10:17
Q. You said you used to like it. When is the last time that you consumed either the juice or the sparkling cider? 10:17
A. I haven't bought the sparkling cider for a 10:17

while. I think the juice a couple years back. I still had kids around. 10:18
Q. And the cider longer than that? A couple of years back? 10:18
A. Probably getting -- I don't remember. I don't remember the year. Can't be no -- no more further than 20- -- like, 2025. 10:18
Q. Okay. For both products or just sparkling cider? 10:18
A. Probably for both products. 10:18
Q. And when you bought the sparkling cider last, did you drink it? 10:18
A. I don't recall. 10:18
Q. How about the apple juice? 10:18
A. No. It was for the kids. 10:18
Q. Okay. At some point, you stopped buying the Martinelli's products? 10:18
A. Yeah. A little bit -- little bit different walk in my Christianity. A little bit further than I was on my viewing -- my viewing, my perception, and things. 10:18
Q. So how did that affect your decision to stop purchasing the Martinelli's products? 10:19
A. Well, I'm not supposed to even pretend that we're drinking, for one. So that -- my 10:19

perception is a little bit different now. 10:19

Coming from -- from drinking, not drinking, having a bottle that's got no alcohol in it, you know, to not even wanting to see the alcohol bottle or pretendo [phonetic] one. It's different. 10:19

Q. And that's because the sparkling cider bottle sort of looks like a champagne bottle? 10:19

A. Yeah. 10:19

Q. Okay. Any other reasons that you can think of? 10:19

A. And they're not real juice. 10:19

Q. Tell me what you mean by that? 10:19

A. Well, it says a hundred percent juice on both of them. When I bought it for my kids, that's what we bought it for. It was a little bit more pricier. You know, wherever we'd go, we'd stop and get the kids some juice. I already have crazy kids, you know. You don't want to keep pumping them up full of sugar and syrups and all of those stuff. But it said a hundred percent juice. And it's supposed to be better for them. So we would stop and get those. So wherever we went, we would buy Martinelli's. 10:20

Q. So what is the reason that you think it's a hundred percent juice? 10:20

A. It said on the bottle. 10:20
Q. And when you say a "hundred percent juice," what does that mean to you? 10:20 10:20
A. Smashed apple, a hundred percent. That's it. Just -- just your apple smashed, a hundred percent. There's no sugars or all the extra stuff. It's just smashed juice. 10:20 10:20 10:20 10:20
Q. And as you sit here today, do you know what the ingredients are in the Martinelli's sparkling cider? 10:20 10:20 10:20
A. I don't. But I know there's an additive in it, though. 10:20 10:20
Q. How do you know that? 10:20
A. Because it says in the back. 10:20
Q. When did you first view the back label of the sparkling cider? 10:20 10:20
A. I can't tell you that, the date, but it was 2025. 10:20 10:20
Q. And how did it come to be that you looked at the back label? 10:20 10:21
A. I saw a ad, and it was talking about the Martinelli's. And I thought, "Hmm, I don't remember that." So I -- you know, when you're shopping and stuff, you take a -- you take a good look. And I took -- took a bottle, and I saw it. And it was 10:21 10:21 10:21 10:21 10:21

remember what you paid for it? 10:34
A. I don't. 10:34
Q. At any time did you return Martinelli's product that you had purchased? 10:34 10:35
A. Did I return it? 10:35
Q. Yeah. 10:35
A. No. 10:35
Q. Did you ever ask for a refund? 10:35
A. No. 10:35
Q. Have you ever contacted Martinelli's to complain because there is something added to the juice? 10:35 10:35 10:35
A. No. 10:35
Q. Any reason you didn't do that? 10:35
A. I didn't have a problem with the juice. 10:35
Q. In other words, you liked it. It tasted good. The kids liked it? 10:35 10:35
A. Yes. We had problem -- the problem is with your labelling. I feel -- I mean, all these years I have been, like -- you guys are, like, part of my home. You know, it's the labelling. You guys didn't tell us the truth on it. It's -- it's supposed to be a hundred percent juice. I paid a lot of money to make sure it was juice for -- for my kids, you know. 10:35 10:35 10:35 10:35 10:35 10:35 10:35 10:35

lawyer? 11:02
A. Correct. 11:02
Q. And as far as you know, whatever that information was, your lawyer did, in fact, incorporate it into the amended document? 11:02
A. Correct. 11:02
Q. I'm going to show you Paragraph 1 of this document. So it's right under the word "Introduction." 11:02
Do you see that? 11:02
MR. KRIVOSHEY: Click the plus and it will be a little bigger. 11:02
There we go. 11:03
BY MS. ORD: 11:03
Q. Are you there? 11:03
A. I'm there. 11:03
Q. So this is talking about [as read]: 11:03
"The purpose of this lawsuit, which aims to hold Martinelli's responsible for misleadingly marketing it's Martinelli's Apple Juice, Martinelli's Sparkling Cider, and Martinelli's Sparkling Blush products." 11:03
Correct? 11:03
A. Correct. 11:03

