ISABELLE L. ORD (Bar No. 198224)
isabelle.ord@us.dlapiper.com
TIA Q. NGUYEN (Bar No. 338778)
tia.nguyen@us.dlapiper.com
**DLA PIPER LLP (US)**
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
Tel: 415.836.2500
Fax: 415.836.2501

CHRISTINE E. ELLICE (Bar No. 276181)
christine.ellice@us.dlapiper.com
HARRISON B. PARK (Bar No. 347839)
harrison.park@us.dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067
Tel: 310.595.3000
Fax: 310.595.3300

KEARA M. GORDON*
keara.gordon@us.dlapiper.com
COLLEEN M. CAREY GULLIVER*
colleen.gulliver@us.dlapiper.com
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Tel: 212.335.4500
Fax: 212.335.4501

*admitted *pro hac vice*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JOLY RAMIREZ and SORANGIE SANCHEZ, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

S. MARTINELLI & COMPANY,

Defendant.

CASE NO. 5:25-CV-07569-NC

**DEFENDANT S. MARTINELLI & COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**<u>REDACTED</u>**

Date: March 31, 2027
Time: 11:00 A.M.
Room: 5
Judge: Magistrate Judge Nathanael Cousins

Complaint Filed: September 5, 2025
Amended Complaint Filed: November 13, 2025

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 4

A. Martinelli's and Its Products ..... 4

B. The Product Labels ..... 4

C. Vitamin C Is Good for You. ..... 5

D. The Plaintiffs Were Not Deceived. ..... 6

E. Wholesalers and Retailers, Not Martinelli's, Decide Where, When, and at What Price the Products Are Sold. ..... 7

F. Procedural History ..... 8

III. LEGAL STANDARD ..... 8

IV. ARGUMENT ..... 9

A. Article III Standing Defects Pervade the Putative Class. ..... 9

1. Plaintiffs Do Not Have Article III Standing. ..... 10

2. Determining Standing is an Individualized Issue. ..... 11

3. Sanchez Lacks Article III Standing for Injunctive Relief. ..... 12

B. The Plaintiffs Cannot Satisfy Rule 23(a). ..... 13

1. The Plaintiffs Are Not Typical. ..... 13

2. The Plaintiffs Are Not Adequate. ..... 14

a. *The plaintiffs lack credibility.* ..... 14

b. *The plaintiffs flouted their discovery obligations.* ..... 15

3. Commonality Is Lacking. ..... 16

C. Plaintiffs Do Not Satisfy Rule 23(b)(3). ..... 17

1. Individual, Rather than Common, Issues Predominate. ..... 17

a. *The Dennis surveys fail to collectively establish predominance because Dennis twice tests a single product class but applies the results to the other unanalyzed product class.* ..... 17

b. *Individual issues of materiality and reliance predominate.* ..... 18

c. *Individual issues of deception predominate.* ..... 21

i. *The perception survey is fatally mismatched.* ..... 21

ii. *The plaintiffs fail to establish that "100% Juice" has a common meaning and therefore is unambiguously deceptive.* ..... 24

d. *Individual damages issues predominate.* ..... 28

i. *The price premium damages model is legally unsupportable because Martinelli's does not set retail prices, which vary.* .... 28

ii. *Dennis' damages model is incompatible with the plaintiffs' theory of liability.* .... 29

iii. *The plaintiffs' damages model ignores supply-side factors.* .... 31

iv. *The availability of statutory damages does not create class-wide injury or damage.* .... 31

e. *Individual issues regarding the CLRA's "consumer" element predominate.* .... 33

2. A Class Action Is Not Manageable or Superior to Individual Litigation.... 33

D. A Class Cannot Be Certified Under Rule 23(b)(2). .... 34

1. Sanchez Is Not a Member of the Proposed Injunctive Class. .... 34

2. Injunctive Relief Is Not Appropriate for Either Class as a Whole. .... 35

V. CONCLUSION .... 35

# TABLE OF AUTHORITIES


Page(s)

**Cases**

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*,
2017 WL 2559615 (C.D. Cal. June 7, 2017) .......... 19, 24

*Algarin v. Maybelline, LLC*,
300 F.R.D. 444 (S.D. Cal. 2014) .......... 28, 35

*AmEx Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) .......... 8

*Arabian v. Sony Elecs., Inc.*,
2007 WL 627977 (S.D. Cal. Feb. 22, 2007) .......... 33

*Astiana v. Ben & Jerry's Homemade, Inc.*,
2014 WL 60097 (N.D. Cal. Jan. 7, 2014) .......... 28

*Badella v. Deniro Mktg. LLC*,
2011 WL 5358400 (N.D. Cal. Nov. 4, 2011) .......... 20

*Bates v. Abbott Lab'ys*,
2025 WL 65668 (2d Cir. Jan. 10, 2025) .......... 24

*Bodenburg v. Apple Inc.*,
146 F.4th 761 (9th Cir. 2025) .......... 24

*Bohn v. Pharmavite, LLC*,
2013 WL 4517895 (C.D. Cal. Aug. 7, 2013) .......... 15

*Caldwell v. Nordic Nats., Inc.*,
709 F. Supp. 3d 889 (N.D. Cal. 2024) .......... 13

*Chapman v. Pier 1 Imps. (U.S.) Inc.*,
631 F.3d 939 (9th Cir. 2011) (en banc) .......... 12

*In re Clorox Consumer Litig.*,
301 F.R.D. 436 (N.D. Cal. 2014) .......... 33

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... *passim*

*Corcoran v. CVS Health*,
2017 WL 1065135 (N.D. Cal. Mar. 21, 2017) .......... 14

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) .......... 12

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
431 U.S. 395 (1977) ........ 34

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ........ 9, 13

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018) ........ *passim*

*Grodzitsky v. Am. Honda Motor Co.*,
957 F.3d 979 (9th Cir. 2020) ........ 9, 16

*Gross v. Vilore Foods Co.*,
2022 WL 1063085 (S.D. Cal. Apr. 8, 2022) ........ 19, 20, 22

*Harris v. Vector Mktg. Corp.*,
753 F. Supp. 2d 996 (N.D. Cal. 2010) ........ 14

*Jaimez v. DAIOHS USA, Inc.*,
181 Cal. App. 4th 1286 (2010) ........ 14

*Johnson v. Harley-Davidson Motor Co. Grp.*,
285 F.R.D. 573 (E.D. Cal. 2012) ........ 33

*Jones v. ConAgra Foods, Inc.*,
2014 WL 2702726 (N.D. Cal. June 13, 2014) ........ 20, 24

*Jovel v. Boiron, Inc.*,
2014 WL 1027874 (C.D. Cal. Feb. 27, 2014) ........ 14

*Kenney v. Fruit of the Earth, Inc.*,
2024 WL 4578981 (9th Cir. Oct. 25, 2024) ........ 12, 13

*In re KIND LLC "Healthy & All Nat." Litig.*,
627 F. Supp. 3d 269 (S.D.N.Y. 2022), *aff'd*, 100 F.4th 419 (2d Cir. 2024) ........ 25

*Kronenberg v. Allstate Ins. Co.*,
743 F. Supp. 3d 465 (E.D.N.Y. 2024) ........ 32

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011) ........ 10

*Lara v. First Nat'l Ins. Co. of Am.*,
25 F.4th 1134 (9th Cir. 2022) ........ 11

*Larsen v. Vizio, Inc.*,
2017 WL 11633132 (C.D. Cal. Apr. 27, 2017) ........ 29

*Legrand v. Abbott Lab'ys*,
2026 WL 3084657 (N.D. Cal. Oct. 15, 2026) ........ 17, 28, 29

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
350 F.3d 1018 (9th Cir. 2003) .......... 9, 10, 13, 34

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 10, 12

*Madden v. Midland Funding, LLC*,
237 F. Supp. 3d 130 (S.D.N.Y. 2017) .......... 32

*Marshall v. Hyundai Motor Am.*,
334 F.R.D. 36 (S.D.N.Y. 2019) .......... 32, 35

*McMorrow v. Mondelēz Int'l, Inc.*,
2020 WL 1157191 (S.D. Cal. Mar. 9, 2020) .......... 29, 30

*Michel v. Lidl, US, LLC*,
2025 WL 2418956 (Sup. Ct. Queens Cnty. Aug. 1, 2025) .......... 25, 27

*Montera v. Premier Nutrition Corp.*,
111 F.4th 1018 (9th Cir. 2024) .......... 32, 33

*Moore v. Mars Petcare US, Inc.*,
2024 WL 4336602 (N.D. Cal. Sep. 27, 2024) .......... 18

*Nguyen v. Medora Holdings, LLC*,
2015 WL 4932836 (N.D. Cal. Aug. 18, 2015) .......... 10

*Nimmons v. Weis Mkts. Inc.*,
2025 WL 4660802 (Sup. Ct. Broome Cnty. Oct. 31, 2025) .......... 25

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) .......... 10

*Pagan v. Abbott Labs. Inc.*,
287 F.R.D. 139 (E.D.N.Y. 2012) .......... 32, 33

*Pasik v. Sabra Dipping Co., LLC*,
2022 WL 22904964 (Sup. Ct. Nassau Cnty. Apr. 13, 2022) .......... 24

*Pierce-Nunes v. Toshiba Am. Info. Sys.*,
2016 WL 5920345 (C.D. Cal. June 23, 2016) .......... 14, 24

*Red v. Kraft Foods, Inc.*,
2012 WL 8019257 (C.D. Cal. Apr. 12, 2012) .......... 28

*Rusoff v. Happy Grp., Inc.*,
187 F.4th 1182 (9th Cir. 2026) .......... *passim*

*Sharpe v. A&W Concentrate Co.*,
2021 WL 3721392 (E.D.N.Y. July 23, 2021) .......... 32, 33

*Shin v. Sanyo Foods Corp. of Am.*,
348 F.R.D. 477 (C.D. Cal. 2025) .......... 18, 19

*Simon v. Ashworth, Inc.*,
2007 WL 4811932 (C.D. Cal. Sep. 28, 2007) .......... 14

*Sinatro v. Barilla Am., Inc.*,
2026 WL 2970361 (N.D. Cal. Sep. 30, 2026) .......... 25, 26, 27

*Small v. Allianz Life Ins. Co. of N.A.*,
122 F.4th 1182 (9th Cir. 2024) .......... 14

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011), *abrogated on other grounds by Comcast*, 569 U.S. 27 .......... 13, 19

*Stiner v. Brookdale Senior Living, Inc.*,
665 F. Supp. 3d 1150 (N.D. Cal. 2023) .......... 12

*Sykes v. Mel S. Harris & Associates LLC*,
780 F.3d 70 (2d Cir. 2015) .......... 32

*Townsend v. Monster Bev. Co.*,
303 F. Supp. 3d 1010 (C.D. Cal. 2018) .......... 20, 21, 24, 29

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 7, 9, 12

*Tropical Sails Corp. v. Yext, Inc.*,
2017 WL 1048086 (S.D.N.Y. Mar. 17, 2017) .......... 21

*Vizcarra v. Unilever U.S., Inc.*,
339 F.R.D. 530 (N.D. Cal. 2021) .......... *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
500 F. Supp. 3d 940 (N.D. Cal. 2020) .......... 31

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 8, 16, 35

*Warren v. Coca-Cola Co.*,
670 F. Supp. 3d 72 (S.D.N.Y. 2023) .......... 24

*White v. Symetra Assigned Benefits Serv. Co.*,
104 F.4th 1182 (9th Cir. 2024) .......... 9

*Whiteside v. Kimberly Clark Corp.*,
108 F.4th 771 (9th Cir. 2024) .......... 24

*Wright v. Apple & Eve LLC*,
2025 WL 4050909 (Sup. Ct. Kings Cnty. Oct. 16, 2025) .......... 25

*Zakaria v. Gerber Prods. Co.*,
755 F. App'x 623 (9th Cir. 2018) .......... 31

**Statutes**

Cal. Civ. Code § 1761(d) .......... 33

**Other Authorities**

21 C.F.R. § 182.3013 .......... 5

Fed. R. Civ. P. 23 .......... *passim*

# I. INTRODUCTION

The plaintiffs were not deceived. Their theory is that Martinelli's "100% Juice from U.S. Grown Fresh Apples" and "Premium 100% Juice Not from Concentrate" statements misled them and other consumers into believing the products contained nothing but apples, when they also contain added Vitamin C (also known as ascorbic acid). But apples, by their very nature, contain Vitamin C, and both plaintiffs knew that when they purchased Martinelli's products. Martinelli's discloses the added Vitamin C on the ingredient list and in the Nutrition Facts panel of every bottle. And for the sparkling products, the only products for which the plaintiffs seek money damages, no reasonable consumer believes apples become carbonated by themselves.