Q. Have you ever purchased Martinelli's Sparkling Blush? 11:03

A. Not for certain. I don't know. I purchased the Martinelli's Sparkling Cider. I'm not sure if it had a blush on it. 11:03

Q. Was it pink? 11:03

A. I don't recall. 11:03

Q. Okay. Do you know if there is any of the asorbic-something in the sparkling blush product? 11:03

A. I don't -- I don't recall. I don't recall the product. 11:03

Q. And it says [as read]: 11:03

"Plaintiffs Joly Ramirez" -- I'm going to butcher this -- "Sorangie" -- is that how you say it? 11:04

MR. KRIVOSHEY: Don't ask me. 11:04

BY MS. ORD: 11:04

Q. [As read]: 11:04

-- "Sorangie Sanchez, on behalf themselves and all others similarly situated, bring this class action." 11:04

What does it mean to say that you bring this on behalf of all others similarly situated? 11:04

MR. KRIVOSHEY: Objection to form. 11:04

///

BY MS. ORD: 11:04
Q. Do you know? 11:04
A. For other consumers, I guess. 11:04
Q. So are you bringing the lawsuit for yourself? 11:04
A. And -- and others. 11:04
Q. And who are the others? 11:04
A. Anybody who has boughten [verbatim] your guys's product. 11:04
Q. Okay. Looking at Paragraph 4, so we're moving along in the Complaint here. 11:04
Let me know when you're there. 11:04
A. Okay. 11:05
Q. So middle of the paragraph it says [as read]: 11:05
"These added preservatives and ingredients are not mentioned or disclosed anywhere on the product's front labels." 11:05
Do you see that? 11:05
A. I do. 11:05
Q. What are the added preservatives? 11:05
A. Wouldn't it be in the -- well, it says the "ascorbic acid." 11:05
Q. So is that an added preservative? 11:05

be, a better role model for my kids and everybody else. So it's a learning process. 11:13 11:14

Q. And that means not having the bottle that looks like an alcohol bottle, even if there's no alcohol in it? 11:14

A. Yeah. I was making my own, actually. I did a ginger ale and then -- and then a apple -- apple -- what do you call those little powdery things you put in there? Try to make your own. 11:14

Q. So when is the last time you think you bought the sparkling product then? 11:14

MR. KRIVOSHEY: Objection. Asked and answered. 11:14

THE WITNESS: 2025. 11:14

BY MS. ORD: 11:14

Q. So you didn't stop having in your home anything that resembled alcohol until 2025? 11:14

A. Yeah. It's not until I moved over to this new place that my conviction is kicking in. And I'm being more of a role model. They're having me out there with different people. And... 11:14

Q. Okay. The juices that you make at home, how do you make those? 11:14

A. Just apple juice. Five apples. And you put some ginger ale in it. Just regular old apples, 11:14

you just boil them down with ginger ale or sparkling -- 11:14 11:15
Q. How long does that last for? 11:15
A. -- or sparkling water or something. 11:15
Q. How long does that last for? 11:15
A. It was just for the event. It's whatever we're having an event for. 11:15 11:15
Q. Did you ever -- 11:15
A. It makes the house smell good of cinnamon. 11:15
Q. Do you ever keep it in the refrigerator and drink it over time or no? 11:15 11:15
A. No. I don't think so. I think it's just, like, one sitting. 11:15 11:15
Q. Would it last if you kept it in the fridge for a while? 11:15 11:15
A. It's probably needed to be done -- like, consumed within three days. 11:15 11:15
Q. Otherwise, it might get moldy or something? 11:15 11:15
A. Like, turn into hooch. 11:15
Q. Oh. Which would then be an alcoholic product; correct? 11:15 11:15
A. Correct. 11:15
Q. We don't want that. 11:15
Do you know what the claims are in your 11:15

lawsuit against Martinelli's? 11:15
MR. KRIVOSHEY: Objection. Form. 11:15
BY MS. ORD: 11:15
Q. You can answer. Unless he instructs you not to answer, you can answer. 11:15
A. The labelling, supposed to be a hundred percent juice. 11:16
Q. Anything else? 11:16
A. It's not supposed to have anything in it. Just a hundred percent juice. Juice is juice. It's just from apples. 11:16
Q. Do you know how Martinelli's juice and sparkling cider are made? 11:16
A. I do not. 11:16
Q. Have you ever investigated whether they are, in fact, made from a hundred percent fresh apple juice? 11:16
A. No. 11:16
Q. Would that change your testimony if that was the case? 11:16
MR. KRIVOSHEY: Objection. Form. Calls for speculation. 11:16
THE WITNESS: You still want me to answer? 11:16
BY MS. ORD: 11:16
Q. Yeah. 11:16