At the pleading stage, this Court accepted the plaintiffs' allegations as true. The record tells a different story. Plaintiff Sanchez knew apple juice contains Vitamin C, considers that a "good thing," and kept buying other juice brands with added Vitamin C after filing this suit. (Declaration of Isabelle L. Ord ("Ord Decl."), Ex. G at 32:5–15, 33:10–17, 43:22–45:25). A label saying "added vitamin C" actually made her *want* to buy a competing product. *Id.* at 33:18–36:12; 182:1–183:7. Plaintiff Ramirez testified that Vitamin C is good for you in moderation, that it had nothing to do with this lawsuit, it did not bother her that her supplements contain it, and she purchased products containing preservatives. (*Id.*, Ex. C at 111:13–15; 140:8–10, 150:1–23, 153:6–14.) Therefore, not only did the plaintiffs *know* Martinelli's products contained Vitamin C (because it comes from apples), they believed Vitamin C is good, precluding any argument they were misled or injured.

Both plaintiffs bought Martinelli's for years—until they saw their counsel's Facebook solicitation which characterized ascorbic acid as a "preservative" and told them they could make money suing Martinelli's (the "Solicitation"). (*Id.*, Ex. G at 74:5–81:16, 237:10–19; *Id.*, Ex. C at 102:2–15, 103:11–14; *see also id.*, Ex. D.) Neither knew, even at deposition, that ascorbic acid is just another name for Vitamin C, as the Amended Class Action Complaint (ECF No. 16) ("AC") acknowledges. (*Id.*, Ex. G at 199:4–6, 204:15–21, 205:10–206:3; *Id.*, Ex. C at 89:14–16.) The plaintiffs seek to represent three classes of Martinelli's purchasers in New York and California. This Court should deny certification for multiple, independent reasons.

As a threshold issue, the plaintiffs lack Article III standing. Neither paid more for the

products because of the "100% Juice" statement. Neither knows what a price premium is nor has records substantiating their purchases. Determining whether any individual class member was injured would require individualized inquiries, including, what they understood "100% Juice" meant and whether they already knew the products contained Vitamin C. And Sanchez lacks standing to seek an injunction—now that she knows the products contain Vitamin C, she cannot be misled.

The plaintiffs are also inadequate and atypical. Their testimony demonstrates they were not misled, so they are not typical of the classes they seek to represent. Disregarding their obligations as class representatives, both plaintiffs provided incomplete and inaccurate discovery responses and, when asked about this in her deposition, Ramirez acknowledged: "I did not answer to the best of my ability," "[d]idn't put much thought process behind it," and did not "know if I even read half the crap in there." (*Id*., Ex. C at 201:22–202:18.) Sanchez abdicated her obligations to her lawyers and verified answers her lawyers wrote without even reviewing them. (*Id*., Ex. G at 56:18, 57:9, 75:22, 112:5–118:19, 138:21–140:16.) Commonality fails because the plaintiffs' "common questions" merely restate their legal claim, and they offer no valid common evidence to answer them.

The biggest impediment to certification is lack of predominance. The plaintiffs rely on the expert opinions of Dr. J. Michael Dennis (survey expert) and Colin Weir (damages),[1] who attempt to show that common evidence exists as to class-wide injury (based on Dennis' surveys) and that damages are capable of measurement class-wide (based on Weir's conjoint analysis). Dennis' report relies on a perception study, the goal of which is to assess what meanings consumers ascribe to certain label statements, such as "100% Juice" ("Perception Survey"). He reports results of that study for only five products, all of which are variations of Martinelli's still apple juice, but the plaintiffs do not seek to certify a *damages* class relating to still, only to sparkling products; they only seek a New York injunctive relief class relating to still. (Mot. 3–4.) The Perception Survey is irreparably flawed because *he did not test the three products for which the plaintiffs seek damages.* Instead, he says he designed a survey of only still products, which he claims are "generalizable" to

[1] The parties will file Rule 702 motions on February 12, 2027. (ECF No. 66.) Martinelli's will move to exclude the opinions of both the plaintiffs' experts. As set forth in the expert reports of Rebecca Kirk Fair (Ord. Decl., Ex. B ("Kirk Fair Rpt.") and Dr. Jon Tomlin (Ord Decl., Ex. A ("Tomlin Rpt.")), those opinions are unreliable and should not be considered in ruling on the Motion.

sparkling products. (Declaration of Joel D. Smith ("Smith Decl.") (ECF No. 60-1), Ex. 21 ("Dennis Rpt.") ¶ 71.) They are not. Still and sparkling are different products that appeal to different customers, are sold in different packaging, and purchased for different reasons. Survey evidence as to the perception of one type of product cannot supply class-wide evidence as to the other. Proving the plaintiffs' case would therefore require litigating individualized issues as to each class member, defeating predominance. Moreover, a class action is not the superior method for such litigation.

Worse, it appears Dennis withheld critical data from Martinelli's and its experts. While Dennis headlines results from testing five still products, the incomplete data provided indicates that he *did ask* survey respondents about *six sparkling products*; Dennis' report does not mention that part of the survey or its results. Martinelli's has requested this missing information for months and the plaintiffs refuse to provide it, which suggests that the results (whatever they are) hurt their case. Martinelli's reserves all rights to continue to seek the production of this crucial data.

Even relying on the still products Dennis tested, the results do not support class-wide deception or injury because *more* respondents said that "100%" on the products did *not* mean "no added Vitamin C" than those that said it did. If Dennis did indeed test consumer perception of the "100% Juice" statement on the sparkling products, respondents likely indicated deception at an even lower rate, as a reasonable consumer would not expect a carbonated product to only contain apples.

The expert studies fail to support class certification for additional reasons, including that:

- Dennis' Materiality Survey does not align with the plaintiffs' liability theory. Plaintiffs claim that "100% Juice" is misleading because it does not disclose Vitamin C is added. But Dennis doesn't test that theory. He only tests what happens if "100%" is removed.

- Dennis' 7.29% price premium, to the extent it measures anything, it is the value of the word "100%," not the alleged omission of Vitamin C. When he tested the alternative "with added ingredient" label, the premium fell to 3.60%, a result the Motion does not mention.

- The Conjoint Study ignores supply-side factors.

- Because Martinelli's does not set retail prices, which vary widely by retailer, region, and season, the plaintiffs cannot rely on a price premium theory as a matter of law.

Finally, the Court should deny certification of both proposed Rule 23(b)(2) classes. Sanchez

is not even a member of the injunction-only class she proposes to lead. And everyone now knows the products contain Vitamin C, so there is no risk of future harm.

## II. FACTUAL BACKGROUND

### A. Martinelli's and Its Products

Founded in Watsonville, California in 1868, S. Martinelli & Company is a fifth-generation family business, still family-owned and family-run. (Ord. Decl., Ex. T.) As its labels explain: "Our family has been crafting premium apple juice products since 1868, and that tradition continues today with John Martinelli leading the way." (Smith Decl., Ex. 3; AC ¶ 17.)

Martinelli's sells both still and sparkling apple juice products. [redacted] (Smith Decl., Ex. 45 at MARTINELLIS_000000155.) [redacted] (*Id.* at MARTINELLIS_000000162–63.)

Martinelli's still juice is an everyday purchase viewed as [redacted] and associated with [redacted] commonly recognized through its distinctive apple-shaped bottle. (*Id.*, Ex. 41 at MARTINELLIS_00000113, MARTINELLIS_00000126.) Ramirez bought it "for the kids," (Ord Decl., Ex. C at 56:18–57:8), and Sanchez because "[i]t was fancy." (*Id.*, Ex. G at 58:13–15.) Martinelli's sparkling cider comes in a champagne-style bottle and is popular among adults, particularly during the holidays and special events as a non-alcoholic beverage. (Mot. 1; Smith Decl., Ex. 3; Ord Decl., Ex. C at 57:8–21.) [redacted] (Tomlin Rpt. ¶¶ 31–36.) Sparkling cider customers buy for [redacted] so they [redacted] (Smith Decl., Ex. 41 at MARTINELLIS_00000101.) [redacted] (*Id.*)

### B. The Product Labels

The plaintiffs seek to certify a damages class for three 25.4-ounce sparkling cider products: Sparkling Cider (excluding the Northwest Blend and Graduation Label varieties), Organic Sparkling Cider, and Heritage Sparkling Cider (the "Sparkling Products"). (Mot. 1 n.1.) Their front labels state

"100% Juice from U.S. Grown Fresh Apples." (Mot. 4; Smith Decl., Exs. 3, 4, 6.) The plaintiffs are not seeking damages relating to still products but seek an injunctive relief class for two still products: Apple Juice (10 oz. and gallon sizes) and Organic Apple Juice (half-gallon). (Mot. 4 n.16.) Their labels state "100% Juice" or "Premium 100% Juice Not from Concentrate." (AC, Ex. 1.)

The labels for the sparkling and still products changed during the putative class period. Martinelli's produced dozens of product labels in discovery but cannot identify specifically when any particular label appeared in the marketplace due to variability in production timing, shipping, distribution, and each retailer's inventory. (Ord Decl., Ex. O at 20.)

Each sparkling product has contained the same ingredients—carbonated apple juice and Vitamin C—for the entirety of the putative class period. For the still products, Martinelli's began adding Vitamin C as an ingredient between July 2024 and January 2025 to maintain color and limit oxidation. Martinelli's does not hide that its products contain Vitamin C. To the contrary, it clearly discloses Vitamin C on the product's ingredient and Nutrition Facts panels. The Nutrition Facts panel discloses that the products provide 100 percent of the daily value of Vitamin C. (*Id.* at 40–41; *id.*, Ex. S; *id.*, Ex. C at 167:12–168:1; 173:2–176:5; *id.*, Ex. G at 256:2–257:15.)

**C. Vitamin C Is Good for You.**

The FDA has stated that added Vitamin C in juice is not only safe, but beneficial. It lists Ascorbic Acid (Vitamin C) as Generally Recognized as Safe (GRAS) and explains that Vitamin C can safely be manufactured "from edible fruits and vegetables," including in "[a]pple[s]." (*Id.*, Ex. V §§ 1.1, 1.3, 2.4; Ex. W.) Vitamin C is "an effective antioxidant" that "has very low toxicity and is not believed to cause serious adverse effects even at high intakes." (*Id.*, Ex. V § 6.2.1; *see also* 21 C.F.R. § 182.3013.) Indeed, "[t]here is no scientific evidence suggesting that vitamin C is carcinogenic or teratogenic, or that it causes adverse reproductive effects," (Ord Decl., Ex. V at 13), and "[t]he long history of consumption of ["apples"] as a source of vitamin C also supports its safety." (*Id.* §§ 6.2, 6.3.) Vitamin C is "considered an underconsumed nutrient in the U.S.," and thus, "vitamin C extract product in foods that are otherwise authorized for the addition of vitamins can be considered GRAS." (*Id.* § 6.3.) The plaintiffs agree, as described below.