A. No. 11:16
Q. It would not change your testimony? 11:16
A. No. 11:16
Q. Why not? 11:16
A. I went to school for marketing and -- and management, and everything is a propaganda. You know, you guys need to be honest, have an integrity in the right thing to -- to inform the consumer what they're purchasing. 11:16
And I was a avid user for me and my children. And I feel like you guys deceived me. You know, it's -- and -- and it's okay. You guys are okay with it. 11:16
And you guys need to be held reliable [verbatim] for what you guys's putting into our products. 11:17
Q. What's in it, other than juice? 11:17
A. You tell me. It's your product. 11:17
Q. Well, you're the one that's suing my client. So -- 11:17
A. Well, it's not juice. It's not just juice. 11:17
Q. So what's -- 11:17
A. And we wouldn't be here if it was just juice. 11:17

outcome in this lawsuit? 11:39
A. No. 11:39
Q. If you prevail in this lawsuit, what is your understanding of what you will receive? 11:39
A. Monetary and then -- maybe you guys will change your advertising on the bottle, and to help other plaintiffs be able to speak up for their -- I can't speak for them but only myself. But at least it will be open for other people too. 11:39
Q. Do you believe that you are entitled to a specific amount of money? 11:40
MR. KRIVOSHEY: Objection to form. 11:40
THE WITNESS: No comment. 11:40
BY MS. ORD: 11:40
Q. You don't know? 11:40
A. [Witness shakes head side to side]. 11:40
Q. Do you have any idea how an amount might be calculated? 11:40
MR. KRIVOSHEY: Objection to form. 11:40
THE WITNESS: No. 11:40
BY MS. ORD: 11:40
Q. Okay. Other than your current counsel, did you speak to any other lawyers about Martinelli's? 11:40
A. No. Just -- just this counsel. 11:40

A. I will follow. 11:43
Q. Whose idea was it to sue Martinelli's? 11:44
A. Are you asking me? 11:44
Q. Uh-huh. 11:44
A. It's mine. 11:44
Q. Okay. Did you sign an engagement letter with your counsel? 11:44 11:44
A. A what? 11:44
Q. Did you sign a letter with your counsel retaining them? 11:44 11:44
A. I did. 11:44
Q. Do you want to represent individuals, other than yourself, in connection with this lawsuit? 11:44 11:44 11:44
A. I do. 11:44
Q. Why? 11:44
A. I think it gives people a fair chance to be able to come out swinging and -- and be able to get some monetary compensation back to the damage that's been done being lied to all these years. 11:44 11:44 11:45 11:45
Q. How many years back do you think you can get monetary compensation for? 11:45 11:45
A. I don't know. 11:45
MR. KRIVOSHEY: Objection to form. 11:45
///

MR. KRIVOSHEY: Objection to form. Mischaracterizes testimony. 13:11
THE WITNESS: I'm seeing it for the first time. So at the time you're asking me, I didn't know Vitamin C has anything to do with our apple juice. 13:11
BY MS. ORD: 13:11
Q. But that's not the reason that you brought this lawsuit; correct? 13:11
A. No. 13:11
Q. It's because of the ascorbic acid? 13:11
A. I don't know. It's because -- I'm supposed to be getting juice, and you guys got all these extra additives and things in there, things that I wasn't aware of. 13:11
Q. So when you filed the lawsuit, what were you objecting to being added specifically to the apple juice? 13:12
A. I never seen this nutritional fact sheet on your guys's Martinelli's. 13:12
Q. So what was the -- what was the thing that was added to the apple juice that you were objecting to? 13:12
A. The ascorbic acid. 13:12
Q. Okay. That's it? 13:12

A. Yes. 13:12
MS. ORD: Okay. Let us now look to Tab 26, Tia, which is going to be Exhibit 11. And we are marking a label for Martinelli's Sparkling Cider. 13:12 13:12 13:12 13:12
(Deposition Exhibit 11 was marked for identification and is attached hereto.) 13:12 13:12
BY MS. ORD: 13:12
Q. Has it come up? 13:12
A. No, not yet. 13:12
MS. NGUYEN: You might want to refresh it. 13:12
THE WITNESS: I don't know how. 13:13
MS. ORD: Do you mind -- 13:13
MR. KRIVOSHEY: Oh. Sorry. Yeah. 13:13
THE WITNESS: I don't -- I don't mess with computers. 13:13 13:13
MR. KRIVOSHEY: Don't worry about it. I'll get it. 13:13 13:13
I'll pull up the whole page. 13:13
Okay. There's -- there's two pages to this exhibit. Look at the front and the back. 13:13 13:13
THE WITNESS: Okay. 13:13
BY MS. ORD: 13:13
Q. Okay. You've mentioned a few times during your testimony today that your eyesight had gotten 13:13 13:13

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES ) SS.

I, Dayna Hester, C.S.R. No. 9970, in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was { } was not required;

I further certify that I am not interested in the event of the action.

Witness my hand this 4th day of September, 2026.



Certified Shorthand Reporter
for the State of California