**D. The Plaintiffs Were Not Deceived.**

***Sanchez***. Sanchez has been purchasing Martinelli's since she was a teenager. She bought the individual bottles because they were "fancy," not because of the 100% juice statement. (*Id.*, Ex. G at 57:12–58:15.) Sanchez believes apple juice is good for her "[b]ecause it's from apples" and because of "the vitamins," and she considers it "a positive thing" that apple juice has vitamins. (*Id.* at 32:5–15, 33:10–17.) She considers sparkling cider nutritious "[b]ecause it's from apple juice," and expects the vitamins in apples to be in the juice. (*Id.* at 43:10–44:1.) She knows that Vitamin C is "good for your immune system," has known since about 2020 that apple juice contains Vitamin C, views that as a good thing, and testified that the presence of Vitamin C in apple juice would affirmatively make her want to buy it. (*Id.* at 44:8–45:25, 225:1–3.) Sanchez admitted that the product labels disclose in the ingredient panel that they contain Vitamin C. (*Id.* at 257:11–258:22.)

Sanchez had no issue with Martinelli's products until she saw the Solicitation stating she "may be entitled to compensation." (*Id.* at 80:3–82:5.) The prospect of being "owed money" was "a factor" in her decision to respond. (*Id.*) Sanchez's lawyers told her that Martinelli's contains "ascorbic acid," which is a "preservative" that she "assume[d] [was] bad since it's an acid" but has never investigated it. (*Id.* at 79:13–80:1.) She claimed she did not know until her deposition that ascorbic acid is actually the same thing as Vitamin C, even though the AC says so. (*Id.* at 185:8–10; 204:15–21; 205:10–206:3; AC ¶ 13.)

Even after filing suit, Sanchez bought Wellsley Farms and Great Value apple juices, which list ascorbic acid as an ingredient. (Ord Decl., Ex. G at 33:18–36:12, 195:7–196:5, 201:23–202:10; *id.* Ex. H.) The Wellsley Farms "added vitamin C" statement made her want to buy it; as she put it, "[i]t's not that I don't want the vitamin C because it's apple juice." (*Id.* at 182:1–183:7, 204:7–9.) She would keep buying Great Value "if [she] can't find anything more natural," and would buy Martinelli's again if its label disclosed vitamin C and ascorbic acid (it does). (*Id.* at 203:14–25, 231:17–23.)

Not only does she not object to Vitamin C, but she may also have known that Vitamin C was in Martinelli's juices during the relevant period. Because she is diabetic, Sanchez checks the Nutrition Facts panel on back labels for sugar content, and she did so before buying the apple juice

half gallon and the sparking cider. (*Id.* at 38:2–39:8, 69:6–15, 85:14–17, 257:2–258:22.) The Nutrition Facts panels expressly disclose that the products contain 100% daily recommended value of Vitamin C and, right below that, the ingredient list discloses the presence of Vitamin C as well. If she saw either of them, which disclosed Vitamin C (ascorbic acid), she was not deceived.

***Ramirez.*** Ramirez bought Martinelli's still apple juice for her children and grandchildren, and she drank the sparkling cider on holidays. (*Id.*, Ex. C at 56:18–57:21.) She bought Martinelli's for her children because it was "a better product" than drinks "full of sugar and syrups." (*Id.* at 56:18–57:5, 59:13–21.) She also had no concerns about Martinelli's until she saw the Solicitation. (*Id.* at 102:2–103:14.) She does not know what ascorbic acid is ("It's some -- it's a chemical. I don't know"), has not researched it, and did not know it goes by another name. (*Id.* at 61:20-62:3, 73:22-24, 88:24–89:17.) She, however, has no objection to Vitamin C, testifying: Martinelli's is "a really good juice" even with the "ascorbic-something," Vitamin C is good for you "[i]n moderation," and Vitamin C has "[n]othing" to do with this lawsuit. (*Id.* at 73:8–13, 111:13–15, 140:8–10.) She acknowledged that the Products' labels disclose Vitamin C, that she understood that one would look at the ingredients list to determine if a product is all natural, and she intentionally takes supplements that contain Vitamin C. (*Id.* at 144:8–12, 147:13–150:23, 156:14–21, 167:6–168:1, 174:9–176:5.)

Ramirez stated she objected to the products because they are "full of sugar and syrups," "concentrate," and other "additives" that she could not name, but the at-issue products do not contain any added sugar, syrups, or concentrate, and the added Vitamin C is disclosed in the Nutrition Facts label and the ingredient list. (*Id.* at 59:11–60:7, 85:2–5, 96:17–98:7.)

**E. Wholesalers and Retailers, Not Martinelli's, Decide Where, When, and at What Price the Products Are Sold.**

"[T]he vast majority of Martinelli's sales with consumers are through third-party retailers," largely via wholesalers and distributors. (*Id.*, Ex. O at 13; *see also id.* Ex. N at Resp. to RFA No. 76; Declaration of Kate Hartline ("Hartline Decl.") ¶ 2.) Martinelli's cannot identify every retailer that carried the Products or where they were ultimately sold. (Ord Decl. Ex. O at 11–12; Hartline Decl. ¶¶ 2–3.) It only sells directly to consumers at its onsite store at its headquarters in Watsonville and, until sometime in 2024, through a webstore. (Ord Decl., Ex. O at 45–46.)

Retailers, not Martinelli's, set the retail price, and Martinelli's "does not establish a manufacturer's suggested retail price." (*Id.* at 45; Hartline Decl. ¶ 4.) Its wholesale prices are individualized. (Ord Decl. Ex. O at 46; *see also* Hartline Decl. ¶ 4.) The plaintiffs' expert Weir agrees that Martinelli's "does not control the retail price paid by consumers," that "retailers' pricing was responsive to changing market forces," and that "retail pricing of the Class Products varied during the relevant time period." (Smith Decl., Ex. 52 ("Weir Decl.") ¶¶ 51, 53, 62.)

**F. Procedural History**

The AC challenged at least 11 product lines and sought nationwide, California, New York, multi-state classes, asserted claims under the UCL, FAL, CLRA, and GBL §§ 349 and 350, for unjust enrichment, fraud, and breach of express warranty, and alleged that Martinelli's extracts a "massive price premium" of "roughly 50 percent." (AC ¶¶ 1 & n.1, 5, 9, 31, 48–132.) The Court dismissed the New York unjust enrichment claim and the punitive damages request, otherwise denied Martinelli's motion to dismiss, and noted that concerns about material differences among the products could be addressed at class certification. (ECF No. 35 at 4, 11.)

Now, the plaintiffs seek only to certify damages classes for three sparkling products and an injunctive relief class for two still products in three sizes. (Mot. 3 n.15, 4 n.16.) They abandon the nationwide and multi-state classes, seek only California and New York classes, and drop their unjust enrichment and breach of express warranty claims. (*Id.* at 3–4.) The plaintiffs rely on Dennis, who conducted perception, materiality, and conjoint surveys that are mismatched to the but-for scenarios and product types tested (sparkling vs. still, or both). They also rely on Weir, who multiplies Dennis' 7.29% premium by total sales, even though the conjoint survey was based on only one sparkling product. (Dennis Rpt. ¶¶ 71, 96–100, 132; Weir Decl. ¶¶ 62–63.) Section IV.C.1 addresses the defects in their methods and Martinelli's will separately challenge their opinions under Rule 702.

## III. LEGAL STANDARD

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). "[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Rule 23 imposes "stringent

requirements" for class certification. *AmEx Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). The plaintiffs bear the burden of showing "that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).

Plaintiffs rely heavily on *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, (Mot. 3, 10–13, 15–19, 21 (citing 326 F.R.D. 592 (N.D. Cal. 2018)), asserting their Motion "largely tracks with" it. (*Id.* at 3.) Although *Fitzhenry-Russell* involved a beverage product and the same plaintiffs' experts, that does not relieve the plaintiffs of their burden "[t]o make their required showing" of "*prov[ing]*—not simply plead[ing]—that their proposed class satisfies each requirement of Rule 23.'" *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024). "Courts may only certify a class if they conclude, 'after a rigorous analysis, that the prerequisites' of Rule 23 have been met." *Id.* "By the time a lawsuit gets to the class certification stage, the inquiry does not turn on mere allegations, but rather on the 'persuasiveness' of the classwide proof that plaintiffs bring to bear." *Rusoff v. Happy Grp., Inc.*, 187 F.4th 1182, 1193 (9th Cir. 2026).

Ninth Circuit law is clear: "Where, as here, there is conflicting evidence presented for and against a requirement for class certification . . . the Court must 'judg[e] the persuasiveness of the evidence presented' and 'resolve any factual disputes necessary to determine whether' the requirements of Rule 23 have been satisfied." *Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 546 (N.D. Cal. 2021) (quoting *Ellis*, 657 F.3d at 982–83); *see also Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 986 (9th Cir. 2020) (affirming denial of class certification). Critically, where plaintiffs attempt to rely on experts to satisfy Rule 23, "*Daubert*'s gatekeeping requirement plays a central role in the class certification process: plaintiffs may not obtain class certification . . . through the presentation of expert witnesses who lack reliability." *Rusoff*, 187 F.4th at 1192.

## IV. <u>ARGUMENT</u>

### A. Article III Standing Defects Pervade the Putative Class.

"No concrete harm, no standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). "Every class member must have Article III standing in order to recover individual damages," *id.* at 431, and the named plaintiffs "must allege and show that they personally have been injured."

*Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). In "class actions, the named representatives must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.* at 1022 (citation omitted). Each element must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Where "individualized questions relate to the injury status of class members," a court must determine "whether individualized inquiries about such matters would predominate over common questions." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 (9th Cir. 2022) (en banc).

**1. Plaintiffs Do Not Have Article III Standing.**

The plaintiffs attempt to predicate standing on their supposed payment of a price premium. (*See* Mot. 12.) Under that theory, the alleged injury is paying "more for [the product] than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 329 (2011). "At the class certification stage, [] unlike on a motion to dismiss, the would-be class representative must show standing, rather than merely allege it. . . . through evidentiary proof." *Nguyen v. Medora Holdings, LLC*, 2015 WL 4932836, at *5 (N.D. Cal. Aug. 18, 2015) (citation modified).

*Nguyen* is directly on point. There, plaintiffs challenging an "all natural" label lacked standing where one "did not know the price she paid," had "no record of her purchases," and "suffered no financial harm as a result of her purchases." *Id.* at *1, *5. Another kept buying the product "well after the label change removed the words 'all natural.'" *Id.* The court held that although the plaintiffs alleged a price premium, they "cite[d] no evidence on this issue whatsoever." *Id.* at *6. As a result, "Plaintiffs do not have Article III standing to pursue any relief." *Id.*

The same result follows here. Like the *Nguyen* plaintiffs, Ramirez and Sanchez may now say the "100% Juice" label mattered to them, but their testimony proves otherwise. Neither testified that they paid more for the Products because of the "100% Juice From U.S. Grown Fresh Apples" or "Premium 100% Juice Not from Concentrate" claims. Both testified that they did not know what a price premium was, neither testified that the alleged misstatement affected what they were willing

to pay, and neither has any record of purchases. (Ord Decl., Ex. G at 72:22–73:6, 176:17–177:10, 231:1–11; *Id.*, Ex. C at 77:15–20, 79:24–80:4, 117:5–6.) Ramirez was asked how much more she paid "to make sure it was a hundred percent juice," but she did not provide an answer. (*Id.*, Ex. C at 76:1–25.) The only dollar figure she offered was $2, but that was the difference between gas station and grocery store prices, not a premium attributable to the label. (*Id.* at 86:8–25.) Sanchez continued to buy competing 100% apple juice products with added Vitamin C after filing suit, knew that apples contained Vitamin C, and was asked repeatedly whether the presence of Vitamin C would cause her to pay more or less; she refused to answer. (*Id.*, Ex. G at 53:8–57:11.) She did, however, testify that the fact that Vitamin C is in apple juice is something that would affirmatively make her want to buy it. (*Id.* at 45:16–25.) This dispels any possible allegation of injury here.

The plaintiffs lack standing; class certification should be denied for this reason alone.

**2. Determining Standing is an Individualized Issue.**

Even if the plaintiffs had standing (they do not), determining standing for each putative class member requires individualized analysis. Common questions do not predominate where "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person." *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022). Several barriers stand in the way of standing for the putative class.

First, whether an individual paid more because of the alleged misstatement depends on what she understood "100% Juice" to mean. The phrase conveys multiple truthful attributes: the juice was 100% from U.S. grown apples, no added sugar, not from concentrate, and no added water. The plaintiffs' own survey shows that for a majority of the products tested, *more respondents said "100% Juice" does not communicate "no added Vitamin C" than said it does*. (Dennis Rpt. ¶¶ 77–78.) A class member who valued the phrase for a truthful reason (e.g., "not from concentrate") was not injured by another potential meaning (e.g., "no added Vitamin C"). The only way to identify injured class members is to ask each of them.

Second, whether an individual paid a premium depends on what she paid, which varies by retailer, region, and season. [redacted] (Tomlin Rpt. ¶¶ 35–36.) Prices varied across retailers and regions over the four-and-a-half-year putative class period. (Weir

Decl. ¶ 62; Hartline Decl. ¶¶ 4–5.) The plaintiffs cannot fill this gap with Dennis' conjoint survey. Whether an individual plaintiff was injured is a threshold question distinct from the amount of any injury. A class-wide ***damages*** estimate cannot answer whether a particular consumer, at a particular store, at a particular time, paid more because of the label. *See Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1207–09 (N.D. Cal. 2023) (rejecting overpayment theory).

Third, some individuals bought with knowledge that defeats any claim of injury. Some, for example, bought after Martinelli's removed "no additives" language and noticed that removal. Others bought after encountering the publicity described in the Motion. (Mot. 8.) Others still, like Sanchez, who is diabetic and routinely inspects the Nutrition Facts panels, may have read that and been fully aware of the Vitamin C. Others may have seen other Martinelli's products that contain front labels disclosing the presence of Vitamin C. (Ord Decl., Ex. I.) Determining which putative class members fall into these categories requires a multitude of individualized inquiries. Plaintiffs offer no common method for resolving any of these questions. (*See* Sections IV.C and IV.D.)

#### 3. Sanchez Lacks Article III Standing for Injunctive Relief.

Sanchez seeks to certify two New York injunctive relief classes under Rule 23(b)(2). (Mot. 13–14.) She must separately demonstrate standing for that relief, *TransUnion*, 594 U.S. at 430–31, by showing "a 'real and immediate threat of repeated injury' in the future." *Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc) (citation omitted). In the false advertising context, that threat may consist of a consumer's inability "to rely on the product's advertising or labeling in the future." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018). Sanchez must prove that threat with evidence. *Lujan*, 504 U.S. at 561.[2]

Courts applying *Davidson* have held that where the label itself discloses the challenged fact, there is no threat of future deception. In *Kenney v. Fruit of the Earth, Inc.*, the Ninth Circuit held that the plaintiff lacked standing to seek an injunction because she was "aware that the sunscreen's back label states that it contains octocrylene, a chemical active ingredient," and so she "need not

[2] At the motion to dismiss stage, the Court accepted as true the plaintiffs' allegations that they want to purchase the products again but "cannot know for certain whether the false labeling has been or will be corrected." (ECF No. 35 at 11.) Now, at certification, Sanchez must prove standing with evidence and the record demonstrates she cannot.

purchase the sunscreen again to determine whether it has non-zinc active ingredients." 2024 WL 4578981, at *1 (9th Cir. Oct. 25, 2024); *see also Caldwell v. Nordic Nats., Inc.*, 709 F. Supp. 3d 889, 910 (N.D. Cal. 2024) (no injunctive relief standing).

Here, the ingredient Sanchez challenges is disclosed on every bottle. (AC ¶ 4; ECF No. 35 at 2.) She unquestionably now knows the products contain added Vitamin C. (Ord Decl., Ex. G at 204:10–21, 257:16–258:22.) As in *Kenney*, she "need not purchase [the product] again to determine whether it has" Vitamin C. 2024 WL 4578981, at *1. She only needs to read the bottle.

Sanchez's request for injunctive relief fails for an additional, independent reason: there is no evidence that she purchased any still product after November 1, 2024, the beginning of the putative class period. Martinelli's began adding Vitamin C to the still products between July 2024 and January 2025, and it then took time for the new bottles to get into circulation. (Ord Decl., Ex. O at 40–43.) Sanchez testified that her last purchase of any Martinelli's product was in December 2024, and that purchase was Sparkling Cider, not a still product. (*Id.*, Ex. G at 77:24–78:2, 163:22–164:10.) She does not have any receipt showing she bought any Martinelli's product at any time. (*Id.* at 72:22–73:6, 162:20–163:4, 176:17–177:10.) Because Sanchez cannot show she bought a still product containing added Vitamin C, she cannot show that she was injured by the challenged labels.

**B. The Plaintiffs Cannot Satisfy Rule 23(a).**

A party seeking class certification must present evidence proving "that there are in fact sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast*, 569 U.S. at 33 (2013).

**1. The Plaintiffs Are Not Typical.**

"The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Ellis*, 657 F.3d at 984. A plaintiff is atypical if she would be "preoccupied with defenses unique to" her or lacks injury. *Id.* at 984; *Lierboe*, 350 F.3d at 1022–23 (no typicality where plaintiff has no cognizable claim and no injury).

If a plaintiff's testimony shows that she "was not really deceived," then she "is not at all typical of [a] proposed class" raising deception-based claims. *Stearns v. Ticketmaster Corp.*, 655

F.3d 1013, 1019 (9th Cir. 2011) (affirming finding that plaintiffs were atypical), *abrogated on other grounds by Comcast*, 569 U.S. 27; *Corcoran v. CVS Health*, 2017 WL 1065135, at *8 (N.D. Cal. Mar. 21, 2017) (plaintiffs not "typical" where injuries did not align with case's "central theory"); *Pierce-Nunes v. Toshiba Am. Info. Sys.*, 2016 WL 5920345, at *5 (C.D. Cal. June 23, 2016) (plaintiff not typical where no "evidence that he relied on Defendants' advertising and product packaging").

As shown in Section II.D, both plaintiffs' testimony shows that they were not deceived. They are atypical and class certification should be denied.

**2. The Plaintiffs Are Not Adequate.**

The plaintiffs fail to demonstrate that they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts ask whether named plaintiffs (1) "have any conflicts of interest with other class members" and (2) will "prosecute the action vigorously on behalf of the class." *Small v. Allianz Life Ins. Co. of N.A.*, 122 F.4th 1182, 1202 (9th Cir. 2024). The plaintiffs are inadequate because they: (1) lack credibility; and (2) flouted their discovery obligations.

a. *The plaintiffs lack credibility.*

"[T]he honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry 'because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims.'" *Harris v. Vector Mktg. Corp.,* 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (citations omitted). "[C]ourts have denied motions for class certification based on inadequate representation" because "an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims." *Jovel v. Boiron, Inc.*, 2014 WL 1027874, at *3 (C.D. Cal. Feb. 27, 2014). A plaintiff is not an adequate class representative if he or she "has credibility issues." *Jaimez v. DAIOHS USA, Inc.*, 181 Cal. App. 4th 1286, 1307 (2010) (finding named plaintiff inadequate); *see also Simon v. Ashworth, Inc.*, 2007 WL 4811932, at *2–3, *5 (C.D. Cal. Sep. 28, 2007) (plaintiff inadequate where he was "cavalier about signing statements under penalty of perjury").

Here, both plaintiffs gave incorrect sworn answers. In response to an interrogatory asking her to identify all her legal proceedings, Ramirez's sworn answer was confined to traffic violations. (Ord Decl., Ex. F. at 3.) She later testified about many additional legal proceedings, including charges for great bodily injury on her spouse, being caught with contraband (crack cocaine) in

prison, fighting the cops in prison, receiving stolen property, guardian proceedings to obtain custody of her grandchildren while her daughter was in prison, and so many class actions and other settlements she "can't even count." (*Id.*, Ex. C at 14:10–22:12, 38:20–39:17, 108:14–17, 116:23–117:3, 206:21–207:15, 226:22–227:4, 244:9–245:11.) Sanchez testified that she had not had a job since 2023, did not work for Instacart or Uber since "COVID," and had no other forms of income, but instead collects disability payments. (*Id.*, Ex. G at 20:16–21:3, 27:7–10, 30:12–15, 267:9–24, 280:9–10.) That was untrue. (*Id.*, Ex. U at MARTINELLIS_00006500–10 (showing Instacart payouts to Sanchez between 2021–2025; Ex. X at MARTINELLIS_00006512–18 (showing Uber payouts to Sanchez between 2021–2026).) Sanchez also denied using another name, having any role in a particular company, or any prior legal proceedings; each answer proved false. (*Id.*, Ex. G at 12:16–18, 20:16–21:3, 259:7–263:12, 267:9–276:16.) This testimony raises serious concerns. The dishonesty is not tangential, it goes to the concealment of material facts and plaintiffs' willingness to testify truthfully under oath.

b. *The plaintiffs flouted their discovery obligations.*

Class representatives who do not comply with their discovery obligations and cannot articulate the basis of their claims "pose[] a more than probable concern that [their] credibility will be a significant issue at trial, undermining the interest of the classes." *Bohn v. Pharmavite, LLC*, 2013 WL 4517895, at *3–4 (C.D. Cal. Aug. 7, 2013) (finding named plaintiff inadequate).

The plaintiffs are inadequate because they flouted their discovery obligations. Ramirez verified interrogatory answers with "no documents, no evidence, no nothing," conceded she "just shot through" them, did not "know if [she] even read half the crap in there," and produced only three documents. (Ord Decl., Ex. C at 184:23–187:7, 201:22–202:18; *id.*, Exs. D–E.) While she testified that she "contacted [her] parole agent" who provided her with "a parole certificate," which she then provided to her counsel, (*Id.*, Ex. C at 215:9–218:9), neither she nor counsel produced it before her deposition, attempting to conceal her criminal past. (*Id.*, Ex. J at 3; *id.*, Ex. K at 6; *id.*, Ex. L at 2.)

Sanchez's lawyers wrote her interrogatory answers, which she verified without review; when asked about errors, she said, "[y]ou have to ask my lawyer, since he's the one that did my answers," and she refused to answer 21 deposition questions. (*Id.*, Ex. G at 56:18, 57:9, 75:22, 112:5–118:19,

138:21–140:16.) Sanchez admitted that the AC gets wrong the basic fact of which Martinelli's products she actually purchased and she did not know what products she bought. (*Compare* AC ¶ 20 (identifying only Apple Juice in half gallon size and Sparkling Cider in 750-milliliter size), *with* Ord Decl., Ex. G at 65:21–66:19 (adding small bottles), 123:16–127:10, 127:25–128:8.)

**3. Commonality Is Lacking.**

Commonality requires common questions, the answers to which "resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The plaintiffs must "point to common evidence other than the alleged misrepresentations themselves to establish that the question of likelihood of deception can be resolved on a classwide basis." *Vizcarra*, 339 F.R.D. at 548 (no commonality). Commonality also requires a finding that the class suffered a common injury. *Grodzitsky*, 957 F.3d at 986 (affirming denial of class certification).

The plaintiffs list five purportedly common questions and assert that the "central question is whether Martinelli's labels were likely to deceive a reasonable customer." (Mot. 11–12.) Because this question is nothing more than a recitation of the plaintiffs' legal claim, it is precisely the type rejected by the Supreme Court. *Wal-mart*, 564 U.S. at 349–351. Here, deception cannot be answered with common proof and the plaintiffs do not demonstrate otherwise. Instead, they simply assert (incorrectly) that the labels at issue are identical. Even if that were true, that does not answer the questions that actually matter, such as whether each putative class member: saw the back label, which disclosed the presence of Vitamin C (ascorbic acid); already knew (like Sanchez) because of common sense, experience with other apple juice products, or otherwise, that the products contained Vitamin C; or actually believed (like Sanchez) that the presence of Vitamin C was good. The plaintiffs must point to "common evidence other than the misrepresentations themselves" to show that deception can be resolved class-wide. *Vizcarra*, 339 F.R.D. at 548. The only evidence they offer are Dennis' surveys, which do not supply common proof of their theory of deception or injury for the reasons explained below. (*See* Section IV.C.) As such, this case is distinguishable from *Fitzhenry-Russell*, 326 F.R.D. at 611–12, where, unlike here, the plaintiff pointed to survey evidence that appropriately tested the effect of the alleged misrepresentation at issue on consumers' understanding of the product. Absent class-wide evidence, there is no commonality.

### C. Plaintiffs Do Not Satisfy Rule 23(b)(3).

To satisfy Rule 23(b)(3), the plaintiffs must show (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior." Fed. R. Civ. P. 23(b)(3). Neither requirement is met.

#### 1. Individual, Rather than Common, Issues Predominate.

Predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Rusoff*, 187 F.4th at 1193. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Vizcarra*, 339 F.R.D. at 551. "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," *Comcast*, 569 U.S. at 34, requiring "courts to conduct a 'rigorous analysis' to determine whether the claims are suitable for class treatment under Rule 23(b)(3)." *Rusoff*, 187 F.4th at 1193. "Plaintiffs 'must marshal facts showing, by a preponderance of the evidence, that class issues predominate.'" *Legrand v. Abbott Lab'ys*, 2026 WL 3084657, at *10 (N.D. Cal. Oct. 15, 2026) (denying class certification). As set forth below, individual questions predominate here at every step.

a. *The Dennis surveys fail to collectively establish predominance because Dennis twice tests a single product class but applies the results to the other unanalyzed product class.*

The plaintiffs assert that "Dr. Dennis' work furnishes separate and independent class-wide evidence sufficient to establish materiality and deception." (Mot. 17.) Not so. In lieu of evidence, the plaintiffs offer three surveys that fail to establish class-wide liability *for each of the two product classes for which they seek relief*. Rather, the surveys attempt to establish deception for still products, and price premium for sparkling products. The plaintiffs seek to certify two damages classes relating to three Sparkling Products, formally abandoning their damages class claims made in the AC relating to still products and instead seeking injunctive relief only for two still products.

But even though the plaintiffs confined their request for monetary damages only to the Sparkling Products, Dennis did not provide Perception Survey results regarding *any sparkling*

*products*. (Dennis Rpt. ¶¶ 71, 74.) The purpose of that survey was to attempt to establish class-wide proof of liability and injury, yet Dennis says that he only tested *still products*. (*See id.*) As a result, Dennis' report *is completely silent as to whether consumers associated any meaning whatsoever with "100% Juice" when it appears on the label of a Sparkling Product*.[3] Conversely, Dennis' price premium analysis purportedly applies only as to "the at-issue Martinelli's Sparkling Cider products." (Dennis Rpt. ¶ 162.) The plaintiffs did not measure—or measured and chose not to disclose—a price premium for the still products. Moreover, Dennis performed the conjoint survey as to only *as to one of the three at-issue sparkling products for which the plaintiffs seek monetary damages:* Martinelli's 25.4 oz Sparkling Cider—he did not test the Heritage or Organic Sparkling Ciders, despite substantial price differences between the products. (Tomlin Rpt. ¶¶ 44–46.)

Of Dennis' three surveys, he chose only to ask respondents to assess both still and sparkling in one, the Materiality Survey, and that survey is flawed for the other reasons detailed below. The conclusion from this mix-and-match approach is clear: the surveys are not reliable evidence because they do not provide class-wide evidence of deception or price premium for any one putative class.

b. *Individual issues of materiality and reliance predominate.*

As the plaintiffs recognize, certification of their claims require class-wide proof that the alleged misrepresentations are "material" to the class. (Mot. 16–18.) "[T]o establish materiality and reliance (i.e., causation and injury)," the plaintiffs must show "that a reasonable person would have considered the defendant's representation material.'" *Moore v. Mars Petcare US, Inc.*, 2024 WL 4336602, at *7 (N.D. Cal. Sep. 27, 2024) (denying class certification). "[W]hether a class member relied on a misrepresentation is normally an individualized question," though a "presumption 'of reliance [can] arise[] whenever there is a showing that a misrepresentation was material.'" *Shin v.*

[3] It is possible that Dennis did test consumers' perceptions of the Sparkling Products but then chose not to provide the data to Martinelli's and its experts. Kirk Fair has examined the data that Dennis produced and identified potentially missing data. (Kirk Fair Rpt. ¶ 12 n. 22.) What is there suggests Dennis may have tested six additional products (including sparkling) in his Perception Survey but failed to disclose the responses or data associated with that testing. (*Id.*) Martinelli's has repeatedly requested that the plaintiffs produce this missing data, but they refuse. (Ord Decl., Ex. M.) As a result, Martinelli's will file a forthcoming motion to compel pursuant to Fed. R. Civ. P. 26(a)(2)(B). Martinelli's reserves all rights, including to seek to file supplementary papers in opposition to class certification should the missing data warrant that relief.

*Sanyo Foods Corp. of Am.*, 348 F.R.D. 477, 486 (C.D. Cal. 2025) (denying class certification). However, "[i]f the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified." *Stearns*, 655 F.3d at 1022–23. Here, the plaintiffs have not provided common evidence of materiality and are therefore not entitled to an inference of reliance.

First, the plaintiffs assert that various "Martinelli's documents consistently show that the '100% Juice' representations are the most important." (Mot. 6–7.) But "materiality depends on the perspective of the consumer, not the perspective of the defendant—marketing assumptions by the maker of a food product as to what consumers may or may not find important are insufficient." *Shin*, 348 F.R.D. at 487; *see also In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, 2017 WL 2559615, at *7 (C.D. Cal. June 7, 2017) (holding that deposition testimony "does not convince the Court that materiality is subject to common proof because [it] addresses only how [the defendant] perceived its own branding techniques, and not how consumers reacted.").

Second, the Materiality Survey is unreliable because it failed to test the alleged misstatement/omission underlying the plaintiffs' theory of liability. The plaintiffs contend the Products' front labels are misleading because they "omit any mention of preservative or non-juice additives in the Products, despite the Products containing 'ascorbic acid.'" (AC ¶ 27; *see also id.* ¶¶ 11, 13.) Thus, to supply common materiality evidence, the survey must "test whether these specific Products' failure to disclose [the omitted information] would have been material to the participants' purchasing decision." *Gross v. Vilore Foods Co.*, 2022 WL 1063085, at *7 (S.D. Cal. Apr. 8, 2022) (denying class certification). Dennis' survey does not do that. Instead, he tested only respondents' purported preference for products with or without the "100%" language; not the materiality of "the allegedly omitted disclosure of added Vitamin C." (Kirk Fair Rpt. ¶¶ 14; 36–39.) Survey results showing a purported preference for a contextless "100%" phrase says nothing about whether the absence of "with added Vitamin C" was material to a reasonable consumer. This fundamental flaw matters because consumer research indicates that purchasers have "favorable perceptions of Vitamin C," so they are likely to "respond differently to such a disclosure than to the removal of '100%' altogether." (*Id.* at ¶ 39.) Because of the mismatch between the but-for disclosure Dennis tested and

the plaintiffs' theory of liability, the Materiality Survey fails to establish materiality attributable to the alleged omission. *See Vizcarra*, 339 F.R.D. at 549–50 ("[Dennis'] opinions are not capable of answering the question of whether a reasonable consumer would find the [challenged statement] material" because the survey proffered did not match the "theory of liability.").

Third, Dennis' Materiality Survey does not account for real-world marketplace conditions or factors influencing consumers' decisions. (Kirk Fair Rpt. ¶¶ 26–29.) In *Jones*, certification failed because the expert "did not survey any customers to assess whether the challenged statements were in fact material to their purchases, as opposed to, or in addition to, price, promotions, retail positioning, taste, texture, or brand recognition." *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014). Because "there are numerous reasons a customer might buy [the products]" and "there is a lack of evidence demonstrating the impact of the challenged label statements," the plaintiffs "lack[ed] common proof of materiality." *Id.* at *16; *see also Townsend v. Monster Bev. Co.*, 303 F. Supp. 3d 1010, 1045–48 (C.D. Cal. 2018) (no materiality where survey was "not tethered to consumers' purchasing behavior"); *Badella v. Deniro Mktg. LLC*, 2011 WL 5358400, at *9 (N.D. Cal. Nov. 4, 2011) (no certification where there were many "potentially different reasons the class members might have" joined defendant's website).

So too here. "In the real world, consumers encounter the representation on Martinelli's branded product packaging alongside product imagery and other label claims" and make purchasing decisions "in the context of competing beverages," "brand identity," "product quality," "taste," and "other in-store display cues" such as holiday displays for seasonal products like Martinelli's sparkling cider. (Kirk Fair Rpt. ¶ 26.) Consumers purchase the products for a wide variety of reasons entirely unrelated to the "100% Juice" statement, particularly for the sparkling products, which are [redacted] (Smith Decl., Ex. 41 at MARTINELLIS_00000101.) Indeed, Sanchez purchased Martinelli's glass still juice bottles because they are "fancy," and Martinelli's sparkling cider for the holidays as a "special treat." (Ord Decl., Ex. G at 58:13–21, 59:23–60:3.) Ramirez purchased the still products because "[t]he kids liked it" and the sparkling products was a "substitute for champagne." (*Id.*, Ex. C at 57:3, 57:18–19.) Dennis' Materiality Survey did not account for any

of these real-world marketplace drivers that influence consumers' real-world purchasing decisions and therefore fails to show class-wide materiality. Because the plaintiffs have failed to proffer any evidence of class-wide materiality, they are not entitled to any inference of class-wide reliance.

Stripped of the presumption of class-wide reliance, the plaintiffs' California statutory claims and common law fraud claims[4] require individualized inquiries as to reliance, precluding certification. *See, e.g.*, *Townsend*, 303 F. Supp. 3d at 1048 (UCL, FAL, and CLRA claims could not be certified without common proof of materiality, resulting in "significant individualized issues related to proof of reliance"); *Tropical Sails Corp. v. Yext, Inc.*, 2017 WL 1048086, at *13 (S.D.N.Y. Mar. 17, 2017) ("[C]lass certification would be inappropriate for [the] common law fraud claim" because the plaintiff could not "show reliance—a core element of common law fraud in any jurisdiction—by common proof"). The plaintiffs contend their common law fraud claims are appropriate for certification because this case "involve[es] uniform false statements." (Mot. 18.) Not so. The products contain varying iterations of "100%" language, including "Premium 100% Juice Not From Concentrate" and "100% Juice From U.S. Grown Fresh Apples," (*see* AC ¶¶ 2–4), which may impact consumer understanding and purchasing behavior differently. (Kirk Fair Rpt. ¶¶ 30–31.) As a result, individualized inquiries as to materiality and reliance predominate.

c. *Individual issues of deception predominate.*

The plaintiffs fail to adequately show through "evidentiary proof" that deception can be established with common evidence. *Rusoff*, 187 F.4th at 1193 (quoting *Comcast*, 569 U.S. at 33). Even "if [Martinelli's] representations were material"—and plaintiffs have not demonstrated that they are—if they were "not deceptive, plaintiffs would have no viable case at all." *Id.* at 1197. The plaintiffs' proffered evidence of deception is inadequate for numerous reasons.

i. *The perception survey is fatally mismatched.*

The Perception Survey, as disclosed in Dennis' report, tests only on still products, despite the plaintiffs' request to certify a Rule 23(b)(3) class only for sparkling products. "[D]eception is a 'central element' of [the plaintiffs'] deceptive advertising claims under both California and New

---

[4] While the NY GBL §§ 349 and 350 claims do not require reliance, certification of those claims should be denied for lack of common evidence of materiality, for the reasons discussed herein.

York law." *Id.* To demonstrate common evidence of deception, the plaintiffs must show through common proof that "a reasonable consumer is likely to be deceived by the [at-issue] Products' front labels." *Gross*, 2022 WL 1063085, at *5. In *Vizcarra*, a consumer perceptions survey Dennis commissioned could not show "that the alleged misrepresentations could be deceptive as a matter of law" because it tested "statements and elements that are not at issue in th[e] action." 339 F.R.D. at 546, 548. There, "Dennis did not specifically test the effect of the [challenged r]epresentations" so "the results of his survey do not speak as to whether consumers' expectations as to the [product] at issue were caused by any of the" at-issue label statements. *Id.* at 546–47.

The Perception Survey here suffers from a similar and even more fundamental defect. (Mot. 9 (citing Dennis Rpt. ¶¶ 21–22, 31, 70–79).) The Perception Survey's results speak only to respondents' purported understanding of the "100%" claim for *still* products, not the *sparkling* ones for which the plaintiff seek damages. (Mot. 3–4.) Like *Vizcarra*, the plaintiffs tested "elements that are not at issue" for a damages class. *See* 339 F.R.D. at 546. "Without testing whether consumers of Martinelli's sparkling cider products were in fact misled by the at-issue representations according to Plaintiffs' theory, Dennis cannot establish a causal link between the alleged deception and any purported harm." (Kirk Fair Rpt. ¶ 52.)

Dennis concedes this fundamental deficiency, but asserts that his results "are generalizable" to sparkling products "because of the substantive overlap in the use of the '100% Juice' claim." (Dennis Rpt. ¶ 71.) But "[t]he presence of [purportedly] similar language on the two products' labels does not establish that consumers interpret the representation similarly across the different products or that the surveyed apple juice purchasers are representative of purchasers of sparkling cider products." (Kirk Fair Rpt. ¶ 53.; *see also id.* ¶ 58.) It is not reliable to "generalize" assumptions across the product types due to differences between the two product types, including for example:

- **The claims differ.** The still products Dennis tested say "100% Apple Juice" or "Premium 100% Juice," whereas the sparkling say "100% Juice From U.S. Grown Fresh Apples." (Dennis Rpt. ¶¶ 33, 74, Mot. 4.) These are different statements with potentially different attendant meanings.
- **The products, occasions, and purchasers differ.** While the still products are viewed as

[redacted]

[redacted] (Smith Decl., Ex. 41 at MARTINELLIS_00000126.) Given these differences, [redacted] (*Id.*, Ex. 45 at MARTINELLIS_00000158.) [redacted] (*Id.*) Dennis "provides no support for his assertion that a sample of purchasers/intenders for still apple juice would be appropriate for evaluating perceptions of sparkling juice customers." (Kirk Fair Rpt. ¶ 56.)

- **The formulations have different histories.** The Sparkling Products have contained Vitamin C for over a decade, but Martinelli's just began adding Vitamin C to the still products in 2024. (Ord Decl., Ex. O at 41–43; *Id.* Exs. P–Q.)
- **Different product features lead to different assumptions.** Critically, sparkling cider is, by definition, carbonated, and therefore necessarily contains carbon dioxide in addition to apple juice in its natural form. (Kirk Fair ¶ 54.) Unlike still products, reasonable consumers of sparkling products likely expect that more than just apples are used to provide the product's distinctive bubbly nature. *See id.* The plaintiffs' complete failure to provide *any* deception evidence for sparkling products begs the question: why not?

The plaintiffs' apparent answer is that they did not need to test sparkling at all, because internal Martinelli's documents "furnish sufficient classwide evidence of materiality and consumer deception." (Mot. 17.) As stated above, Martinelli's internal marketing documents are not class-wide proof. (Section IV.C.1.b.) But even if they were, they would show only that consumers value the phrase "100% Juice," not that consumers read it to promise the absence of added Vitamin C. That is materiality, and materiality is not deception. In *Rusoff*, Dennis' materiality survey found that consumers were 8.1 times more likely to prefer eggs labeled "pasture raised," yet the Ninth Circuit reversed certification because the plaintiffs lacked "common proof connecting" their theory of deception "to consumer perceptions." 187 F.4th at 1190, 1194. "[T]he lack of a classwide showing on deception cannot be overcome by supposedly common issues of materiality and damages that are unmoored from any classwide showing of actionable wrongdoing." *Id.* at 1197. Materiality evidence cannot substitute for the sparkling perception evidence the plaintiffs never offered.

Dennis does not dispute or account for the differences between still and sparkling, but offers

only that "[i]f the court were to determine that an additional consumer perception survey would be helpful specific to the Sparkling Juice Products, I shall conduct one." (Dennis Rpt. ¶ 71.) That is the kind of "unelaborated idea[] for future expert work" that the Ninth Circuit held cannot support certification "on the present record." *Rusoff*, 187 F.4th at 1196. Without such a survey, the plaintiffs fail to provide any common evidence of deception for the sparkling products under Rule 23(b)(3).

ii. *The plaintiffs fail to establish that "100% Juice" has a common meaning and therefore is unambiguously deceptive.*

"Where plaintiffs fail to establish a controlling definition for a key term in an alleged misstatement, courts have found that [elements of false labeling claims are] not susceptible to common proof." *In re 5-Hour Energy*, 2017 WL 2559615, at *8 (collecting cases); *see also Townsend*, 303 F. Supp. 3d at 1045 (no predominance where plaintiffs do not establish the challenged "statement has a common meaning"). Predominance cannot be satisfied where "consumers' understanding of the alleged misrepresentation [is] not [] uniform." *Pierce-Nunes*, 2016 WL 5920345, at *7; *Jones*, 2014 WL 2702726, at *14 (no predominance where "there is no fixed meaning for the word 'natural'"). When a label statement is "inherently ambiguous," plaintiffs "must point to common evidence other than the alleged misrepresentations themselves to establish that the question of likelihood of deception can be resolved on a classwide basis." *Vizcarra*, 339 F.R.D. at 547–48. From there, where the challenged label statement is "'unambiguously deceptive to an ordinary consumer,'" *Bodenburg v. Apple Inc.*, 146 F.4th 761, 769 (9th Cir. 2025), or where a reasonable consumer would "require[] more information before concluding that the products' front labels were making a specific promise," the Court "must look to the back label" to dispel the ambiguity. *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 780 (9th Cir. 2024).

For GBL claims, New York law requires that "one must consider the entire context of the label." *Pasik v. Sabra Dipping Co., LLC*, 2022 WL 22904964, at *8 (Sup. Ct. Nassau Cnty. Apr. 13, 2022); *Bates v. Abbott Lab'ys*, 2025 WL 65668, at *3 (2d Cir. Jan. 10, 2025) (if "ambiguity is cured by the accurate reporting . . . on the Nutrition Facts Panel," there is no false or misleading statement); *Warren v. Coca-Cola Co.*, 670 F. Supp. 3d 72, 84, 86 (S.D.N.Y. 2023) ("Plaintiff is not 'entitled to take a fleeting glimpse at the front of a product label, home in on the one word that

confirms h[er] hopes about the product and ignore the other words'" on the "entirety" of the label.).

"Reasonable shoppers seeking to determine whether the juice is 100% juice with no other ingredients would simply turn to the nutrition label to assess the product's proportions of various ingredients." *Michel v. Lidl, US, LLC*, 2025 WL 2418956, at *1 (Sup. Ct. Queens Cnty. Aug. 1, 2025); *accord Nimmons v. Weis Mkts. Inc.*, 2025 WL 4660802, at *1, *3 (Sup. Ct. Broome Cnty. Oct. 31, 2025) (dismissing claim); *Wright v. Apple & Eve LLC*, 2025 WL 4050909, at *1 (Sup. Ct. Kings Cnty. Oct. 16, 2025) (same). Here, the Nutrition Facts panel and the ingredients list disclose the presence of an added ingredient, Vitamin C, which defeats any claim of deception.

Beyond the defect of testing only still products, Dennis' Perception Survey fails to show class-wide deception; courts have rejected his similar surveys for reasons applicable here. *See, e.g.*, *Rusoff*, 187 F.4th at 1188; *Sinatro v. Barilla Am., Inc.*, 2026 WL 2970361, at *7 (N.D. Cal. Sep. 30, 2026); *Vizcarra*, 339 F.R.D. at 547 (denying certification, survey failed to show that "representation had a "fixed meaning"); *In re KIND LLC "Healthy & All Nat." Litig.*, 627 F. Supp. 3d 269, 287–93 (S.D.N.Y. 2022) (excluding Dennis' opinion because he failed reliably to show "how a reasonable consumer would understand the 'All Natural' claim"), *aff'd*, 100 F.4th 419 (2d Cir. 2024).

As noted above, in *Rusoff*, the plaintiffs' theory was that "pasture raised" conveyed compliance with particular industry standards, but Dennis' survey "did not address whether a reasonable consumer understood 'pasture raised' as aligned with either" standard. 187 F.4th at 1188, 1190. The failure "to provide survey evidence measuring deception by reference to that industry standard precludes a finding of predominance." *Id.* at 1193–94 (citation omitted).

Similarly, in *Sinatro*, the court excluded Dennis' perception opinions as to whether the statement "ITALY'S #1 BRAND OF PASTA" was deceptive. 2026 WL 2970361, at *1, *7. Dennis' survey asked "respondents whether the statement means that '[t]he product's ingredients are sourced from Italy,'" thereby "steer[ing] them to that very meaning and giv[ing] them no opportunity to indicate other meanings." *Id.* at *7. As a result, "[s]urvey respondents who answered Dennis' question affirmatively might have never made an association with Italian ingredient sourcing had the survey not fed it to them." *Id.* "Absent survey evidence suggesting an unambiguously deceptive meaning, . . . a reasonable consumer would necessarily require more information before concluding

that the statement should instead be understood to mean something else entirely." *Id.* at *9.

The same defects abound here. As an initial matter, plaintiffs fail to demonstrate that "100% Juice" is unambiguously deceptive. "100% Juice" must be read in context of the label statements around it: "100% Juice from U.S. grown fresh apples," "100% Juice from U.S. grown fresh organic apples," "Premium 100% Juice Not from Concentrate" or "100% Apple Juice," which signify the Products contain 100% apple juice from freshly grown U.S. apples that is not from concentrate, unlike other brands. Dennis' Perception Survey fails to "consider whether the surrounding language may itself influence consumers' understanding." (Dennis Rpt. ¶ 24.) Instead, he "directs respondents to interpret artificially abbreviated versions of the at-issue representations" by testing only "100% Apple Juice" and "Premium 100% Juice." (*Id.* ¶ 23.)

And as in *Sinatro*, Dennis' Perception Survey provided respondents with pre-assigned meanings, rather than asking them what the "100%" statement meant. Demonstrating that there is no one, unambiguous meaning, Dennis did not even use one pre-selected meaning; he chose three different possible meanings. He asked whether the label "communicate[s]" that the Product: (1) "contains only juice and does not have an additional ingredient" (CP_3); (2) "contains only juice and does not have an added preservative" (CP_4); and (3) "[t]he company making the product did not add Vitamin C" (CP_5). (Dennis Rpt. ¶ 68.) Respondents agreed with all three at different rates, indicating the "results are probative of ambiguity." *Sinatro*, 2026 WL 2970361, at *9. This ambiguity[5] requires the reasonable consumer to consult the full context of the label, including the Nutrition Facts and ingredients panels on the back, which expressly disclose the presence of Vitamin C. Nothing was hidden and there was no deception.

Moreover, the meaning Dennis tested that most correlates to the plaintiff's actual theory is that "100% Juice" means it does not contain additional Vitamin C (above what is naturally in apples). (Dennis Rpt. ¶ 68.) *Only 43.2% to 52.8% of respondents interpreted the label in that way.*

---

[5] Although the Court previously held at the motion to dismiss stage that the plaintiffs "have successfully alleged that the front labels would be 'unambiguously deceptive to an ordinary consumer,'" ECF No. 35 at 6, "[p]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Rusoff*, 187 F.4th at 1193. At the class certification stage, they have not done so.

(*Id.* ¶ 78.) For three of the tested products, *more* respondents said "100%" did *not* communicate that meaning than said it did: 47.2% versus 43.9%, 47.3% versus 43.2%, and 47.3% versus 43.3%. (*Id.* ¶¶ 77–78.)[6] And for four of the five tested products, "**less than half of respondents** indicated the statement '[d]oes not communicate this meaning.'" (Kirk Fair Rpt. ¶ 50.) Despite its obvious factual inaccuracy, Dennis describes this result as "[m]ost respondents." (Dennis Rpt. ¶ 77.) It is not.

The control groups answered similarly. A large share of respondents who saw only "Apple Juice," with no "100%," *also said* the label communicated "only juice" (40.3% to 50.9%) or "no added preservative" (up to 44.9%). (*Id.*¶¶ 75–76.) After subtracting control-group responses, the term "100%" conveyed "no added Vitamin C" to only 20.0% to 32.7% of respondents. Dennis confoundingly describes these results as indicating that "[m]ost respondents perceived the challenged '100%' claim to be communicating that 'the company making the product did not add Vitamin C (in addition to the Vitamin C that comes naturally from the apples)." (*Id.* ¶ 77.) Not so.

Even if a majority of consumers thought that the "100%" statement meant that no added Vitamin C (and the evidence shows otherwise), there is no evidence that consumers would perceive that negatively. To the contrary, as Kirk Fair explains, consumers view "Vitamin C as healthy" and frequently seek it out in beverages. (Kirk Fair Rpt. ¶ 39.) And plaintiffs' testimony establishes they both considered inclusion of Vitamin C positively. (Section II.D.)

There is a wide spectrum of potential meanings associated with the phrase "100% Juice" that Dennis did not test in the Perception Survey (despite acknowledging the importance of these attributes in his Conjoint Survey), including that the Product is not made from concentrate, is made from U.S. grown fresh apples, has no added sugar, is not diluted with water, and does not contain artificial flavoring. (Kirk Fair Rpt. ¶ 37.) Dennis did not test any of these potential meanings or allow respondents to say what the presence of "100%" on the label meant to them. (*Id.*) Therefore, as in *Sinatro*, the Perception Survey "does not even address the question of ambiguity." 2026 WL 2970361, at *7, *9. Given the inherent ambiguity here, a reasonable consumer "seeking to determine

---

[6] For these reasons, *Fitzhenry-Russell* does not solve the plaintiffs' problems. There, the plaintiff presented survey evidence "that almost 80% of people thought 'Made from Real Ginger' meant that Canada Dry was made using ginger root." 326 F.R.D. at 613. Here, Dennis' Perception Survey does not demonstrate that consumers thought the "100% Juice" claim meant Vitamin C was not added.

whether the juice is 100% juice with no other ingredients would simply turn to the nutrition label" and doing so clearly discloses that Vitamin C is an ingredient. *Michel*, 2025 WL 2418956, at *1.

d. *Individual damages issues predominate.*

To satisfy Rule 23(b)(3), the plaintiffs must "show that 'damages are capable of measurement on a classwide basis,' [and] predominance is absent where '[q]uestions of individual damage calculations will inevitably overwhelm'" common questions. *Legrand*, 2026 WL 3084657, at *10 (quoting *Comcast*, 569 U.S. at 34). The plaintiffs fail to satisfy this requirement.

i. *The price premium damages model is legally unsupportable because Martinelli's does not set retail prices, which vary*.

A price premium damages model is inapplicable here as a matter of law. Where a defendant "does not sell retail and does not set retail prices," a price "premium method is inappropriate given the substantial variability in retail prices among the Class Products and competing products." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 460–61 (S.D. Cal. 2014) (denying certification); *see also Red v. Kraft Foods, Inc.,* 2012 WL 8019257, at *11–12 (C.D. Cal. Apr. 12, 2012) (same); *Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at *12–13 (N.D. Cal. Jan. 7, 2014).

In *Astiana*, the court denied certification because the plaintiff "fail[ed] to offer a damages model that is capable of measurement across the entire class." 2014 WL 60097, at *13. Because "Ben & Jerry's does not sell retail, and does not set retail prices[,] [e]stablishing a higher price for a comparable product would be difficult because prices in the retail market differ and are affected by the nature and location of the outlet in which they are sold." *Id.* at *12. Likewise, in *Algarin*, the court rejected the plaintiffs' price premium method as "inappropriate given the substantial variability in retail prices among the Class Products and competing products." 300 F.R.D. at 460.

The same result follows here. Retailers, not Martinelli's, set pricing for the products purchased by consumers and the "retail pricing of the Class Products varied during the relevant time period." (Weir Decl. ¶¶ 53, 62.) Prices vary by retailer, promotion, geography (because Martinelli's is made on the west coast, freight and transportation costs generally cause Martinelli's products to cost more outside of the west coast), and season, from everyday-low-price retailers like Walmart and Dollar Tree, where Sanchez shopped, to high-low grocers like Stater Brothers, where Ramirez

shopped. (Hartline Decl. ¶¶ 4–5.) The plaintiffs paid different prices depending on where they shopped. (Ord Decl., Ex. C at 74:3–17, 85:24–86:12; *Id.*, Ex. G at 86:16–87:22.) Dennis and Weir's price premium measures are therefore fundamentally defective because they are based on prices Martinelli's never set and retail sales Martinelli's never received.

*Fitzhenry-Russell* does not require a different result because there, Dennis did "account[] for the variation in pricing in the study between grocery and convenience stores." 326 F.R.D. at 616. He did not do so here. The plaintiffs have not presented a class-wide damages model.

ii. *Dennis' damages model is incompatible with the plaintiffs' theory of liability.*

The plaintiffs' damages model additionally fails because it does not match their claims. "A plaintiff must show 'damages are capable of measurement on a classwide basis' in a manner 'consistent with its liability case.'" *McMorrow v. Mondelēz Int'l, Inc.*, 2020 WL 1157191, at *8 (S.D. Cal. Mar. 9, 2020). "A plaintiff's proposed damages model 'must measure only those damages attributable to' their liability theory." *Legrand*, 2026 WL 3084657, at *10. "Therefore, '[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event.'" *Id.* (quoting *Comcast*, 569 U.S. at 38).

Here, the plaintiffs' liability theory is that Martinelli's front labels do not disclose the addition of Vitamin C/ascorbic acid, which acts as a preservative to maintain color. (AC ¶ 27; *see also* Mot. 1–2.) The plaintiffs' damages methodology must therefore measure only the price premium attributable to consumers being misled "in that particular fashion." *Larsen v. Vizio, Inc.*, 2017 WL 11633132, at *9 (C.D. Cal. Apr. 27, 2017) (denying certification). "The exact wording of each statement [in a price premium analysis] is thus critical to . . . class certification." *Townsend*, 303 F. Supp. 3d at 1020–23 (conjoint survey was "irrelevant and unreliable").

Dennis and Weir do not isolate the price premium attributable to the plaintiffs' liability theory. Instead, they calculate a 7.29% price premium based on the removal of the "100%" claim. (Dennis Rpt. ¶¶ 160–61.) Whether consumers attribute a price premium to the term "100%" on the Sparkling Products' labels is a different question than whether they attribute it to the omission of a disclosure regarding added Vitamin C/other ingredients. Weir only calculates purported damages

amounts based on the 7.29% figure. (Tomlin Rpt. ¶ 22.) Separately, Dennis presents an alternative conjoint model based on the inclusion of "with added ingredient" on the label, and the supposed premium fell to 3.60%, a result the plaintiffs do not mention. (Dennis Rpt. ¶¶ 172–75; *see* Mot. 10, 20.) Neither of these models comports with the plaintiffs' theory of liability, however, because no scenario tested the value of a disclosure indicating "with added Vitamin C." (*See* Dennis Rpt. ¶ 132.)

More fundamentally, the plaintiffs' mix-and-match approach dooms class certification. The plaintiffs' proffered class-wide evidence of deception (the Perception Survey) exclusively rests on testing done on *still products*, but the Conjoint Survey purports to calculate a price premium based solely on a single sparkling product: Martinelli's Sparkling Cider. (*Id.*) Dennis improperly generalized the conjoint findings to the other two sparkling products. (*Id.* ¶ 160.) But there are substantial price variations across the three different sparkling products, and as Dr. Tomlin, Martinelli's expert, explains, "[t]here is no economic justification for presuming that the results of [Dennis'] survey for the Sparkling Cider 25.4 oz product should apply to the other products." (Tomlin Rpt. ¶¶ 45–46.) Furthermore, the plaintiffs have not established class-wide evidence that customers of the Sparkling Products were deceived. Trying to import a price premium from another product is precisely the "methodology that identifies damages that are not the result of the wrong" that *Comcast* forbids. 569 U.S. at 37. "Rule 23(b)(3) cannot authorize treating" purchasers of still and sparkling products "as members of a single class." *See id.* at 38.

Courts have rejected Dennis' calculations in numerous other cases, and the same result follows here. *See, e.g.*, *Vizcarra*, 339 F.R.D. at 554 (denying certification because Dennis' "proposed method for calculating damages does not fit [the plaintiff's] theory of liability and therefore is inconsistent with *Comcast*"); *McMorrow*, 2020 WL 1157191, at *9 (same because under Dennis' proposed survey, "[p]laintiffs' theory of liability is [] not consistent with their damages model as required by *Comcast*"). Again, plaintiffs cannot rely on *Fitzhenry-Russell* simply because the plaintiffs here picked the same experts. (Mot. 3, 15–17.) There, unlike here, the plaintiffs did "not change[] their theory of liability, and their damages model fits the theory of the case." 326 F.R.D. at 615. The plaintiffs' damages methodology here is insufficient.

iii. *The plaintiffs' damages model ignores supply-side factors.*

A conjoint model must also "reflect supply-side considerations and marketplace realities that would affect product pricing." *Zakaria v. Gerber Prods. Co.*, 755 F. App'x 623, 624 (9th Cir. 2018) (affirming decertification); *see In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020) (excluding price premium calculation for "ignor[ing] the 'supply' part of the supply/demand curve"). Here, despite the "very different price levels" between the Sparkling Cider, Heritage Sparkling Cider, and Organic Sparkling Cider, Dennis' conjoint survey tested only Sparkling Cider. (Tomlin Rpt. ¶ 45.) The varying price points mean "that different demand and supply conditions apply to the three different product types." (*Id.* ¶ 46.) Dennis fails to account for these differences. Indeed, unlike the Sparkling and Organic Cider, the Heritage Cider primarily sells in a multi-pack, rather than single bottles, (*id.* ¶ 45), yet Dennis' model assumes the same price premium applies across bottles and multi-packs. Even within the conjoint survey for the Sparkling Cider, Dennis' price attributes ($2.99 to $6.99) do not track real-world prices, (*id.* ¶ 56), and unlike in *Fitzhenry-Russell,* where the survey used "the known quantity of the product [that] had been sold in real life," 326 F.R.D. at 605, the sales data here omit channels where the plaintiffs themselves shopped. (Dennis Rpt. ¶¶ 132, 142, 155; *Id.*, Weir Decl. ¶ 52.)

Furthermore, Dennis' and Weir's price premium analyses fail to account for a critical differentiating factor not at issue in *Fitzhenry-Russell* that impacts consumer demand and market supply for Martinelli's sparkling products: seasonality. (Tomlin Rpt. ¶¶ 31–43.) [redacted] so any supposed "price premium needs to be analyzed differently for the holidays." (*Id.* ¶¶ 35, 41). Dennis and Weir ignore seasonality, and their attempt to apply a single price premium percentage without considering "differences across different time periods during the year" for "demand, supply, and pricing" "renders their analysis economically unreliable." (*Id.* ¶ 43.) Martinelli's will address these defects more fully in its Rule 702 motions.

iv. *The availability of statutory damages does not create class-wide injury or damage.*

The plaintiffs attempt to show damages are measurable on a class-wide basis simply by relying on the statutory damages potentially available under N.Y. GBL sections 349 and 350. (Mot.

20–21.) If that were the law, the court would always certify sections 349 and 350 damages classes. It is not. Quite the contrary, to get statutory damages, one must first prove a common injury, which the plaintiffs here fail to do. *See Kronenberg v. Allstate Ins. Co.,* 743 F. Supp. 3d 465, 499 (E.D.N.Y. 2024) (denying certification); *Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 59 (S.D.N.Y. 2019) (same).

The plaintiffs' argument conflicts with deception and injury. Under N.Y. GBL sections 349 and 350, it is axiomatic that the "[d]eception alone cannot constitute 'actual injury' . . . as to hold otherwise would render that element of the statute wholly superfluous." *Marshall*, 334 F.R.D. at 59; *Kronenberg*, 743 F. Supp. 3d at 497 ("the alleged deception alone cannot be both the 'act and injury'"). In *Pagan*, for example, the plaintiffs argued that common issues predominated because of the availability of statutory damages, obviating the need to provide any other damages model. The court squarely rejected this tactic, because "the Plaintiffs need to first show that the class members have been injured or harmed in the same way." 287 F.R.D. at 149. The court held that the plaintiffs did not even satisfy the commonality requirement, let alone the more demanding predominance requirements. *Id.* It found, "[A]ny attempt by the Plaintiffs to establish commonality through the availability of a minimum amount of statutory damages is without merit." *Id.*

None of the plaintiffs' cited cases (Mot. 21) hold that the availability of statutory damages can substitute for common proof of injury. In *Sykes v. Mel S. Harris & Associates LLC*, the plaintiff provided "common evidence" that the injury "which was the same for all plaintiffs, is a fraudulently procured default judgment" obtained through a uniform scheme of false affidavits. 780 F.3d 70, 82 (2d Cir. 2015). The court similarly found in *Madden v. Midland Funding, LLC* that every class member was injured because they each received a collection letter demanding interest above New York's criminal usury cap. 237 F. Supp. 3d 130, 154–55 (S.D.N.Y. 2017). Statutory damages followed from these common injuries, they did not substitute for them.

The plaintiffs also cite *Montera v. Premier Nutrition Corp.* and *Sharpe v. A&W Concentrate Co.*, (Mot. 21), which are not relevant. In *Montera*, the Ninth Circuit held that no proof of individual reliance was required because all class members were injured by buying a product "valueless for its advertised purpose." 111 F.4th 1018, 1029 (9th Cir. 2024). Here, the Products are not valueless. In

*Sharpe*, the court found Dennis' forthcoming conjoint analysis, if "viable," would "provide common proof of the injury" and was "consistent with its liability case." 2021 WL 3721392, at *6 (E.D.N.Y. July 23, 2021). Here, Dennis' analysis is incomplete, not viable, and inconsistent with the plaintiffs' liability case, for the reasons set forth above, including as to damages. (*See* Section IV.C.1.c.)

The plaintiffs have not produced common proof that New York purchasers were injured in the same way and the statutory amounts are simply a measure of damages for an injury the plaintiffs fail to prove class-wide. *See Pagan v. Abbott Labs. Inc.*, 287 F.R.D. 139, 149 (E.D.N.Y. 2012).

e. *Individual issues regarding the CLRA's "consumer" element predominate.*

The CLRA applies only to "consumers," meaning individuals who purchase "for personal, family, or household purposes," Cal. Civ. Code § 1761(d), presumably why the class definitions are limited only to purchases made for "for personal or household use." (Mot. 3–4.) Martinelli's predominantly sells to wholesalers and distributors, which in turn, can then resell to a wide range of entities, including but not limited to warehouse clubs, vendors, food service providers, restaurants, bars, catering services, commissaries, and vending machine providers. (Hartline Decl. ¶ 2.) Determining class membership would require a purchaser-by-purchaser inquiry to ascertain whether individuals bought for personal and/or household use, or something else.

Courts have recognized that this factor weighs against certification. *Johnson v. Harley-Davidson Motor Co. Grp.*, 285 F.R.D. 573, 583 (E.D. Cal. 2012) (denying certification); *Arabian v. Sony Elecs., Inc.*, 2007 WL 627977, at *4–6 (S.D. Cal. Feb. 22, 2007) (same). When considered in combination with the other individualized issues, certification should be denied.

**2. A Class Action Is Not Manageable or Superior to Individual Litigation.**

In assessing superiority, courts consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). The individualized questions discussed above "render a class action unmanageable." *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 449 (N.D. Cal. 2014). Additionally, Martinelli's has no records identifying the consumers who bought its products at retail; even the named plaintiffs have no proof of when or where they bought them. (Hartline Decl. ¶ 3; Ord Decl., Ex. G at 72:22–73:6, 176:17–177:10; *Id.*, Ex. C at 77:15–20, 79:24–80:4.)

**D. A Class Cannot Be Certified Under Rule 23(b)(2).**

The plaintiffs ask the Court to certify two injunctive classes, both represented by Sanchez alone: (1) a Rule 23(b)(2) "injunctive relief subclass" that is part of a Rule 23(b)(3) damages class of New Yorkers who purchased the Sparkling Products for personal household use since September 5, 2021, and (2) a Rule 23(b)(2) injunction-only class of New Yorkers who purchased three still products—the 10-ounce and gallon Apple Juice and the half-gallon Organic Apple Juice—for personal household use since November 1, 2024. (Mot. 1–2 & n.2.) The injunction they seek would require Martinelli's to disclose "the use of preservatives or added ingredients" on the front label. (*Id.* 13–14.) Neither class can be certified. As shown in Section IV.A.3, Sanchez lacks Article III standing, which alone forecloses both classes. Independently, (1) she is not a member of the injunction-only class she proposes to lead, and (2) an injunction would not provide relief "respecting the class as a whole" to classes composed entirely of past purchasers. Fed. R. Civ. P. 23(b)(2).

**1. Sanchez Is Not a Member of the Proposed Injunctive Class.**

"[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). A plaintiff who "never was a member of the class she was named to represent" cannot represent it. *Lierboe*, 350 F.3d at 1022–23. The putative class consists of New York purchasers, since November 1, 2024, of only the 10-ounce and gallon Apple Juice and the half-gallon Organic Apple Juice. (Mot. 1–2 & n.2.) But Sanchez does not claim to have bought two out of three of those products and there is no evidence that she bought the third during the putative class period.

Sanchez did not buy an organic product, instead she alleges only purchasing the half-gallon Apple Juice and the Sparkling Cider (AC ¶ 20), neither of which is in this putative class. She did not testify that she bought the gallon Apple Juice. (Ord Decl., Ex. G at 62:2–17, 122:3–123:8.) While she claims to have bought the 10-oz bottle, there is no evidence that she did so in New York after November 1, 2024. Sanchez says the last purchase of any Martinelli's product was in December 2024 and that was Sparkling Cider. (*Id.* at 77:24–78:2, 163:22–164:10.) She has no receipt showing that she bought a 10-ounce bottle, or any other Product, on any particular date. (*Id.* at 72:22–73:6, 162:20–163:4, 176:17–177:10.) And even if she bought a 10-ounce bottle between November 1,

2024 and December 2024, that bottle may not have contained added Vitamin C, as Martinelli's started adding it in between July 2024 and January 2025, and it then took time for the new bottles to get into circulation. (Ord Decl., Ex. O at 20, 41–43.) Sanchez cannot represent this putative class.

**2. Injunctive Relief Is Not Appropriate for Either Class as a Whole.**

Certification is limited only to where "final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). It applies only when "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. In *Algarin*, the court denied Rule 23(b)(2) certification because purchasers who had learned the "realities of the products" would "not benefit from the injunctive relief as they cannot demonstrate a probability of future injury; if they know the 'truth' they cannot be further deceived." 300 F.R.D. at 458.

Here, the putative class members are past purchasers of products whose ingredient panels disclose the Vitamin C, which this lawsuit discloses to the world, and, as a result, they cannot demonstrate the probability of future injury. A front-label "with added Vitamin C" or "added ingredients" statement would provide no benefit to purchasers who already know what is in the bottle, and none to those who want the Vitamin C or do not care.

The Sparkling Products injunctive relief subclass is identical to the damages subclass, on behalf of which the plaintiffs seek statutory damages. (Mot. 1–3, 20–21.) Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Wal-Mart*, 564 U.S. at 360–61, and "injunctive relief "must be necessary and appropriate on its own; 23(b)(2) does not create another avenue to money damages." *Marshall*, 334 F.R.D. at 49, 60–61 (denying certification). Sanchez testified that she hopes to get money too. (Ord Decl., Ex. G at 217:3–4.)

Finally, Rule 23(b)(2) does not relax Rule 23(a). For the reasons stated previously (*see* Sections IV.B.1–2), Sanchez is not an adequate or a typical representative, and those failures independently foreclose certification of any injunctive class.

## V. <u>CONCLUSION</u>

Martinelli's respectfully requests that the Court deny the plaintiffs' Motion.

Dated: November 17, 2026

**DLA PIPER LLP (US)**

By: */s/ Isabelle L. Ord*
ISABELLE L. ORD
CHRISTINE E. ELLICE
TIA Q. NGUYEN
KEARA M. GORDON
HARRISON B. PARK

*Attorneys for Defendant*
*S. MARTINELLI & COMPANY*