# Exhibit C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JOLY RAMIREZ AND SORANGIE SANCHEZ, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

PLAINTIFFS,

VS.

S. MARTINELLI & COMPANY,

DEFENDANTS.

CASE NO. 5:25-CV-07569-NC

VOLUME 1
(PAGES 1 TO 248)

VIDEO-RECORDED DEPOSITION OF JOLY RAMIREZ
WEDNESDAY, AUGUST 19, 2026
VOLUME 1

JOB NO. CA 8293859
REPORTED BY: DAYNA HESTER, C.S.R. 9970

VIDEO-RECORDED DEPOSITION OF JOLY RAMIREZ, VOLUME 1, TAKEN ON BEHALF OF DEFENDANT S. MARTINELLI & COMPANY ("MARTINELLI'S"), AT 9:23 A.M., WEDNESDAY, AUGUST 19, 2026, AT THE LAW OFFICES OF DLA PIPER LLP (US), 2000 AVENUE OF THE STARS, SUITE 400, LOS ANGELES, CALIFORNIA, BEFORE DAYNA HESTER, C.S.R. NO. 9970, PURSUANT TO NOTICE.

APPEARANCES OF COUNSEL:

FOR PLAINTIFFS:

SMITH KRIVOSHEY, PC
BY: YEREMEY O. KRIVOSHEY, ESQ.
28 GEARY STREET
SUITE 650, PMB 1507
SAN FRANCISCO, CALIFORNIA
YEREMEY@SKCLASSACTIONS.COM
(415) 839-7000

FOR DEFENDANT S. MARTINELLI & COMPANY:

DLA PIPER LLP (US)
BY: ISABELLE L. ORD, ESQ.
BY: TIA Q. NGUYEN, ESQ.
555 MISSION STREET, SUITE 2400
SAN FRANCISCO, CALIFORNIA 94105-2933
(415) 836-2500
ISABELLE.ORD@US.DLAPIPER.COM
TIA.NGUYEN@US.DLAPIPER.COM

ALSO PRESENT:

ALEX KLYUSNER, VIDEOGRAPHER



INDEX


| DEPONENT | EXAMINATION | PAGE |
|---|---|---|
| JOLY RAMIREZ VOLUME 1 | | |
| | BY MS. ORD | 9 |
| | BY MS. ORD (CONTINUED) | 135 |
| | BY MR. KRIVOSHEY | 244 |


QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 52 | 19 |
| 53 | 6 |
| 53 | 16 |
| 54 | 5 |
| 81 | 11 |
| 106 | 4 |
| 107 | 14 |
| 112 | 18 |
| 114 | 17 |
| 114 | 22 |
| 185 | 6 |
| 185 | 19 |
| 221 | 25 |
| 222 | 9 |

EXHIBITS


| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| EXHIBIT 1 | 27 | FILE TITLED "EXHIBIT 1 - TAB 01 - NOTICE OF DEPOSITION OF PLAINTIFF JOLY RAMIREZ.PDF" |
| EXHIBIT 2 | 50 | FILE TITLED "EXHIBIT 2 - TAB 02 -CLASS ACTION COMPLAINT FILED 9.5.2025 (1).PDF" |


-- EXHIBITS CONTINUED ON NEXT PAGE --



EXHIBITS (CONTINUED)


| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| EXHIBIT 3 | 80 | FILE TITLED "EXHIBIT 3 - TAB 03 - AMENDED CLASS ACTION COMPLAINT FILED 11.13.2025.PDF" |
| EXHIBIT 4 | 101 | FILE TITLED "EXHIBIT 4 - TAB 07 - RAMIREZ_00001-2.PDF" |
| EXHIBIT 5 | 142 | FILE TITLED "EXHIBIT 5 - TAB 21 - JULY 28, 2026 FACEBOOK POST.PDF" |
| EXHIBIT 6 | 145 | FILE TITLED "EXHIBIT 6 - TAB 22 - SCREENSHOT OF JANUARY 25, 2026 INSTAGRAM POST_REDACTED.PDF" |
| EXHIBIT 7 | 147 | FILE TITLED "EXHIBIT 7 - TAB 33 - VASCUFLOW VITAMIN D3 K2 HAWTHORN FRUIT SUPPLEMENT LIQUID DROPS SUPPLEMENT FACTS.PDF" |
| EXHIBIT 8 | 151 | FILE TITLED "EXHIBIT 8 - TAB 34 - VOLTZAP BLACK SEED AND HONEY GUMMIES.PDF" |
| EXHIBIT 9 | 157 | FILE TITLED "EXHIBIT 9 - TAB 35 - JUNE 25, 2025 MAGNESIUM BOTTLE POST.PDF" |
| EXHIBIT 10 | 162 | FILE TITLED "EXHIBIT 10 - TAB 25 - MARTINELLI HALF GALLON FRONT & BACK LABEL.PDF" |
| EXHIBIT 11 | 173 | FILE TITLED "EXHIBIT 11 - TAB 26 - MARTINELLI 750 ML FRONT AND BACK LABEL.PDF" |
| EXHIBIT 12 | 178 | FILE TITLED "EXHIBIT 12 - TAB 11 – WEBSITE OF 10OZ GLASS WITH LABEL BOTTLE.PDF" |
| EXHIBIT 13 | 181 | FILE TITLED "EXHIBIT 13 - MARTINELLIS_00000555.PDF" |


-- EXHIBITS CONTINUED ON NEXT PAGE --



EXHIBITS (CONTINUED)


| EXHIBIT NO. | PAGE | DESCRIPTION |
|---|---|---|
| EXHIBIT 14 | 183 | FILE TITLED "EXHIBIT 14 - TAB 04 - RAMIREZ - ROG RESPONSES FINAL.PDF" |
| EXHIBIT 15 | 209 | FILE TITLED "EXHIBIT 15 - TAB 53 - 2026.08.17 RAMIREZ - VERIFICATION PAGE - SIGNED.PDF" |
| EXHIBIT 16 | 213 | FILE TITLED "EXHIBIT 16 - TAB 06 - 2026.07.10 RAMIREZ - SUPP ROG AND RFP RESPONSE.PDF |
| EXHIBIT 17 | 221 | FILE TITLED "EXHIBIT 17 - TAB 43 - 2025.08.27 JOLY RAMIREZ DEMAND LETTER.PDF" |
| EXHIBIT 18 | 227 | FILE TITLED "EXHIBIT 18 - TAB 16 - MONSTER ENERGY V. RAMIREZ ET AL. COMPLAINT.PDF" |
| EXHIBIT 19 | 241 | FILE TITLED "EXHIBIT 19 - RAMIREZ_00003.PDF" |

Q. So hyphenated? 09:30
A. Yeah. There you go. 09:30
Q. Any other names you've ever used before? 09:30
A. Joly Zelaya-Jones, no. 09:30
Q. Have you ever been deposed? 09:30
A. What? 09:30
Q. Have you ever been deposed like this for 09:30
examination before? 09:30
A. No. 09:30
Q. Have you ever testified under oath in a 09:30
court of law before? 09:30
A. When I was getting in trouble when I was 09:30
younger, yeah. 09:30
Q. You actually testified under oath? 09:30
A. Oh. Not testify, but they swear us in. 09:30
Q. And did you actually give testimony or no? 09:30
A. I don't believe so. 09:30
Q. Can you think of any time before today 09:30
that you've been sworn in and actually given 09:30
testimony? 09:30
A. No. 09:30
Q. Okay. About how many times have you been 09:31
sworn in but not given testimony? 09:31
A. I think I -- when I was younger, I 09:31
remember having to do -- like, be in the courtroom 09:31

Page 14

for either myself getting in trouble or I was also a 09:31
guardian for my daughter. And I -- we were in front 09:31
of a judge because I was their guardian, and I was 09:31
given -- given the rights back to mom. And we had 09:31
to raise our hand. So I remember raising my hand 09:31
for the Court. 09:31
Q. In the guardianship matter? 09:31
A. Yeah, I believe so. 09:31
Q. So that would have been one time before 09:31
that you testified? 09:31
A. I was -- I have -- she had two kids. So 09:31
we were adding a child. So I might have been in 09:31
there more than one time for the same case. 09:31
Q. So maybe at least one time testifying, 09:31
possibly more than one time? 09:31
A. I can't -- I can't tell you how many times 09:31
we were -- we were at the guardianship court for 09:31
that -- for the case for the kids. But I had two of 09:32
her children for nine years. 09:32
Q. Okay. 09:32
A. So any time we had to go in that court, we 09:32
had to swear. 09:32
Q. So at least two times, maybe more? 09:32
A. Probably. 09:32
Q. Okay. Apart from the guardianship 09:32

Page 15

proceeding, can you think of any other time where 09:32
you were asked to testify under penalty of perjury 09:32
in a court? 09:32
A. I'm trying to think if I... 09:32
I don't recall. 09:32
Q. Is it possible you just can't recall or 09:32
you can't think of any? 09:32
A. I'm trying to see myself sitting in, 09:32
raising my hand. The only time that I can see 09:32
myself doing that would be for the -- for the kids 09:32
in -- in probate -- or probate court -- 09:32
Q. Okay. 09:32
A. -- for the children. 09:32
And they never needed my testimony for 09:33
anything when I was getting myself in trouble, I 09:33
don't think. 09:33
Q. Okay. And, obviously, the guardianship 09:33
proceeding was an important matter to you -- 09:33
A. Right. 09:33
Q. -- because it involved your children and 09:33
grandchildren; correct? 09:33
A. Correct. 09:33
Q. And when you testified in that matter, you 09:33
would have been careful to be accurate and tell the 09:33
truth? 09:33

Page 16

A. Correct. 09:33
Q. And do you understand that that is your 09:33
obligation today as well? 09:33
A. Yes. 09:33
Q. You mentioned getting into trouble. 09:33
What were you referring to? 09:33
A. Criminal history when I was younger. 09:33
Q. Anything that occurred after the age of 09:33
18? 09:33
A. Oh. Everything was -- everything was over 09:33
the age of 18. There was one or two things when I 09:33
was a minor. 09:33
Q. Starting with the things over the age of 09:33
18, what criminal history are you referring to? 09:33
A. Receiving stolen property. 09:33
You want me to name everything? 09:34
Q. Yes, to the best of your recollection. 09:34
A. Receiving stolen property; 09:34
I don't know their -- their code names or 09:34
anything. 09:34
Great bodily injury on my spouse with a 09:34
broom as a weapon; 09:34
I used my mom's -- or my -- a friend of 09:34
mine's handicap placard to get into college parking, 09:34
and got in trouble for that; 09:34

Page 17

And while I was in -- in custody, I brought out some contraband. 09:34 09:35
I think -- and tickets, probably. Some -- some -- 09:35 09:35
Q. That's all you can think of for now? 09:35
A. I have to go by year. I have a bit of a memory issue. 09:35 09:35
Q. Can you think of any other criminal proceedings other than the ones that you have already identified? 09:35 09:35 09:35
A. No. Those are the major ones. 09:35
Q. So you referenced -- 09:35
A. Those are the ones that got me in trouble. 09:35
Q. -- receiving stolen property. 09:35
What was the property that you -- 09:35
A. A vehicle. 09:35
Q. And did that result in a criminal charge? 09:35
A. It gave me, like -- suspended driver's license and, like, 82 weekends to dump or a suspension -- suspended driver's license. I didn't have a license at time, so they suspended me from ever getting one, or something like that, and then a bunch of weekends at the dump. 09:36 09:36 09:36 09:36 09:36 09:36
Q. So was that a plea rather than a conviction, you pled guilty and that was what you 09:36 09:36

Page 18

received? 09:36
A. I did -- I did plead guilty, yes. 09:36
Q. Was that a felony or a misdemeanor? 09:36
A. I don't recall. 09:36
Q. And then you referenced great bodily injury involving a spouse. 09:36 09:36
So that was a domestic violence incident? 09:36
A. It was domestic violence, yes. 09:36
Q. Was that a felony or a misdemeanor? 09:36
A. It was enough to get me put into prison. So I went to prison for that one. 09:36 09:36
Q. And were you convicted in that case, or you pled guilty? 09:36 09:36
A. I don't recall what that -- I don't recall what -- what I pled. I just know I got two years with half, and I was sent to Chowchilla. 09:36 09:37 09:37
Q. So you were found criminally responsible for domestic violence on your spouse? 09:37 09:37
A. Correct. 09:37
Q. Okay. And then was that while you were in custody for that one that you received contraband? 09:37 09:37
A. I -- well, I was in the county jail waiting for that, yes, I pulled out contraband. 09:37 09:37
Q. What was the contraband? 09:37
A. Methamphetamines. 09:37

Page 19

Q. And did you plead guilty, or were you convicted of that one as well? 09:37 09:37
A. I did. 09:37
Q. Any other charges around contraband? 09:37
A. No. No. 09:37
I got a couple more charges for fighting the cops while I was in there, though. 09:37 09:37
Q. While you were in custody? 09:37
A. Yeah. 09:37
Q. Were those felonies or misdemeanors? 09:37
A. I don't know. 09:37
Q. Were you convicted or did you plead guilty on any of those? 09:37 09:37
A. They punished me by, like, putting me in isolation somewhere in the jail. So I -- I did my time in there. But I don't know if it was actually on document. 09:37 09:37 09:38 09:38
Q. In other words, it may have been, like, an administrative punishment but not a formal criminal charge? 09:38 09:38 09:38
A. Correct. 09:38
Q. Anything else you can think of during the time that you were in custody? 09:38 09:38
A. No. That's it. 09:38
Q. And then you mentioned the handicap 09:38

Page 20

placard. 09:38
Was that a criminal offense? 09:38
A. It was -- I got a ticket inside and I had to go to court. 09:38 09:38
Q. And were you convicted, or did you plead guilty on that? 09:38 09:38
A. I pled guilty. 09:38
Q. Okay. It was true, you had done it? 09:38
A. Yes, ma'am. I was running late for class and I grabbed my girlfriends parking placard that I used when I go pick her up. 09:38 09:38 09:38
Q. Okay. You mentioned that the contraband you received was methamphetamines; correct? 09:38 09:38
A. It wasn't meth. It was -- it was crack, crack cocaine. 09:38 09:38
Q. Okay. And you received that while you were in custody? 09:38 09:38
A. I didn't receive it. I pulled it out of me -- 09:38 09:39
Q. Okay. 09:39
A. -- while in custody. Yes. They didn't search everything. 09:39 09:39
Q. Okay. At that time, were you using crack? 09:39
A. Yes. 09:39
Q. Approximately how many years did you use 09:39

Page 21

crack? 09:39
A. Maybe a year and a half prior. 09:39
Q. And did you continue to use crack during the time that you were in custody? 09:39
A. I pulled it out maybe once or twice while I -- while I was there, yes. 09:39
Q. And it was hidden on your person; is that correct? 09:39
A. In my person, yes. 09:39
Q. Okay. Other than crack, were you, at that time, using any other illegal substances? 09:39
A. Marijuana. 09:39
Q. Anything else? 09:39
A. No. 09:39
Q. Are you currently using any illegal drugs? 09:39
A. No, ma'am. 09:39
Q. When is the last time that you did so? 09:39
A. January 3rd, 2005. 09:39
Q. And you have been clean ever since? 09:39
A. Yes, ma'am. 09:39
Q. You mentioned that you have a memory issue. 09:39
A. Yeah. 09:39
Q. What is the memory issue? 09:39
A. AD- -- I'm ADHD. ADHD, so severely that I 09:39

Page 22

don't have, like, a short- -- short-term memory loss or something they say. Like, the things that I remember, I -- have to be, like, niched in with a memory or something. 09:40
Q. Anything else beyond the ADHD? 09:40
A. Bipolar. 09:40
Q. Okay. And are you currently taking medication for bipolar? 09:40
A. No, ma'am. 09:40
Q. When is the last time you took medication for bipolar? 09:40
A. Around the same time I got saved, January 3rd, 2005. 09:40
Q. And are you able to function now, even though you are bipolar, without medication? 09:40
A. Yes. 09:40
Q. Are you under a doctor's care? 09:40
A. Yes. 09:40
Q. Okay. Anything else that may affect your memory that we should know about? 09:40
A. That will affect my memory? 09:40
Q. Yeah. 09:40
A. I had depo -- the depo shot, and I got, like, some masses in my head. 09:40
Q. Okay. What was -- 09:40

Page 23

A. And I have been having a lot of, like, real bad headaches lately. 09:40
Q. When was that? 09:41
A. The depo I got when I was younger for birth control, and they continued me on them while going through the menopause. 09:41
Q. And was that helpful to you? 09:41
A. It made some of the side effects less. 09:41
Q. And was one of those side effects kind of foggy brain, memory issues? 09:41
A. No. I don't think it was foggy. I think that is from the, like, menopause. I get, like, the sweats and stuff. But the depo helped with the cyst that I have in my uterus. 09:41
Q. Okay. And then what about the masses in your head? What is going on with that? 09:41
A. I don't know. 09:41
Q. Have you been to a doctor about it? 09:41
A. Maybe once. 09:41
Q. And are you currently under a physician's care? 09:41
A. No, not for those. No. 09:41
Q. Do you know if it's something serious or just something that you can kind of just let go for now? 09:41

Page 24

A. I don't know. I haven't researched anything. 09:41
Q. Does that -- 09:41
A. I lost my insurance for a minute there, so I just -- I got my insurance back, and I'm going back to the doctor barely. 09:42
Q. And has that -- the masses in your head, has that affected your health at all? 09:42
A. Just sleeping sometimes. 09:42
Q. How about your memory? Any effect on your memory? 09:42
A. What I have left of it. 09:42
Q. Okay. And the reason that you have memory issues, before you get to the part about what you have left of it, is because of the -- the birth control that you were taking, the hormones you were taking? 09:42
A. I just got -- I get, like, real bad migraines. 09:42
Q. Okay. 09:42
A. I do have something up -- something up here [witness indicates]. 09:42
Q. Are you feeling okay today? 09:42
A. I came -- I came in an Uber. And I was getting some really bad headaches on the way up 09:42

Page 25

Q. Any other marriages? 09:58
A. No. 09:58
Q. How many children do you have? 09:58
A. Four. 09:58
Q. What are their first names? 09:58
A. Jonala, Austin, Jahmaya, and then Jolene. 09:58
Q. During the last four years, did any of those children live with you? 09:58
A. All of them. 09:58
Q. And do you have grandchildren? 09:58
A. Yes. 09:58
Q. How many grandchildren? 09:58
A. Four -- five. 09:58
Q. What are their names? 09:58
A. Leilah, Faith, Ariah, Nasir, and the newest one, Neaveh. 09:58
Q. And in the last four years, did any of those children live with you? 09:58
A. I have Neaveh live with me now. 09:59
Q. And at least at one point, there was a guardianship proceeding that you testified about before and you did have your grandchildren living with you; correct? 09:59
A. Faith and -- and -- yes. 09:59
Q. That was when they were pretty small? 09:59



A. Yeah. Their mom came home in 2020, and I gave them back. 09:59
Q. Where was she during that time period? 09:59
A. Chowchilla. 09:59
Q. And what was she in for? Do you know? 09:59
A. Not Chowchilla. CNW [verbatim]. She was in Corona. 09:59
Q. What was she in for? 09:59
A. Violence, just like me. 09:59
Q. Against her spouse? 09:59
A. A girl. She got -- she got violence. That's all I know. 09:59
Q. And you had the children while she was incarcerated? 09:59
A. Yeah, they gave her 12 years. 09:59
Q. And did she serve 12? 09:59
A. She did serve almost ten. 09:59
Q. Okay. Where did you attend high school? 09:59
A. Perris -- Perris Lake. Perris Lake C School [verbatim]. And then I got bounced around. I was getting in trouble; so I lived in Escondido for a little bit with my dad. I think it's called Perris Lake Middle School or C school. And then there was a -- there was on Nuevo, a main high school. 10:00



Q. And did you graduate from high school? 10:00
A. I did not. 10:00
Q. Okay. Did you then go on to attend any further colleges or schools? 10:00
A. I did. I got my Class A truck driver's license, tried to get my associate's degree through RCC for business and marketing. And I have, like, nine credits away still. I have not completed. 10:00
Q. What's "RCC"? 10:00
A. Riverside Community College. 10:00
Q. Okay. Did you end up getting a truck driving license? 10:00
A. I did. 10:00
Q. And do you have it still? 10:00
A. Released after a year. 10:00
Q. Did you ever end up driving professionally? 10:01
A. No. They wouldn't give me a chance having a drug charge on me. I got kind of ahead of myself for -- I guess they would say because I didn't have a clean time first. So the clean time that I got was in -- in prison so when I -- not "prison." How do you say? When I got my Class A, I didn't have enough clean time. They shouldn't have put me in that field knowing that I wouldn't be hirable, but



they took my class money; so I -- I got shot down. They wanted you to have at least two years sobriety; so I let my -- I let it go. 10:01
Q. Okay. Other than that truck driving license, have you ever had or do you have now any other licenses? 10:01
A. Just a California license. 10:01
Q. Driving license. 10:01
Any other education that we haven't already talked about? 10:01
A. Other education? Just the RCC college, truck driving. I did a lot of -- completed a lot of drug and alcohol classes. 10:02
Q. And are you currently sober? 10:02
A. Yes, ma'am. 10:02
Q. Are there any criminal charges pending against you? 10:02
A. No. 10:02
Q. Are you currently on probation or under supervision? 10:02
A. No. 10:02
Q. When is the last time you were under supervision? 10:02
A. I think I got out of -- I got off of parole 13 months after I arrived at Set Free Church 10:02

BY MS. ORD: 10:14
Q. Will you follow your counsel's 10:14
instruction? 10:14
A. Yes. 10:14
Q. Before this document was filed, can you 10:14
think of any information about your experiences with 10:14
Martinelli's that you provided for this publicly 10:14
filed document? 10:14
MR. KRIVOSHEY: Objection. 10:14
Don't answer. 10:14
Based on attorney-client privilege. 10:14
BY MS. ORD: 10:14
Q. Will you follow your client -- your 10:15
counsel's instruction? 10:15
A. Yes. And you're -- and you're asking the 10:15
same thing over and over. 10:15
Q. Yes. Because you're not answering the 10:15
question. 10:15
All right. So I am going to ask you a 10:15
couple questions about this document. 10:15
Let's start with Paragraph 17, please. 10:15
A. On this same thing? 10:15
Q. Yep. 10:15
MR. KRIVOSHEY: Yes. Just scroll down. 10:15
You can make it bigger, if you'd like. 10:15



THE WITNESS: Okay. 10:15
Okay. We're at 17. 10:15
BY MS. ORD: 10:15
Q. Okay. And you are Joly Ramirez; correct? 10:15
A. Correct. 10:15
Q. And you do reside in San Bernardino, 10:15
California? 10:15
A. Correct. 10:15
Q. That's not a secret; right? 10:15
A. No. 10:15
Q. Have you, in the past, purchased 10:15
Martinelli's apple juice in half-gallon size and 10:15
sparkling cider in 750 milliliter size? 10:15
A. I have. 10:16
Q. Did you verify that that information was 10:16
true and correct before this document was filed in a 10:16
court of law? 10:16
A. Say it again. 10:16
Q. Did you verify that that was truthful that 10:16
you have purchased Martinelli's juice in a 10:16
half-gallon size and sparkling cider in a 10:16
750 milliliter size before this was filed in a court 10:16
of law? 10:16
A. I'm getting thrown. If I am giving him 10:16
the -- the things that I -- that I talked to my 10:16



attorney -- 10:16
Q. Correct? 10:16
A. -- I gave him the -- the things that I 10:16
used. So he's going based on what I say. 10:16
MR. KRIVOSHEY: Hang on. Wait. -- 10:16
THE WITNESS: I don't understand the 10:16
question then. Are you asking -- how am I going to 10:16
verify him? He's asking me what I used. 10:16
BY MS. ORD: 10:16
Q. Is it truthful? 10:16
A. It's truthful. 10:16
Q. Those -- those are the two Martinelli's 10:16
products that you purchased? 10:16
A. Yes. 10:16
Q. And you have purchased those products on 10:16
more than one occasion? 10:16
A. Correct. 10:16
Q. Do you like Martinelli's Orange -- Apple 10:16
Juice? 10:17
A. I did. It was pretty expensive; but, yes, 10:17
I did. 10:17
Q. What did you like about it? 10:17
A. The supposed to be a hundred percent 10:17
free -- sorry. Sorry. 10:17
A hundred percent juice. It's supposed to 10:17



be for the kids. 10:17
Q. Anything else? 10:17
A. The kids liked it. And -- 10:17
Q. So you bought it for the kids? 10:17
A. Yeah. It was better -- a better product. 10:17
Q. Did you drink it yourself or just for the 10:17
kids? 10:17
A. No. I got it for the kids, and we used it 10:17
for, like, parties and stuff because, you know, 10:17
recovering addicts and stuff, you know, for -- for 10:17
our parties. 10:17
Q. So that would be the sparkling cider for 10:17
the parties? 10:17
A. Yeah. 10:17
Q. And you did drink that; correct? 10:17
A. Yes. That's what we brought the New 10:17
Year's, in our birthdays, or holidays. 10:17
Q. Like, a substitute for champagne? 10:17
A. [Witness nods head up and down]. 10:17
Q. That's a "yes"? Yeah? 10:17
A. Yes, ma'am. 10:17
Q. You said you used to like it. When is the 10:17
last time that you consumed either the juice or the 10:17
sparkling cider? 10:17
A. I haven't bought the sparkling cider for a 10:17

while. I think the juice a couple years back. I 10:18
still had kids around. 10:18
Q. And the cider longer than that? A couple 10:18
of years back? 10:18
A. Probably getting -- I don't remember. I 10:18
don't remember the year. Can't be no -- no more 10:18
further than 20- -- like, 2025. 10:18
Q. Okay. For both products or just sparkling 10:18
cider? 10:18
A. Probably for both products. 10:18
Q. And when you bought the sparkling cider 10:18
last, did you drink it? 10:18
A. I don't recall. 10:18
Q. How about the apple juice? 10:18
A. No. It was for the kids. 10:18
Q. Okay. At some point, you stopped buying 10:18
the Martinelli's products? 10:18
A. Yeah. A little bit -- little bit 10:18
different walk in my Christianity. A little bit 10:18
further than I was on my viewing -- my viewing, my 10:18
perception, and things. 10:18
Q. So how did that affect your decision to 10:18
stop purchasing the Martinelli's products? 10:19
A. Well, I'm not supposed to even pretend 10:19
that we're drinking, for one. So that -- my 10:19



perception is a little bit different now. 10:19
Coming from -- from drinking, not 10:19
drinking, having a bottle that's got no alcohol in 10:19
it, you know, to not even wanting to see the alcohol 10:19
bottle or pretendo [phonetic] one. It's different. 10:19
Q. And that's because the sparkling cider 10:19
bottle sort of looks like a champagne bottle? 10:19
A. Yeah. 10:19
Q. Okay. Any other reasons that you can 10:19
think of? 10:19
A. And they're not real juice. 10:19
Q. Tell me what you mean by that? 10:19
A. Well, it says a hundred percent juice on 10:19
both of them. When I bought it for my kids, that's 10:19
what we bought it for. It was a little bit more 10:19
pricier. You know, wherever we'd go, we'd stop and 10:19
get the kids some juice. I already have crazy kids, 10:19
you know. You don't want to keep pumping them up 10:19
full of sugar and syrups and all of those stuff. 10:19
But it said a hundred percent juice. And it's 10:20
supposed to be better for them. So we would stop 10:20
and get those. So wherever we went, we would buy 10:20
Martinelli's. 10:20
Q. So what is the reason that you think it's 10:20
a hundred percent juice? 10:20



A. It said on the bottle. 10:20
Q. And when you say a "hundred percent 10:20
juice," what does that mean to you? 10:20
A. Smashed apple, a hundred percent. That's 10:20
it. Just -- just your apple smashed, a hundred 10:20
percent. There's no sugars or all the extra stuff. 10:20
It's just smashed juice. 10:20
Q. And as you sit here today, do you know 10:20
what the ingredients are in the Martinelli's 10:20
sparkling cider? 10:20
A. I don't. But I know there's an additive 10:20
in it, though. 10:20
Q. How do you know that? 10:20
A. Because it says in the back. 10:20
Q. When did you first view the back label of 10:20
the sparkling cider? 10:20
A. I can't tell you that, the date, but it 10:20
was 2025. 10:20
Q. And how did it come to be that you looked 10:20
at the back label? 10:21
A. I saw a ad, and it was talking about the 10:21
Martinelli's. And I thought, "Hmm, I don't remember 10:21
that." So I -- you know, when you're shopping and 10:21
stuff, you take a -- you take a good look. And I 10:21
took -- took a bottle, and I saw it. And it was 10:21



supposed to have been a hundred percent juice, and 10:21
that's when I realized that, you know, it was 10:21
additives in it. I didn't know there was additives 10:21
in it. 10:21
Q. So it said a "hundred percent juice" on 10:21
the front label? 10:21
A. Yeah. 10:21
Q. And what did it say on the back? 10:21
A. Like, for the ingredients part? 10:21
Q. Whatever it was that tipped you off to 10:21
think it wasn't a hundred percent juice? 10:21
A. Like sorbic-something [verbatim]. 10:21
Q. Anything else? 10:21
A. It just said sorbic-something [verbatim], 10:21
and I think I Googled it to see what it was. 10:21
Q. What -- what is it? 10:21
A. I don't know. I don't remember what it -- 10:21
what the termin- -- terminology was, but it wasn't, 10:21
you know, a hundred percent juice. 10:22
Q. As you sit here today, do you know what 10:22
this ascorbic-something is? 10:22
A. It's not juice. I don't know. 10:22
Q. Okay. 10:22
A. I don't know. It's some -- it's a 10:22
chemical. I don't know. 10:22

Q. Okay. Anything else you know about ascorbic that we haven't already talked about? 10:22
A. No. Not -- not off- -- offhand. 10:22
Q. So tell me about that moment. Are you actually in the grocery store and you take the bottle off the shelf and you turn it around? 10:22
A. I think I had one of kids go get it because we were in the market. 10:22
Q. And you actually looked at it in the store? 10:22
A. Yeah. Food 4 Less. 10:22
Q. Okay. And did you then pull out your phone at that moment and Google to see what the "ascorbic" was? 10:22
A. No, one of the kids probably did it for me, but I was, like, "Look -- like, hey, go grab that. Let me see something." And, yeah, probably they did it. 10:22
Q. Okay. And then did you put it back on the shelf because it wasn't a hundred percent juice? 10:22
A. No. We didn't -- we didn't buy it. We were just looking at the ingredient to see what -- what this thing was about. 10:23
Q. Okay. And since that time, you have not purchased the sparkling cider since? 10:23



A. No. 10:23
Q. And would your testimony be the same for the apple juice? 10:23
A. Same. About 2025. 10:23
Q. Was that the same shopping trip where -- 10:23
A. No. 10:23
Q. -- you would have looked at that one? 10:23
A. No. Because I was -- I -- prior to me finding out the ingredients, we were buying it -- 10:23
Q. Uh-huh. 10:23
A. -- prior to that. And in our little hood, we have a little liquor store. They have these little tiny ones, little Martinelli's with the white lid and glass bottles, like little half one. 10:23
Q. Uh-huh. 10:23
A. And the kids -- we would get those from there, but the ingredients are not like that on the -- on a regular champagne bottle. They're different, too. 10:23
Q. Okay. 10:23
A. It's a clear bottle. So we would get it at the liquor store over there. 10:23
Q. So tell me when you first saw this advertisement and you said, "Let me go figure out what this is about," you went to the store and you 10:24



looked at the -- 10:24
A. I was kind of concerned, like, "What -- hey, what -- what are they saying about Martinelli's? This is a good company. We've been -- we've been -- you know, we grew up on Martinelli's." These kids grew up on Martinelli's. Good juice. I mean, it's a part of our family almost, like, you know. 10:24
Just, like, Cream of Wheat, oatmeal, certain things that we grew up with. Martinelli's was something I gave my kids, and I raised all my kids up like that. And I got grandbabies, and grandbabies had these. So it's been around for a while. 10:24
So when somebody -- it was something in the paper, somebody had something to say about the Martinelli's, and I was, like, "Nah. Let me see what is going on." So I breezed through it. That's all that was. 10:24
Q. So you did this -- the sparkling bottle, what you just talked about, you were in the store, you took it down, you looked at the back of the bottle, somebody Googled, and you said "Wait" -- 10:24
A. One of the kids might have Googled it. 10:24
Q. So was that before or after you looked 10:24



into the ingredients of the apple juice? 10:24
A. You said before or after I looked into the ingredients of the apple juice? 10:25
Q. Right. 10:25
A. I didn't look into the -- that was the day that I was looking at ingredients. 10:25
Q. Okay. 10:25
A. But the day that I saw the advertising is the day I put my name down, like, "Hey, I want see what is going on with this -- what is going on with Martinelli's." 10:25
Q. Okay. So when you were in the store that day looking at the sparkling bottle, did you also look at the still juice bottle? 10:25
A. At what bottle? 10:25
Q. The juice bottle. 10:25
Did you -- 10:25
A. No, I didn't. 10:25
Q. "No"? 10:25
A. It was just whatever I saw, like, "Oh, hey, the" -- you know, "Oh, I remember somebody -- go grab that really quick. Let me see something." That's all that was. 10:25
Q. So have you ever done the same process, where you take the still juice bottle, not 10:25

buying it for any particular celebration? 10:29
A. I don't celebrate Halloween. So... 10:29
Q. So it wasn't Halloween then? 10:29
A. No. I don't know. I am just saying any 10:29 time we see your bottles it's because there's a 10:29 holiday coming up. 10:29
Q. Okay. Anything else you can think of that 10:29 would help us figure out about when this visit 10:29 happened? 10:29
A. No. 10:29
Q. Is it possible that it was earlier than 10:29 2025? 10:29
A. I don't know. I was in that side of town. 10:29 That's when I shopped at Food 4 Less. I don't -- 10:30 now I am on 9th Street, and I have my pick. You got 10:30 El Super, the Mexican market, and you got Staters. 10:30 And Staters is, like, too expensive for me to be 10:30 there. But it's not worth me wasting the gas to go 10:30 to Food 4 Less. 10:30
And I work two nights, it's in my -- I 10:30 have really good time management. It's either going 10:30 to drive clear across town or come home and relax 10:30 with the kids and do a load of laundry, which would 10:30 be more beneficial for me for the load that is 10:30 coming up this next week. 10:30



So I tell you, it has to be 2025. That 10:30 year. I don't know what month. And I just know 10:30 it's 2025 because I was still on that side of the 10:30 town. 10:30
Q. So the Stater Brothers, you didn't start 10:30 shopping there until you moved to your current 10:30 location? 10:30
A. I don't even like Staters. 10:30
Q. Okay. So you didn't -- 10:30
A. Maybe the chicken. That's about it. 10:30
Q. You probably didn't buy any Martinelli's 10:30 products at Stater Brothers; right? 10:30
A. I haven't bought anything lately, no. 10:30
Q. Okay. So it would have been the Food 4 10:30 Less and not the Stater Brothers? 10:31
A. But I am saying that's what -- the store 10:31 near me now. I haven't bought anything this year. 10:31
Q. Okay. 10:31
A. We are in 2026. I haven't bought anything 10:31 from Martinelli's. 10:31
Q. Do you think you bought anything from 10:31 Stater Brothers that was from Martinelli's in 2025? 10:31
A. I don't know. 10:31
Q. And then you mentioned there was a -- kind 10:31 of a local liquor store? 10:31



A. Yeah. There's Del Rosa. 10:31
Q. During what time period would you have 10:31 been purchasing there? 10:31
A. Any time I drive and I got kids in the 10:31 car. I got me -- I have a Yukon XL. It's like my 10:31 favorite car. My dream car. That I didn't get when 10:31 I was taking on these kids when they were little. I 10:31 had a Kia. So now I have a Yukon. And I am busting 10:31 my butt to get it. And I still got it because they 10:31 got TVs and sunroof, all that good stuff. I got 10:31 that truck for those kids, and now they are grown, 10:31 so it's just me by my myself. I don't need 10:31 Martinelli's in the car anymore. The kids are gone. 10:32 They grown up. 10:32
Q. When is the last time that you would have 10:32 needed Martinelli's in the car for the kids? 10:32
A. I could have one now because little momma 10:32 is in the car, but she is not allowed to have juice. 10:32 But I -- if I -- if I had any kids in the car, it 10:32 would be when they were little. And I had them when 10:32 we were living on Ironwood. 10:32
Q. And when did they leave home? 10:32
A. I gave them back to their mom December of 10:32 2020, but I was still raising them. Officially, on 10:32 paper, I -- they were given back, but I still had 10:32



them. 10:32
Q. Okay. So when is the last time you think 10:32 you bought Martinelli's juice for the kids? 10:32
A. Sometime maybe mid- -- like, mid-year 10:32 2025. 10:33
Q. Okay. 10:33
A. Because I still had them. 10:33
Q. Okay. Okay. Is there anything wrong with 10:33 Martinelli's juice if it has ascorbic-something in 10:33 it? 10:33
A. No. It's not -- Martinelli's is a really 10:33 good juice. The kids likeded [verbatim] it. We all 10:33 thought it was a hundred percent juice, you know. 10:33
Q. Have you ever -- 10:33
A. It had a better -- had a better flavor. 10:33 For -- for yours to say a hundred percent juice, is 10:33 better than Juicy Juice. But Juicy Juice was 10:33 cheaper, though. But some days I would actually 10:33 have to purchase Juicy Juice because I didn't have 10:33 enough of Martinelli's because they liked yours 10:33 better. 10:33
Q. Do you know why the ascorbic stuff was 10:33 added to Martinelli's? 10:33
A. I don't. 10:33
Q. Do you remember what you paid for the 10:33

Martinelli's juice when you would buy it for the 10:33
kids? 10:33
A. A liquor store could charge you 10:33
anywhere -- an arm and a leg. Because it's a liquor 10:33
store. It's -- it's what their prices are. And you 10:34
pay them. You got -- the best part about it is that 10:34
you stop and you hop your butt right on that 10:34
freeway. So we would stop, gas up, get the snacks, 10:34
and we were gone. I paid whatever they said to pay. 10:34
It's Martinelli's. 10:34
Q. And do you remember approximately what 10:34
that would have been? 10:34
A. 3.99, 4.99 for a little tiny one. Yeah, 10:34
they were pretty expensive. I think Juicy Juice 10:34
was, like, maybe $1.70-something for a little 10:34
bottle. But the -- the glass one, you pay almost $3 10:34
to $4 each. 10:34
Q. And how about at Food 4 Less, do you 10:34
remember what you paid for the apple juice? 10:34
A. I don't. I don't remember what I paid. I 10:34
just know I picked it up and I bought it. And we 10:34
were on food stamps, so -- 10:34
Q. And -- 10:34
A. -- we got a lot of it. 10:34
Q. How about for the sparkling, do you 10:34



remember what you paid for it? 10:34
A. I don't. 10:34
Q. At any time did you return Martinelli's 10:34
product that you had purchased? 10:35
A. Did I return it? 10:35
Q. Yeah. 10:35
A. No. 10:35
Q. Did you ever ask for a refund? 10:35
A. No. 10:35
Q. Have you ever contacted Martinelli's to 10:35
complain because there is something added to the 10:35
juice? 10:35
A. No. 10:35
Q. Any reason you didn't do that? 10:35
A. I didn't have a problem with the juice. 10:35
Q. In other words, you liked it. It tasted 10:35
good. The kids liked it? 10:35
A. Yes. We had problem -- the problem is 10:35
with your labelling. I feel -- I mean, all these 10:35
years I have been, like -- you guys are, like, part 10:35
of my home. You know, it's the labelling. You guys 10:35
didn't tell us the truth on it. It's -- it's 10:35
supposed to be a hundred percent juice. I paid a 10:35
lot of money to make sure it was juice for -- for my 10:35
kids, you know. 10:35



Q. How much extra do you think you paid to 10:35
make sure it was a hundred percent juice? 10:35
A. Well, it's, I would say, 12 years of 10:35
raising kids. That's 12 years. 10:35
Q. Is there any amount or value that you put 10:35
on a hundred percent juice that you feel like you 10:35
didn't get because it had something added? 10:36
MR. KRIVOSHEY: Objection. Form. 10:36
THE WITNESS: Well, how much is integrity 10:36
worth? 10:36
BY MS. ORD: 10:36
Q. That's fair. 10:36
A. That's where I am raised up now. 10:36
Q. Can you put a dollar value on integrity? 10:36
MR. KRIVOSHEY: Same objections. 10:36
THE WITNESS: That's what I am trying to 10:36
say. 10:36
BY MS. ORD: 10:36
Q. You can't? 10:36
A. I'm -- I'm asking you. What is integrity 10:36
worth? 10:36
Q. It's very hard to put a value on 10:36
integrity, isn't it? 10:36
A. It is. 10:36
Q. Okay. Other than what we have just talked 10:36



about, can you recall any other purchases of 10:36
Martinelli's juice or sparkling apple cider? 10:36
A. Say it again. 10:36
Q. Can you recall any other purchases other 10:36
than what we've just talked about. You purchased it 10:36
for years, and there was this one event where you 10:36
turned the bottle over? 10:36
A. It was one day. 10:36
Q. Yeah. 10:36
A. It wasn't an event. It was a day 10:36
somewhere in the store. No. 10:37
Q. Are you a member of the Food 4 Less savers 10:37
club or a loyalty program? 10:37
A. No. 10:37
Q. Would there be a record of your purchases 10:37
of Martinelli's products? 10:37
A. I don't know. 10:37
Q. Do you have any receipts that would show 10:37
you actually purchased it? 10:37
A. I don't even save receipts. 10:37
Q. Do you have any pictures of an event where 10:37
you served it and you know you're the one who 10:37
purchased it? 10:37
A. No. 10:37
Q. Do you have any documents or records at 10:37

all that would prove that you ever purchased -- 10:37
A. All that -- if -- if -- if I had -- if I 10:37
had any type of me having it in my home or on 10:37
pictures it's -- it's the era's gone. 10:37
Phones have took over. 10:37
My -- my pictures that I had at one time 10:37
are all in -- all went into storage. And then I 10:37
went to prison. And then no one paid the storage. 10:37
So I lost my stuff. 10:37
So if I had anything, it would be during 10:38
that time when I had those kids and I had those 10:38
pictures. I don't have anything left. 10:38
When you -- when you go into drugs and -- 10:38
and run in the streets, you lose things. You lose 10:38
yourself, you get consequences, and -- and you got a 10:38
family who don't want to pay for your -- your mess. 10:38
I lost a lot. I lost a lot. I don't have anything. 10:38
Q. So no documents or records that would 10:38
prove you ever bought the Martinelli's? 10:38
A. No, no pictures. 10:38
Q. Did you look -- 10:38
A. No events. 10:38
Q. Did you look to see if you had anything at 10:38
all? 10:38
A. There's nothing to -- to -- there's 10:38

Page 78

nothing to look for. I got no -- I got no pictures. 10:38
Q. Okay. 10:38
A. All my stuff is gone. It's been thrown 10:38
out. It's been -- storage has been gone. 10:38
Q. And more recently when you had the -- the 10:38
little kids with you -- 10:38
A. I need to take a minute. 10:38
MS. ORD: I think -- let's just go off the 10:38
record for a minute, shall we? 10:38
MR. KRIVOSHEY: Yes. 10:38
THE VIDEOGRAPHER: Time is 10:39 a.m. and 10:38
we're off the record. 10:38
(Brief recess.) 10:59
10:59 THE VIDEOGRAPHER: Time
is a.m. 10:59
We're back on the record. 10:59
BY MS. ORD: 10:59
Q. Do you understand that you are still under 10:59
oath testifying under penalty of perjury? 10:59
A. Yes, ma'am. 10:59
Q. Okay. So we're going -- we're going to 10:59
move on from the time period when you didn't have 10:59
your things anymore, and we're going to focus on 10:59
the -- the recent time period. 10:59
Do you have any records within the last 10:59
four years of you purchasing Martinelli's products? 11:00

Page 79

A. No. 11:00
Q. And have you looked to make sure that that 11:00
is the case? 11:00
A. Yes. 11:00
Q. Okay. Let us mark as our next exhibit, 11:00
Exhibit Tab Number 3 which we're going to publish 11:00
here, and it will come up for you. 11:00
MS. ORD: And for the record, that is the 11:00
amended class action Complaint filed November 13th 11:00
Number 2025. 11:00
(Deposition Exhibit 3 was marked for 11:00
identification and is attached hereto.) 11:00
BY MS. ORD: 11:00
Q. Just let us know when you're ready. 11:00
A. I'm ready. 11:00
Q. Okay. Have you seen this document before? 11:00
A. Yes. 11:00
Q. Do you know what this is? 11:00
A. A corrected version of something. 11:00
Q. It's the amended class action Complaint? 11:00
Does that look right to you? 11:00
A. Yes. 11:00
Q. Do you know why this was filed? 11:00
A. I'm not sure if it was because I didn't 11:01
have certain things -- didn't have certain things, 11:01

Page 80

and they had to put that on there. And then a 11:01
couple of things that also popped up that I needed 11:01
to add. 11:01
Q. Okay. Do you know what the difference is, 11:01
or if there are any differences between the document 11:01
you're looking at now and the Complaint that we 11:01
looked at before the break, which was the first 11:01
Complaint filed in the lawsuit? 11:01
A. [Witness reviews document]. 11:01
I do not. 11:01
Q. Did you at any time request changes to the 11:01
original Complaint? 11:01
MR. KRIVOSHEY: Objection. 11:01
Don't answer. 11:01
Attorney-client privilege. 11:01
BY MS. ORD: 11:01
Q. As you sit here today, do you believe that 11:01
what is in this amended class action Complaint is 11:01
true and accurate? 11:02
A. Yes. 11:02
Q. And what is the basis for your belief? 11:02
A. I trust my attorney. 11:02
Q. In other words, if you had information 11:02
without telling me what it was that you thought 11:02
needed to be in the Complaint, you gave it to your 11:02

Page 81

lawyer? 11:02
A. Correct. 11:02
Q. And as far as you know, whatever that information was, your lawyer did, in fact, incorporate it into the amended document? 11:02
A. Correct. 11:02
Q. I'm going to show you Paragraph 1 of this document. So it's right under the word "Introduction." 11:02
Do you see that? 11:02
MR. KRIVOSHEY: Click the plus and it will be a little bigger. 11:02
There we go. 11:03
BY MS. ORD: 11:03
Q. Are you there? 11:03
A. I'm there. 11:03
Q. So this is talking about [as read]: 11:03
"The purpose of this lawsuit, which aims to hold Martinelli's responsible for misleadingly marketing it's Martinelli's Apple Juice, Martinelli's Sparkling Cider, and Martinelli's Sparkling Blush products." 11:03
Correct? 11:03
A. Correct. 11:03



Q. Have you ever purchased Martinelli's Sparkling Blush? 11:03
A. Not for certain. I don't know. I purchased the Martinelli's Sparkling Cider. I'm not sure if it had a blush on it. 11:03
Q. Was it pink? 11:03
A. I don't recall. 11:03
Q. Okay. Do you know if there is any of the asorbic-something in the sparkling blush product? 11:03
A. I don't -- I don't recall. I don't recall the product. 11:03
Q. And it says [as read]: 11:03
"Plaintiffs Joly Ramirez" -- I'm going to butcher this -- "Sorangie" -- is that how you say it? 11:04
MR. KRIVOSHEY: Don't ask me. 11:04
BY MS. ORD: 11:04
Q. [As read]: 11:04
-- "Sorangie Sanchez, on behalf themselves and all others similarly situated, bring this class action." 11:04
What does it mean to say that you bring this on behalf of all others similarly situated? 11:04
MR. KRIVOSHEY: Objection to form. 11:04
///



BY MS. ORD: 11:04
Q. Do you know? 11:04
A. For other consumers, I guess. 11:04
Q. So are you bringing the lawsuit for yourself? 11:04
A. And -- and others. 11:04
Q. And who are the others? 11:04
A. Anybody who has boughten [verbatim] your guys's product. 11:04
Q. Okay. Looking at Paragraph 4, so we're moving along in the Complaint here. 11:04
Let me know when you're there. 11:04
A. Okay. 11:05
Q. So middle of the paragraph it says [as read]: 11:05
"These added preservatives and ingredients are not mentioned or disclosed anywhere on the product's front labels." 11:05
Do you see that? 11:05
A. I do. 11:05
Q. What are the added preservatives? 11:05
A. Wouldn't it be in the -- well, it says the "ascorbic acid." 11:05
Q. So is that an added preservative? 11:05



A. Yes. 11:06
Q. And then what are the added ingredients? 11:06
MR. KRIVOSHEY: Objection to form. 11:06
THE WITNESS: I guess the stuff that's in concentrate. 11:06
BY MS. ORD: 11:06
Q. Do you know if the apple juice and the sparkling cider are made from concentrate? 11:06
A. They're not supposed to be. 11:06
Q. When you purchased the Martinelli's products, you did not believe that you were purchasing a product made from concentrate; right? 11:06
A. Correct. 11:06
Q. Anything else you can think of that's an added ingredient? 11:06
A. Anything other than apple juice. 11:06
Q. Okay. When did you first learn that there were added ingredients? 11:06
A. Shortly after me filing this case. 11:06
Q. Okay. When is the first time that you ever looked on the back label of a Martinelli's product? 11:07
A. Shortly after me filing this case. 11:07
Q. Okay. Do you know whether you or any of the punitive class members, the others for whom this 11:07

lawsuit is being brought, have ever overpaid for 11:07
Martinelli's? 11:07
A. I only speak for myself. 11:07
MR. KRIVOSHEY: Objection. -- 11:07
BY MS. ORD: 11:07
Q. And what is your answer for yourself? 11:07
A. Yes. 11:07
Q. How much did you overpay by? 11:07
A. $2. 11:07
Q. Okay. And -- 11:07
A. Depending on what market, what store, what 11:07
liquor store. 11:07
Q. And what is the belief that you overpaid 11:07
by $2 calculated upon? 11:07
A. What they're sold for regular at a retail 11:07
store, at a regular market. 11:07
Q. Okay. 11:07
A. They kind of push the prices up at a gas 11:08
station. 11:08
Q. So you would have paid more at the gas 11:08
station -- 11:08
A. Yeah. 11:08
Q. -- than you would have at the grocery 11:08
store? 11:08
A. Yeah. 11:08



Q. Anything else? 11:08
A. No. 11:08
Q. Okay. Do you know why the 11:08
ascorbic-something was added to 11:08
Martinelli's Apple Juice? 11:08
A. I do not. 11:08
Q. Do you know when it was added? 11:08
A. I do not. 11:08
Q. Do you know why it was added to the 11:08
sparkling cider? 11:08
A. I do not. 11:08
Q. Do you know when it was added to the 11:08
sparkling cider? 11:08
A. I do not. 11:08
Q. When this amended Complaint was filed, did 11:08
you review it before it was filed? 11:08
A. I don't recall. 11:08
Q. Would it have been important to you to 11:08
make sure that anything filed in a court of law 11:08
would be truthful and accurate? 11:08
A. Yes. 11:08
Q. Does that refresh your recollection as to 11:08
whether you looked at it before it was filed? 11:08
A. I believe I got a copy. 11:08
Q. Before it was filed? 11:08



A. I'm not sure. 11:08
Q. Okay. 11:08
A. If it was filed and then I got a copy or a 11:08
copy before it was filed. I just know I have a 11:08
copy. 11:08
Q. Without telling me what they were, do you 11:08
recall making any corrections to the document? 11:09
A. No. 11:09
MR. KRIVOSHEY: Objection. Yeah, 11:09
that's -- that's clearly attorney-client privilege. 11:09
BY MS. ORD: 11:09
Q. Do you know who Sorangie Sanchez is? 11:09
A. No. 11:09
Q. Have you ever spoken to that person? 11:09
A. No. 11:09
Q. Do you have any knowledge or information 11:09
about whether Sorangie Sanchez has purchased 11:09
Martinelli's products? 11:09
A. No. 11:09
Q. Do you know whether the allegations about 11:09
Sorangie Sanchez in this document are truthful and 11:09
accurate? 11:09
A. I do not know who that individual is. 11:09
Q. Have you ever done any research to see 11:09
what the ascorbic additive is that you referenced 11:09



earlier? 11:09
A. No. 11:09
Q. Why not? 11:09
A. I just didn't. 11:09
Q. Do you know if it's harmful? 11:09
MR. KRIVOSHEY: Objection. Form. 11:10
THE WITNESS: It's got ac- -- the word 11:10
"acid" in it. I think it would be harmful in a 11:10
certain amount, yes. 11:10
BY MS. ORD: 11:10
Q. Do you have any idea what the amount would 11:10
be? 11:10
A. No. 11:10
Q. Do you know if ascorbic acid ever goes by 11:10
any other name? 11:10
A. No. 11:10
Q. Other than identifying that ascorbic acid 11:10
was added to the juice and the sparkling cider, do 11:10
you have any knowledge or information as to why it 11:10
would be added? 11:10
A. No. 11:10
Q. Do you want to continue purchasing 11:10
Martinelli's products? 11:10
A. No. 11:10
Q. Okay. Do you ever buy orange juice? 11:10

you just boil them down with ginger ale or 11:14
sparkling -- 11:15
Q. How long does that last for? 11:15
A. -- or sparkling water or something. 11:15
Q. How long does that last for? 11:15
A. It was just for the event. It's whatever 11:15
we're having an event for. 11:15
Q. Did you ever -- 11:15
A. It makes the house smell good of cinnamon. 11:15
Q. Do you ever keep it in the refrigerator 11:15
and drink it over time or no? 11:15
A. No. I don't think so. I think it's just, 11:15
like, one sitting. 11:15
Q. Would it last if you kept it in the fridge 11:15
for a while? 11:15
A. It's probably needed to be done -- like, 11:15
consumed within three days. 11:15
Q. Otherwise, it might get moldy or 11:15
something? 11:15
A. Like, turn into hooch. 11:15
Q. Oh. Which would then be an alcoholic 11:15
product; correct? 11:15
A. Correct. 11:15
Q. We don't want that. 11:15
Do you know what the claims are in your 11:15

Page 94

lawsuit against Martinelli's? 11:15
MR. KRIVOSHEY: Objection. Form. 11:15
BY MS. ORD: 11:15
Q. You can answer. Unless he instructs you 11:15
not to answer, you can answer. 11:15
A. The labelling, supposed to be a hundred 11:16
percent juice. 11:16
Q. Anything else? 11:16
A. It's not supposed to have anything in it. 11:16
Just a hundred percent juice. Juice is juice. It's 11:16
just from apples. 11:16
Q. Do you know how Martinelli's juice and 11:16
sparkling cider are made? 11:16
A. I do not. 11:16
Q. Have you ever investigated whether they 11:16
are, in fact, made from a hundred percent fresh 11:16
apple juice? 11:16
A. No. 11:16
Q. Would that change your testimony if that 11:16
was the case? 11:16
MR. KRIVOSHEY: Objection. Form. Calls 11:16
for speculation. 11:16
THE WITNESS: You still want me to answer? 11:16
BY MS. ORD: 11:16
Q. Yeah. 11:16

Page 95

A. No. 11:16
Q. It would not change your testimony? 11:16
A. No. 11:16
Q. Why not? 11:16
A. I went to school for marketing and -- and 11:16
management, and everything is a propaganda. You 11:16
know, you guys need to be honest, have an integrity 11:16
in the right thing to -- to inform the consumer what 11:16
they're purchasing. 11:16
And I was a avid user for me and my 11:16
children. And I feel like you guys deceived me. 11:17
You know, it's -- and -- and it's okay. You guys 11:17
are okay with it. 11:17
And you guys need to be held reliable 11:17
[verbatim] for what you guys's putting into our 11:17
products. 11:17
Q. What's in it, other than juice? 11:17
A. You tell me. It's your product. 11:17
Q. Well, you're the one that's suing my 11:17
client. So -- 11:17
A. Well, it's not juice. It's not just 11:17
juice. 11:17
Q. So what's -- 11:17
A. And we wouldn't be here if it was just 11:17
juice. 11:17

Page 96

Q. So what's in it? 11:17
MR. KRIVOSHEY: Objection. Asked and 11:17
answered. 11:17
BY MS. ORD: 11:17
Q. Go ahead. 11:17
A. Ascorbic acid and -- and additives. A 11:17
bunch of additives. 11:17
Q. Anything else? 11:17
A. Concentrates. There's other things that 11:17
are -- that's -- that's not even supposed to be in 11:17
there. 11:17
Q. Like what? 11:17
A. Well, you're labelling -- like, when 11:17
you -- when we do our labelling, it's -- I wouldn't 11:17
give you a Nike shoe and -- and put, you know, 11:17
"ProWing" [verbatim] on it. If you're expecting, 11:17
you know, I'm not going to be -- to deceive you. To 11:17
me, it's like you guys went in there to deceive us. 11:17
And I've been so faithful all these years, growing 11:17
my kids up with the Martinelli's. 11:17
Q. So other than -- 11:17
A. So you need to change your labelling. 11:17
Q. Other than the ascorbic acid? 11:17
A. Your additives. 11:17
Q. What are the additives? 11:18

Page 97

A. Whatever is not -- whatever is other than 11:18
the juice. If it doesn't say "apple," they're all 11:18
additives. 11:18
Q. Like, what? 11:18
A. Whatever's on the back of your 11:18
ingredients. I don't know what's on the back of 11:18
your ingredients. 11:18
Q. Other than the one time you were in the 11:18
store, have you ever look at the back of any of the 11:18
bottles? 11:18
A. Just that one time. And there was a 11:18
bunch. More than just -- 11:18
Q. Okay. 11:18
A. More than just -- there was a lot of 11:18
concentrates. There was -- there was -- there was a 11:18
lot. You guys got a lot going on in that package. 11:18
Q. Is it possible that you have confused 11:18
Martinelli's with some other juice product? 11:18
A. No. 11:18
Q. Are you okay? 11:18
A. No. My head's hurting. 11:18
Q. You want to just take a minute? 11:18
A. No. I'm okay. 11:18
Q. Okay. Let me know if it is a problem, and 11:18
we can take a break. 11:18

Page 98

MR. KRIVOSHEY: You want to take five 11:18
minutes? 11:18
THE WITNESS: I'm okay. 11:18
MR. KRIVOSHEY: Okay. 11:18
BY MS. ORD: 11:18
Q. Do you know what's in Juicy Juice? 11:18
A. Huh-uh. 11:19
Q. Does it have sugar added? 11:19
A. I don't know. 11:19
MR. KRIVOSHEY: You want some water? 11:19
Can we take five minutes? 11:19
MS. ORD: Yeah. Let's -- 11:19
Just for the record, the witness is having 11:19
a little bit of a headache; so we're going to take 11:19
five minutes and see if she feels better. 11:19
11:19 THE VIDEOGRAPHER: Time is a.m. 11:19
We're off the record. 11:19
(Brief recess.) 11:28
THE VIDEOGRAPHER: Time is 11:30 a.m. 11:28
We're back on record. 11:30
BY MS. ORD: 11:30
Q. Okay. Before the break there you 11:30
mentioned that you had studied marketing. 11:30
What were you referencing? 11:30
A. The way they labelled things. 11:30

Page 99

Q. Have you studied marketing through a 11:30
formal course? 11:30
A. In college, yeah. 11:30
Q. What courses did you take? 11:30
A. Marketing management. 11:30
Q. Anything else? 11:30
A. Business classes. A bunch of -- a bunch 11:30
of business stuff. 11:30
Q. Relating to marketing? 11:30
A. Yeah. I wanted to open my own shop. 11:30
Q. Did you get a degree in marketing? 11:30
A. I -- no. 11:30
Q. Did you take any courses in labelling? 11:30
A. No. 11:30
Q. Did you take any business law courses? 11:30
A. Businessmap. But no. Business 11:31
accounting, not law. 11:31
Q. Based upon the marketing courses that you 11:31
took, have you used any of your knowledge from those 11:31
courses in connection with this lawsuit? 11:31
A. No. 11:31
Q. Have you ever worked professionally in 11:31
marketing? 11:31
A. No. 11:31
Q. Do you have any opinions about how 11:31

Page 100

Martinelli's should market its products? 11:31
A. No. 11:31
Q. Okay. Let's look at Tab 7. We're going 11:31
to mark as our next exhibit a document that reads 11:31
[as read]: 11:31
"Have you bought Martinelli's a 11:31
100 percent apple juice" -- 11:31
MR. KRIVOSHEY: I'm sorry. Did you say 7? 11:31
MS. ORD: It's Tab 7. I haven't marked it 11:31
yet. This is just to tell Tia -- 11:31
MR. KRIVOSHEY: Oh. Sorry. Okay. 11:31
MS. ORD: -- which document to pull up. 11:31
BY MS. ORD: 11:31
Q. [As read]: 11:31
"Have you bought Martinelli's 11:31
100 percent apple juice, Martinelli's 11:31
Sparkling Blush, or Martinelli's 11:31
Sparkling Cider." 11:31
This will be our next exhibit. 11:32
MS. ORD: Which is Exhibit 4; correct. 11:32
THE REPORTER: Yes. 11:32
THE WITNESS: Okay. 11:32
(Deposition Exhibit 4 was marked for 11:32
identification and is attached hereto.) 11:32
///

Page 101

BY MS. ORD: 11:32
Q. Okay. You mentioned that you had seen an advertisement before relating to Martinelli's. 11:32
Is that the advertisement that you saw? 11:32
A. [Witness reviews document]. 11:32
I'm not sure. 11:32
Q. You think you saw something different? 11:33
A. I'm not sure. I just -- I just know I filled something out. It was, like, on Facebook or something. It popped up on Facebook when I was on Facebook. 11:33
So I don't recall what the whole ad said. I just know that it said "Martinelli," and it had attorneys names. So I filled the little pamphlet out. 11:33
Q. Do you -- 11:33
A. I don't know -- I don't know if I saw this or not because it would have been in a small -- smaller form. 11:33
Q. Do you remember who the attorneys were? 11:33
A. Not on the form itself. I just filled something out for inquiry. 11:33
Q. And then did somebody get in touch with you? 11:33
A. Yeah. I don't know how long after, 11:33

Page 102

though. 11:33
Q. Do you remember the law firm that you got in touch with or that got in touch with you? 11:33
A. I talked with JS. I think his name is -- is it Joey? Or... 11:33
It's one of the attorneys for -- for him. 11:34
Q. Okay. And this person reached out to you after you filled out a form that you saw on Facebook? 11:34
A. Uh-huh. 11:34
Q. Up until the point that you saw this on Facebook, did you have any concerns about Martinelli's? 11:34
A. No. 11:34
Q. Why did you respond to this advertisement? 11:34
A. Because I -- I believe I thought it was like a -- you know, like they were -- like it was incorrect because I had been using the product for so long. 11:34
Q. You felt the advertisement was incorrect? 11:34
A. Yeah. I wanted to inquire about what were they talking about. Like, when did this happen. Like, to know the whole time that I had been buying Martinelli's, I thought -- you know, I was under the impression this was a hundred percent juice. Where 11:34

Page 103

did all of this come from, you know? 11:34
Q. And in the course of communicating about this advertisement, did you come to learn that Martinelli's is not a hundred percent juice? 11:35
A. Yes. 11:35
Q. Then communications with counsel, what knowledge or information do you have as to whether that is true? 11:35
A. Just on the back of your ingredients bottle. 11:35
Q. And you did not look at that until after you had spoken with counsel? 11:35
A. [Witness nods head up and down]. 11:35
Q. When is the first time that you recall seeing the advertisement? 11:35
A. For -- I mean, this one? I don't recall seeing this. 11:35
Q. Any advertisement. 11:35
A. Can you repeat the question? 11:35
Q. Yeah. 11:35
When is the first time that you recall seeing the Facebook advertisement? 11:35
A. I don't know. Beginning -- beginning of -- I don't know. I can't give you a definite answer. 11:36

Page 104

Q. Was it in 2026? 11:36
A. No. 11:36
Q. Was it in 2025? 11:36
A. I'm not sure. 11:36
Q. Could it have been earlier than 2025? 11:36
A. It might have been, like, right around the time of me moving. This was just a lot -- a lot of things going on. 11:36
Q. When was the move? 11:36
A. September '24. 11:36
Q. Okay. 11:36
A. So it was like -- it might have been, like, a month or two span into the next. 11:36
Q. Okay. And the first time you saw the advertisement, did you respond to it? 11:36
A. No. It's been coming up -- it's been on Facebook for a while. 11:36
Q. So what prompted you, finally, to respond to it if you didn't the first time you saw it? 11:36
A. I think I might have read something that they had an additive or something in it. 11:36
Q. Apart from the advertisement itself? 11:36
A. It was a part of the ad. 11:36
Q. Okay. And you did fill out the little form in the ad? 11:36

Page 105



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

A. Yeah. 11:36
Q. And then somebody contacted you? 11:36
A. Yeah. 11:36
Q. And at some point were you asked to be a plaintiff in a lawsuit? 11:36 11:37
MR. KRIVOSHEY: Objection. 11:37
Don't answer. 11:37
Attorney-client privilege. 11:37
BY MS. ORD: 11:37
Q. Will you follow your counsel's instruction? 11:37 11:37
A. Yes. 11:37
Q. What is your understanding as to how you came to be a plaintiff in this lawsuit? 11:37 11:37
MR. KRIVOSHEY: You can answer that to the extent you don't disclose attorney-client communication. 11:37 11:37 11:37
THE WITNESS: Say it again. 11:37
MR. KRIVOSHEY: You're free to respond so long as you don't disclose anything we talked about. 11:37 11:37
So if you can do that, go ahead. If you can't -- 11:37 11:37
THE WITNESS: I can't, sir. 11:37
MR. KRIVOSHEY: Then you can't. 11:37
///

Page 106

BY MS. ORD: 11:37
Q. You have no idea how you came to be suing Martinelli's? 11:37 11:37
A. No. I know how we -- we came to be suing Martinelli's because I got -- I was under the impression or -- not under the impression, I was -- I was -- I can't answer. 11:37 11:37 11:37 11:37
Q. Is this lawsuit proceeding with your authorization? 11:37 11:37
A. It is. 11:37
Q. And you agreed that your name could be used? 11:37 11:37
A. Yes, ma'am. 11:38
Q. Without telling me what it was, did you have any discussions with counsel about your obligations as a plaintiff? 11:38 11:38 11:38
MR. KRIVOSHEY: Objection. 11:38
Don't answer that question. 11:38
Attorney-client privilege. 11:38
BY MS. ORD: 11:38
Q. Will you follow your client's -- your counsel's instruction? 11:38 11:38
A. I will. 11:38
Q. Do you have any obligations as a named plaintiff in this lawsuit? 11:38 11:38

Page 107

A. I don't know. "Obligation" means... 11:38
Q. Anything. 11:38
Do you have any obligations or requirements as a named plaintiff? 11:38 11:38
A. No. 11:38
Q. Okay. Aside from seeing the advertisement for Martinelli's and participating in this lawsuit, have you ever served as a named plaintiff in any other lawsuit? 11:38 11:38 11:38 11:38
A. No. 11:38
Q. Have you ever responded to a similar advertisement for another company or product? 11:38 11:38
A. No. 11:38
Q. Have you -- other than the criminal proceedings and the guardianship proceeding and this lawsuit, have you ever been a party to any lawsuits? 11:38 11:38 11:38
A. No. 11:38
Q. Apart from this litigation, have you ever worked with your current counsel or your current counsel's law firm before? 11:38 11:39 11:39
A. No. 11:39
Q. Do you have any personal or social relationships with your counsel? 11:39 11:39
A. No. 11:39
Q. Have you been promised any particular 11:39

Page 108

outcome in this lawsuit? 11:39
A. No. 11:39
Q. If you prevail in this lawsuit, what is your understanding of what you will receive? 11:39 11:39
A. Monetary and then -- maybe you guys will change your advertising on the bottle, and to help other plaintiffs be able to speak up for their -- I can't speak for them but only myself. But at least it will be open for other people too. 11:39 11:39 11:39 11:39 11:39
Q. Do you believe that you are entitled to a specific amount of money? 11:40 11:40
MR. KRIVOSHEY: Objection to form. 11:40
THE WITNESS: No comment. 11:40
BY MS. ORD: 11:40
Q. You don't know? 11:40
A. [Witness shakes head side to side]. 11:40
Q. Do you have any idea how an amount might be calculated? 11:40 11:40
MR. KRIVOSHEY: Objection to form. 11:40
THE WITNESS: No. 11:40
BY MS. ORD: 11:40
Q. Okay. Other than your current counsel, did you speak to any other lawyers about Martinelli's? 11:40 11:40 11:40
A. No. Just -- just this counsel. 11:40

Page 109



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

Q. What investigation, if any, did you do of your counsel before you agreed to retain them? 11:40
A. Say it again. 11:40
Q. Did you do any investigation of your counsel before you agreed to retain them as your lawyers? 11:40
A. No. 11:40
Q. You didn't Google them or anything like that? 11:40
A. No. 11:40
Q. How do you know they're any good? 11:40
A. I don't. 11:40
Q. Prior to today, had you ever met any of your attorneys in person? 11:41
A. No. 11:41
Q. Approximately how much time do you think you've spent on this lawsuit? 11:41
A. Like with my attorneys? 11:41
Q. Just in general how much time have you spent on the lawsuit? 11:41
A. Five plus hours maybe. 11:41
Q. Okay. And that would be everything from the time that you first saw the advertisement until you came today? 11:41
A. Five plus -- five plus hours. 11:41



Q. And the "plus" would be the time you spent here today so far? 11:41
A. Probably, yeah. 11:41
Q. Okay. 11:41
A. No. No. No. Because we're -- I've already been gone since 6:00 so I would say, like, seven plus. 11:41
Q. Which would be your time from -- 11:41
A. Just from -- 11:41
Q. -- 6:00 a.m. this morning until now? 11:41
A. From the time, phone calls prior up until 6:00 a.m., not counting the time I'm here. 11:42
Q. Okay. What does Vitamin C have to do with this lawsuit, if anything? 11:42
A. Nothing. 11:42
Q. Okay. Is this the only advertisement you've ever seen for Martinelli's? 11:42
A. I don't recall seeing this one. I can't recall it, but I -- I do -- I do recall writing a little pamphlet down. I don't remember if they had questions or anything. It was just your name and stuff I wrote down. And somebody got back with me. 11:42
I don't remember this particular product it was at. 11:42
Q. Do you have any -- 11:42



A. It was just something on Facebook. 11:42
Q. Do you have any records or copies of what you saw on Facebook? 11:42
A. I do not. 11:42
Q. Have you looked for that information? 11:42
A. I don't know how to look for it. 11:42
Q. Okay. Did you, in fact, receive a free assessment from your counsel before proceeding with this lawsuit? 11:43
A. I don't know what that means. 11:43
Q. Do you see in the advertisement where it says "continue to a free case review"? 11:43
A. You mean what -- was that on the -- 11:43
Q. Did you get one? Did you get a free case review from your attorneys? 11:43
A. I don't know what that -- if I got one or not. I just know I talked with somebody. 11:43
Q. And you don't recall one way or another if that included a free case review? 11:43
MR. KRIVOSHEY: Objection. 11:43
Don't answer. 11:43
That's attorney-client privilege. 11:43
BY MS. ORD: 11:43
Q. Will you follow your counsel's instruction? 11:43



A. I will follow. 11:43
Q. Whose idea was it to sue Martinelli's? 11:44
A. Are you asking me? 11:44
Q. Uh-huh. 11:44
A. It's mine. 11:44
Q. Okay. Did you sign an engagement letter with your counsel? 11:44
A. A what? 11:44
Q. Did you sign a letter with your counsel retaining them? 11:44
A. I did. 11:44
Q. Do you want to represent individuals, other than yourself, in connection with this lawsuit? 11:44
A. I do. 11:44
Q. Why? 11:44
A. I think it gives people a fair chance to be able to come out swinging and -- and be able to get some monetary compensation back to the damage that's been done being lied to all these years. 11:45
Q. How many years back do you think you can get monetary compensation for? 11:45
A. I don't know. 11:45
MR. KRIVOSHEY: Objection to form. 11:45
///

BY MS. ORD: 11:45
Q. Are you physically able to proceed as a lead plaintiff in this action? 11:45
A. I believe so, yes. 11:45
Q. Are you mentally able to proceed as a lead plaintiff in this action? 11:45
A. I believe so, yes. 11:45
Q. Do your various health conditions prevent you from doing so? 11:45
A. No, I hope not. 11:45
Q. Do you have the financial resources to proceed as a named plaintiff in this action? 11:45
A. Yes. 11:45
Q. Do you know if your attorney has the financial resources to proceed as your counsel? 11:45
A. Yes. 11:45
Q. How do you know that? 11:45
MR. KRIVOSHEY: Objection. 11:45
Don't answer. 11:45
Attorney-client privilege. 11:45
BY MS. ORD: 11:45
Q. Did you and your attorney ever have any conversations about their financial ability to proceed with this lawsuit? 11:45
MR. KRIVOSHEY: Objection. 11:45



Don't answer. 11:45
THE WITNESS: No. 11:45
BY MS. ORD: 11:45
Q. Okay. Apart from your counsel, have you spoken with anybody about this lawsuit? 11:45
A. No. 11:46
Q. Have you prayed about this lawsuit? 11:46
A. I have. 11:46
Q. What have you prayed? 11:46
A. Not for me to get sick while I am here. 11:46
Q. Anything else? 11:46
A. I don't know. That's it. 11:46
Q. Apart from authorizing the filing of the lawsuit, reviewing the Complaint either before or after it was filed, and preparing for and testifying today, have you done anything else in preparation for this deposition or as a named plaintiff? 11:46
A. No. 11:46
Q. If this case goes to trial, will you testify at trial? 11:46
A. Yes. 11:46
Q. Other than what you saw in your Facebook feed for the advertisement for this lawsuit, do you pay attention to solicitations for class actions or other lawsuits? 11:47



A. Did I -- did I what? 11:47
Q. Do you pay attention to solicitations for other class actions or lawsuits? 11:47
A. No. 11:47
Q. Was it unusual for you to see this pop up in your Facebook feed? 11:47
A. It was unusual to see the name, your guys's product. That was, like -- caught my attention. I am ADHD. I kind of live in my own bubble. But it's a product that I have been with for a long time. It caught my attention. Like... 11:47
Q. Do you ever go to websites to see if there are class actions out there that you might potentially get a relief from? 11:47
A. No. 11:47
Q. Do you ever look on websites of other attorneys to see if they have class actions that you might join? 11:47
A. No. 11:47
Q. Have you ever been asked, before this case, to serve as a lead plaintiff in a lawsuit? 11:47
A. No. 11:47
Q. Have you ever been asked to serve as a claimant or a plaintiff in any other legal proceeding against a company? 11:47



A. No. 11:47
Q. Have you ever done so? 11:47
A. No. 11:47
She said that... 11:47
Q. Do you know what a price premium is? 11:47
A. No. 11:48
Q. You have not produced any documents in this lawsuit; correct? 11:48
A. Correct. 11:48
Q. But you have looked? 11:48
A. Yes, ma'am. 11:48
Q. Between the time that you saw the advertisement and decided to become a plaintiff in this lawsuit and in the present, have you destroyed any documents or records? 11:48
A. No. 11:48
Q. Have you failed to preserve any documents or records? 11:48
A. No. 11:48
Q. Do you have any empty bottles or receipts or anything at home that would relate to this lawsuit? 11:48
A. No. 11:48
Q. If you had purchased a Martinelli's product before you decided to bring the lawsuit, 11:48

when I asked you today? 12:37
A. I let you kno- -- I told you I had them. 12:37
I told you I had them. I don't know how often I'm 12:37
on them. I don't play on them. They're -- to me, 12:37
they're not -- non-existent for me. Facebook and 12:37
Gmail is what I used. 12:37
Q. You forgot that you were on Instagram last 12:37
week? 12:37
A. I don't know what it was. I get alerts, 12:37
send me -- send -- send this. And I post it, and I 12:37
send it. 12:37
Q. So what is the reason that these accounts 12:37
were not identified in your responses under oath to 12:37
us in discovery? 12:37
A. I just gave them to you a little while 12:37
ago. 12:37
Q. What is the reason they were not in your 12:37
written discovery responses under oath? 12:37
A. I -- 12:37
MR. KRIVOSHEY: Objection. Asked and 12:37
answered. Argumentative. 12:37
BY MS. ORD: 12:37
Q. What's the reason? 12:37
A. I don't have a reason. I just -- I didn't 12:37
disclose them. I didn't know to disclose them. 12:37



They're not something I play on, on a regular; so I 12:38
didn't know to give you job platforms and social 12:38
media accounts and things that I -- that I used to 12:38
play on and that I don't play on or things that I 12:38
look at. I didn't know to do that. 12:38
Q. Is there anything else that we asked for 12:38
that you haven't told us about? 12:38
A. I don't know. I'm sure you'll find 12:38
something. 12:38
Q. Well, can you think of anything? 12:38
A. No. 12:38
Q. Okay. Are apples good for you? 12:38
A. Yes. 12:38
Q. "Apple a day keeps the doctor away"? 12:38
A. So they say. 12:38
Q. Do you know what nutrients are in apples? 12:38
A. I do not. 12:38
Q. Do you know what vitamins are in apples? 12:38
A. I do not. 12:38
Q. Do you eat fresh apples? 12:38
A. Not on a regular. 12:38
Q. Do you like apples? 12:38
A. I do. 12:38
Q. And there's no ingredient list on an 12:38
apple; correct? 12:38



A. No, there's not. 12:38
Q. Do you know if apples have naturally 12:38
occurring Vitamin C in them? 12:39
A. I do not. 12:39
Q. Would you not eat an apple if you thought 12:39
it had Vitamin C in it? 12:39
A. I -- I don't know. 12:39
Q. Is Vitamin C good for you? 12:39
MR. KRIVOSHEY: Objection. 12:39
THE WITNESS: In moderation. 12:39
BY MS. ORD: 12:39
Q. Is it a supplement? 12:39
A. It's supposed to be a vitamin. 12:39
Q. Does it occur naturally? Don't know? 12:39
A. I don't know. 12:39
Q. Do you take any supplements? 12:39
A. I do. 12:39
Q. What do you take? 12:39
A. Parasitical. 12:39
Q. What's that? 12:39
A. Like, black walnut hull, black seed oil, 12:39
oil of oregano, natural stuff from the herbs we 12:39
already have. 12:39
Q. What do those supplements do for you? 12:39
A. Takes away inflammation in my knee, oil of 12:39



oregano. Castor oil takes away the stiffness in my 12:39
joints. I do a lot of herbal stuff. 12:39
Q. Anything else you can think of? 12:39
A. Like what? 12:39
Q. Do any of those supplements contain 12:39
Vitamin C? 12:39
A. Oh, I don't know. 12:39
Q. Do any of those supplements contain 12:40
ascorbic acid? 12:40
A. I don't think so. 12:40
Q. Okay. Do you routinely check labels to 12:40
see if it contains ascorbic acid? 12:40
A. I don't. 12:40
Q. If it did contain ascorbic acid, would you 12:40
continue to use that supplement? 12:40
A. No, probably not. 12:40
Q. Why not? 12:40
A. Because there's a lot of things that are 12:40
done in moderation. They're not giving a dosage of 12:40
things. The things that I have, have dosage 12:40
amounts, tell you what milligrams and stuff. I'm 12:40
not get- -- I'm not being informed enough to make 12:40
that decision. 12:40
Q. And do you generally follow the dosage 12:40
instruction on the supplements that you take? 12:40

A. I do. 12:40
Q. How long have you been taking supplements? 12:40
A. Since April -- since the breakup. 12:40
Q. April of 2026? 12:40
A. 2025. 12:40
Q. "2025." Okay. 12:40
Have you ever posted about supplements? 12:40
A. I do. 12:40
Q. What do you post? 12:40
A. My regimen that I take, the ones that I just named to you. I lost, like, 30 pounds taking those regimens since April of last year. 12:40 12:40 12:41
MS. ORD: Tia, let's get a Tab 21, please, which we're going to mark as Exhibit 5. 12:41 12:41
(Deposition Exhibit 5 was marked for identification and is attached hereto.) 12:41 12:41
THE WITNESS: I have to refresh this thing? 12:41 12:41
BY MS. ORD: 12:41
Q. Yeah, please. 12:41
MS. NGUYEN: Just one second. 12:41
THE WITNESS: There it is. 12:41
Yep. That's me. 12:41
BY MS. ORD: 12:41
Q. Okay. So -- 12:41



MR. KRIVOSHEY: You got it? 12:42
BY MS. ORD: 12:42
Q. -- marking -- 12:42
A. Yeah. 12:42
Q. -- as Exhibit 5 is a screenshot from your Facebook account for Joly Ramirez; correct? 12:42 12:42
A. That's correct. 12:42
Q. And you did, in fact, make this post? 12:42
A. Yeah. That's my regimen. One -- one of them. 12:42 12:42
Q. [As read]: 12:42
"Feeling great by cleaning the inside of your body is my new regimen." 12:42 12:42
A. Yes, ma'am. 12:42
Q. And you have already testified that you are taking the supplements that we now see depicted in the photograph; correct? 12:42 12:42 12:42
A. Yes. 12:42
Q. Are there other supplements that we don't see there that you're also taking? 12:42 12:42
A. The Epsom salt, the bentonite clay. I do baths as well. 12:42 12:42
Q. And is it important to you to know what you're putting into your body? 12:42 12:42
A. It is. 12:42



Q. And do you try to be careful about what the supplements are? 12:42 12:42
A. Yes. 12:42
Q. And are you sensitive to what the ingredients of those supplements are? 12:42 12:42
A. Well, they're supposed to be all natural, so I -- I am sensitive to them. Yeah. 12:42 12:42
Q. And how would you know if they're all natural? 12:42 12:43
A. Because it states on the bottle. 12:43
Q. Where would you find that? 12:43
A. On the back of the ingredients. 12:43
Q. Okay. And have you, in fact, looked at the back to make sure these products are all natural? 12:43 12:43 12:43
A. Well, I know the cayenne is because it burns the crap -- crap out of you taking that one. 12:43 12:43
MR. KRIVOSHEY: Do you -- 12:43
THE WITNESS: Oil oregano is -- 12:43
MR. KRIVOSHEY: Are you trying to zoom in? 12:43
THE WITNESS: I -- they're my bottles. That's my picture. I just got the brown one, which is a -- like, a three-in-one. So they give you the milligrams of all the strength of all the things that you're taking inside, I guess. 12:43 12:43 12:43 12:43 12:43



BY MS. ORD: 12:43
Q. Okay. And you have personally chosen these supplements? 12:43 12:43
A. I picked them for myself, yes. 12:43
Q. Okay. 12:43
MS. ORD: Let's go to our next exhibit which is going to be Exhibit 6. 12:43 12:43
We're going to do Tab 22, Tia. 12:43
(Deposition Exhibit 6 was marked for identification and is attached hereto.) 12:44 12:44
MR. KRIVOSHEY: This is 6 -- 12:44
THE WITNESS: That's the new one. This is the one prior to it. 12:44 12:44
MR. KRIVOSHEY: Yeah. Okay. 12:44
BY MS. ORD: 12:44
Q. All right. Do you have Tab 6 [verbatim]? 12:44
A. Yeah. 12:44
Q. Okay. So this is Exhibit 6. This is another social media post from Instagram by "setfreeramirez." 12:44 12:44 12:44
This is yours; correct? 12:44
A. Yes, ma'am. 12:44
Q. And is this another set of pictures of the supplements that you're taking? 12:44 12:44
A. Yes. 12:44

Q. And you did make this post? 12:44
A. Yep. 12:44
Q. And these are, again, the supplements that you're taking which you have had good results with? 12:44
A. These are the ones I started with in -- in April of 2025. 12:44
Q. Okay. And this post is January 25th; so that'll be January of 2026; correct? 12:44
A. Yeah. I -- I've been taking them for six months, this set. And then gave myself a couple months break. And then I -- I got a whole new set because the inflammation gone to the knees, starting working on different -- it was whatever aliments I was going through. 12:45
Q. So are there supplements on this page that you are no longer taking? 12:45
A. The black seed oil gummies. I'm not taking those anymore. 12:45
Q. Okay. 12:45
A. The black walnut and glove of garlic drops. I -- I got them in a pill form. 12:45
Q. Okay. 12:45
A. And the cayenne pepper ones, I just ran out of that. That's -- I haven't re-upped on that one. And then the Mullein leaf is for your lungs, 12:45

Page 146

drops. 12:45
Q. And of all these supplements, you didn't stop taking any of them because they didn't work; correct? 12:45
A. No. They all -- they're all working. 12:45
Q. And you didn't stop taking them because you didn't like what was in them? 12:45
A. No. They're -- I'm taking them all, except the black seed oil. I -- I haven't re-upped on that one or the drops. The drops go too fast for me. 12:46
Q. Okay. 12:46
MS. ORD: Let's mark as Exhibit 7, Tab 33. 12:46
THE WITNESS: And that was on -- that one says it was on Instagram. 12:46
MS. ORD: Do we have 33 up? 12:46
MS. NGUYEN: Just one second. 12:46
MS. ORD: So we'll mark as Exhibit 7 a page -- one-page printout of "Cayenne Pepper Hawthorn Beet Root Turmeric Vitamin K2+D3." 12:46
(Deposition Exhibit 7 was marked for identification and is attached hereto.) 12:46
THE WITNESS: Yep. 12:46
BY MS. ORD: 12:46
Q. And those are liquid drops; correct? 12:46

Page 147

A. They are. 12:47
Q. Are these the ones that you've been taking but you're currently out of? 12:47
A. Yeah. I'm not on those anymore. 12:47
Q. And you see that it has in it Vitamins D3 and K2? 12:47
A. Yes. 12:47
Q. Is that one of the reasons that you took this supplement? 12:47
A. Vitamin K, yes. 12:47
Q. What does Vitamin K do for you? 12:47
A. Well, I don't know what it does off the bat. I just know that when I watched the lady, her name is Barbara O'Neill, she's a Christian woman, and she swears by all the organic things in the earth, that she tells you when you have an element, you put her -- put the element in her website, and she'll tell you what you need to get, and what would help -- what it will help with, and that's what I did. So... 12:47
Q. And it recommended this cayenne pepper Hawthorn product? 12:47
A. Yeah. All the ingredients in it is something she had posted about having rheumatoid arthritis and swelling in joints and pain and stuff. 12:47

Page 148

It works really good she said. So I -- I got it. 12:47
Q. So your purpose in taking this product was her recommendation, not specifically to get Vitamin D3 or Vitamin K2; correct? 12:47
A. No. They said it was the elements that I -- the symptoms that I was feeling would go away if I have those in my regimen. So I picked them up. 12:48
Q. And that turned out to be true; correct? 12:48
A. Yes. 12:48
Q. And do you think there's nothing in this supplement that's bad for you? 12:48
MR. KRIVOSHEY: Objection to form. 12:48
THE WITNESS: I can't get it. 12:48
MR. KRIVOSHEY: Here. Use the -- this. 12:48
Oh. Never mind. That scrolls the page. 12:48
If you do the plus signs here. There we go. 12:48
THE WITNESS: Well, the ingredients on here are all holistic, and they're supposed to be good for your body. 12:49
BY MS. ORD: 12:49
Q. Okay. And do you see at the very bottom it says "other ingredients" and one of those is something called "citric acid"? 12:49
A. [Witness reviews document]. 12:49

Page 149

Where does it say "citric acid". 12:49
Q. Under "other ingredients" at the very bottom. 12:49
A. "Arctic glycerine, purified water, citric acid." I see it, "natural flavors." 12:49
Q. Are you okay with the fact that this product has citric acid in it? 12:49
A. Well, I've been taking it. It's been having great results. So I'm -- I'm going to overlook that. 12:49
Q. Okay. 12:49
A. Yeah. 12:49
Q. Did you not know that before? 12:49
A. I did not know that. I didn't look at the -- I only read what was on the front. It was all -- and it was -- it was the main names of things that Barbara O'Neill said that I should be taking in my regimen -- regimen for menopausal, arthritic, and stuff like that. 12:49
Q. And will you continue to take this product despite the fact that it has citric acid in it? 12:50
A. Well, it does work really good. It's just that it runs out too fast. 12:50
MS. ORD: Okay. Let's mark as our next exhibit, Exhibit 8. We're going to do Tab 34. 12:50



(Deposition Exhibit 8 was marked for identification and is attached hereto.) 12:50
BY MS. ORD: 12:50
Q. While we're waiting, Tab 34 is the black seed and honey gummies. 12:50
Are you there? 12:50
A. Yeah. I see those. 12:50
Q. Is this the product that you take? 12:50
A. Yes. It was a product I took. 12:50
Q. And you no longer do? 12:50
A. Well, I didn't like the way they got stuck in my teeth. I was giving them to my uncle. 12:51
Q. Other than that, is there any reason you stopped taking this product? 12:51
A. No. The gummies got stuck in my teeth. 12:51
Q. And what was the reason you took it? 12:51
A. It's supposed to be good with gut health. 12:51
Q. And did you, in fact, have improvement in gut health while you were taking this? 12:51
A. I did. 12:51
Q. Moving to the second page on the back -- and I apologize -- this is in Spanish. But I don't think we're going to need to read in Spanish. 12:51
Do you see the picture of the apples midway down? 12:51



MR. KRIVOSHEY: Again, you made it pretty small. 35 percent. 12:51
THE WITNESS: [Witness reviews document]. 12:51
I see them. 12:51
BY MS. ORD: 12:51
Q. Okay. 12:51
MR. KRIVOSHEY: No, yeah. 12:51
THE WITNESS: Apple cider vinegar? 12:51
BY MS. ORD: 12:51
Q. Apple cider vinegar powder? Yeah. 12:51
A. Uh-huh. 12:51
Q. Do you see that? 12:51
Were you aware that this product had apple cider vinegar powder in it? 12:51
A. No. 12:51
Q. Is that a problem for you? 12:52
A. No. I just didn't -- I wasn't aware of that. 12:52
Q. So it's not actually fresh apples or apple cider vinegar -- right? -- it's powder? 12:52
A. I didn't know that was even in there. 12:52
Q. Would that cause you to stop taking this product? 12:52
A. No. It just makes me look a little bit more. I'm just getting certain ingredients because



of what the lady is saying, the names of things. I'm just buying because they're cheap, and I'm throwing them in my routine to see how they work. 12:52
Q. Do you know if this contains any vitamins? 12:52
A. I do not. 12:52
Q. Are you aware that this product contains Vitamin C? 12:52
A. I am not. 12:52
Q. Does it bother you if it contains Vitamin C? 12:52
A. No. 12:52
Q. Vitamin C is basically good for you; right? 12:52
A. In moderation, yes. 12:52
MR. KRIVOSHEY: Objection to form. 12:52
BY MS. ORD: 12:52
Q. Do you know if this product contains ascorbic acid? 12:52
A. I do not. 12:52
Q. If it did, would you stop taking it? 12:52
A. I don't know. It works really good, though. It helps your gut. I had acid reflex, and I haven't had any issues and diary product sensitivity. 12:53
Q. Intolerance. Yeah. 12:53

A. And they're gone. So I would have to, you know, do some more research on them. I didn't see all this [witness indicates]. 12:53
Q. So the presence of ascorbic acid in a product by itself is not enough to make you stop using it? 12:53
A. Well, this product is -- is for parasitic, and it's got different gummies, different -- different ingredients for your gut health and inflammation and stuff. 12:53
It worked really good when I used it. I just didn't like it getting stuck in my teeth. So I passed it to my uncle. 12:53
When it talks about the ingredients that are inside it, I would probably try to do more where I'm looking for just the black seed. That's what I did in -- in the other pictures that you have. If they're just black seed where I was taking out all the extra because I just want to work on one name. 12:53
Q. So, simply, the presence of ascorbic acid in a product is not going to be enough for you to not buy it? 12:53
A. Well, I didn't know it was in there. I mean, but, like, you -- like, you're showing here, there's three -- there's other things in there. I 12:54



was just trying to buy it for the black seed. 12:54
Q. Okay. 12:54
A. And if you look on the other pictures that you showed me earlier, I ended up getting the black seed with the black walnut hull, just the ones that I wanted because there was a lot of additives in there that I wasn't aware of when I was taking my regimen. 12:54
Q. Are any of those additive not natural? 12:54
A. No. They're all natural. Beet root powder is -- it's -- it's -- they're just, you know, a certain way they put them in there. But -- 12:54
Q. So no objection to additives in general, just -- 12:54
A. No. I just -- I didn't -- I wasn't aware of these additives. I don't know what kind of health additives would benefit me. But I was only buying it for the black seed oil. 12:54
Q. Okay. And it worked well; right? You were happy with it? 12:54
A. The black seed oil does work well. 12:54
Q. In other words, you didn't overpay for this or get something that you didn't intend to buy? 12:54
A. The black seed oil works very well. The gummies are designed for a certain other things. I 12:54



know black seed oil works well. 12:55
That's why I started to take away all the extra little things and buying, specifically, on my package. If you look for that brown one -- 12:55
Q. Uh-huh. 12:55
A. -- that you have one of those pictures, it's black seed oil, black walnut hull and cloves. So now we're getting more technical where I'm needing my body to be. 12:55
So I started these -- I just grabbed a bunch of things that had a bunch of names, and I tried them to see how they worked. They did have an effect on me, but I -- I gave those on to uncle. 12:55
Q. And you don't feel that you were ripped off by this product; correct? 12:55
A. I think it's more my -- I think it's more my fault for not checking. Because I am -- I am trying to be more healthy-wise. It's my fault for not looking. I just grabbed it because I seen "black seed oil" on top of it. And if you tasted black seed oil, it's very bitter. 12:55
Q. Okay. 12:55
A. So a gummy would have been, like, perfect. If it -- you know... 12:55
MS. ORD: Let's do Tab 35. This is going 12:55



to be Exhibit 8 [verbatim], and this is "magnesium." 12:56
MR. KRIVOSHEY: This is 9. 12:56
MS. ORD: 9? 12:56
THE REPORTER: Yes. 12:56
THE WITNESS: Is the one, magnesium? 12:56
(Deposition Exhibit 9 was marked for identification and is attached hereto.) 12:56
BY MS. ORD: 12:56
Q. Yeah. Exactly. 12:56
A. Uh-huh. That works really good. 12:56
Q. All right. Do you have it there? 12:56
A. I do. 12:56
Q. So we're marking as Exhibit 9 the 15-in-1 magnesium. 12:56
And you recognize this; correct? 12:56
A. Yes. 12:56
Q. This is a product that you have taken? 12:56
A. Yes. 12:56
Q. What do you take it for? 12:56
A. High cortisol levels. 12:56
Q. Satisfied with this product? 12:56
A. I am. 12:56
Q. Do you know what the ingredients are? 12:56
A. Just the three that are in front of me. I don't know the other 14 -- or 12. 12:57

right side of the label, is there anything in there that gives you pause? 13:04 13:05
A. That gives me a pause? 13:05
Q. Yeah. That is problematic to you? 13:05
MR. KRIVOSHEY: Objection to form. 13:05
THE WITNESS: Well, it says "0 percent sugar," but it says total sugars is 31 grams. 13:05 13:05
BY MS. ORD: 13:05
Q. It says "0 percent added sugar"; right? 13:05
A. Uh-huh. 13:05
Q. Whatever sugar is in there comes from apples? 13:05 13:05
A. I am imagining. 13:05
Q. Okay. Anything else there in the nutrition facts that you think is unhealthy or should have been disclosed to you? 13:05 13:05 13:05
A. I can't even see it. It's too small. 13:05
MR. KRIVOSHEY: Yeah. I don't know why -- everything you look at, it just gets so small. 13:05 13:05
THE WITNESS: It's my eyes. It's got bad. 13:06
THE VIDEOGRAPHER: You have to adjust your microphone a little bit. It's rubbing against your shirt. 13:06 13:06 13:06
MR. KRIVOSHEY: Is that better? 13:06
THE VIDEOGRAPHER: Yes. 13:06

Page 166

MR. KRIVOSHEY: Yeah, no wonder you can't see anything. 13:06 13:06
Hang on. Let me download this so you can see the whole thing. 13:06 13:06
Okay. There you go. 13:06
THE WITNESS: Just that there is Vitamin C in it. 13:06 13:07
BY MS. ORD: 13:07
Q. Okay. And that's not in the nutrition facts; correct? 13:07 13:07
A. It isn't. It's in the bottom. 13:07
Q. You are referring to where it says "Ingredients"; correct? 13:07 13:07
A. Well, yes, the ingredients says Vitamin C. But on the protein -- underneath protein. 13:07 13:07
Q. It says 1 gram; right? 1 gram of protein. 13:07
And then you are referring to where it says "Vit. C 190 milligrams 100 percent"? Is that what you are referring to? 13:07 13:07 13:07
A. Yeah. 13:07
Q. What is your understanding of what that refers to? 13:07 13:07
A. I don't know what it refers to. 13:07
Q. It does indicate Vitamin C is in this juice; correct? 13:07 13:07

Page 167

A. It does. 13:07
Q. And does it not also indicate that Vitamin D is in this juice, or no? 13:07 13:07
MR. KRIVOSHEY: Objection to form. 13:07
THE WITNESS: It says "0" on this one. 13:07
BY MS. ORD: 13:07
Q. So no Vitamin D in this? 13:07
A. I don't see any Vitamin D in there. 13:08
Q. Is there any calcium in this? 13:08
A. No. 13:08
Q. Is there any iron in this? 13:08
A. No. 13:08
Q. Is there any potassium in this? 13:08
A. The potassium, 120 -- 120 milligrams. 13:08
Q. Any problem with potassium? 13:08
A. And carbohydrates. 13:08
Q. So do you object to learning that there is potassium in this juice? 13:08 13:08
A. I'm -- yeah, I'm just learning that. How would I object to learning about it? 13:08 13:08
Q. Does that cause you to be concerned about this product in any way? 13:08 13:08
A. I don't know what potasium would do -- 13:08
Q. And then what about Vitamin C? 13:08
A. -- in apple juice. 13:08

Page 168

Q. What about the fact that there is Vitamin C in apples and apple juice? 13:08 13:09
A. It's in there. I see it. I mean -- but you think of Vitamin C, you think of oranges. You don't think of apples. 13:09 13:09 13:09
Q. So would you not buy this product now that you are aware that it has potasium and Vitamin C in it? 13:09 13:09 13:09
A. I would just say I -- it's not a vitamin. I am going -- I want juice. I would just -- why is all this extra stuff -- I'm even going to have to go through my stuff and get rid of stuff because of all the little things that you made points about. You know, some of the things that I am taking, all the little extras is not what I'm buying. I was buying only for the main brand. So I'm going to have to start looking and sorting through my stuff too. 13:09 13:09 13:09 13:09 13:09 13:09 13:09 13:09 13:09
But, yeah, when you think of Vitamin C, you think of vitamins. I'm not trying to have a vitamin. If I'm going to drink it, it's going to be for apple juice. I didn't know none of this stuff was in there. 13:09 13:09 13:09 13:09 13:09
Q. And is it bad for you to take Vitamin C? 13:09
A. I don't know -- I don't know what it's -- I don't know the amount, the quantity, what is bad 13:09 13:09

Page 169

for a person. I don't know. 13:09
Q. Is this the only product, the Martinelli's 13:09
product for which you have investigated whether it 13:09
contained ascorbic acid? 13:10
MR. KRIVOSHEY: Objection to form. Asked 13:10
and answered. 13:10
BY MS. ORD: 13:10
Q. It's the only one? 13:10
A. No comment. 13:10
Q. Well, you have to comment. That's how 13:10
this works. 13:10
A. Give me a minute. My -- you guys are 13:10
making my head throb. 13:10
Can you repeat your question? 13:10
Q. Yeah. 13:10
You talked about having other products you 13:10
needed to go back and see what is in them? 13:10
A. Yeah. Yeah. 13:10
Q. Is the Martinelli's the only product where 13:10
you have actually looked to see if it had ascorbic 13:10
acid in it? 13:10
A. I did. 13:10
Q. And do you see ascorbic acid anywhere on 13:10
this label? 13:10
A. No. But you can use the Vitamin C as an 13:10



ascorbic acid. 13:10
Q. Explain to me what that means. 13:10
A. It's -- it's something that they use to -- 13:10
I mean, you could use it to sustain something. You 13:11
could put Vitamin C in something to help it sustain. 13:11
Q. Is that a purpose for which Vitamin C may 13:11
be added to a product? 13:11
A. I don't know why they would add Vitamin C 13:11
to apple juice. 13:11
Q. Do you recall your testimony earlier today 13:11
where you said Vitamin C has nothing to do with this 13:11
litigation? 13:11
A. About -- 13:11
MR. KRIVOSHEY: Objection to form. 13:11
Argumentative. 13:11
THE WITNESS: Yeah. 13:11
BY MS. ORD: 13:11
Q. Do you stand by that? 13:11
A. I don't know. I'm not a creator. And 13:11
I -- it's not my ingredients. 13:11
Q. But do you stand by your testimony from 13:11
earlier today? 13:11
A. What was my testimony earlier? 13:11
Q. That Vitamin C had nothing to do with this 13:11
lawsuit. 13:11



MR. KRIVOSHEY: Objection to form. 13:11
Mischaracterizes testimony. 13:11
THE WITNESS: I'm seeing it for the first 13:11
time. So at the time you're asking me, I didn't 13:11
know Vitamin C has anything to do with our apple 13:11
juice. 13:11
BY MS. ORD: 13:11
Q. But that's not the reason that you brought 13:11
this lawsuit; correct? 13:11
A. No. 13:11
Q. It's because of the ascorbic acid? 13:11
A. I don't know. It's because -- I'm 13:11
supposed to be getting juice, and you guys got all 13:11
these extra additives and things in there, things 13:11
that I wasn't aware of. 13:11
Q. So when you filed the lawsuit, what were 13:12
you objecting to being added specifically to the 13:12
apple juice? 13:12
A. I never seen this nutritional fact sheet 13:12
on your guys's Martinelli's. 13:12
Q. So what was the -- what was the thing that 13:12
was added to the apple juice that you were objecting 13:12
to? 13:12
A. The ascorbic acid. 13:12
Q. Okay. That's it? 13:12



A. Yes. 13:12
MS. ORD: Okay. Let us now look to 13:12
Tab 26, Tia, which is going to be Exhibit 11. And 13:12
we are marking a label for Martinelli's Sparkling 13:12
Cider. 13:12
(Deposition Exhibit 11 was marked for 13:12
identification and is attached hereto.) 13:12
BY MS. ORD: 13:12
Q. Has it come up? 13:12
A. No, not yet. 13:12
MS. NGUYEN: You might want to refresh it. 13:12
THE WITNESS: I don't know how. 13:13
MS. ORD: Do you mind -- 13:13
MR. KRIVOSHEY: Oh. Sorry. Yeah. 13:13
THE WITNESS: I don't -- I don't mess with 13:13
computers. 13:13
MR. KRIVOSHEY: Don't worry about it. 13:13
I'll get it. 13:13
I'll pull up the whole page. 13:13
Okay. There's -- there's two pages to 13:13
this exhibit. Look at the front and the back. 13:13
THE WITNESS: Okay. 13:13
BY MS. ORD: 13:13
Q. Okay. You've mentioned a few times during 13:13
your testimony today that your eyesight had gotten 13:13

bad; is that true? 13:13
A. Yes. 13:13
Q. Do you have trouble seeing labels in stores? 13:13
A. I don't even look. 13:13
Q. Okay. And if you did look, it would -- 13:13
A. I'm taking your word for it. That's what I'm doing. I'm taking your word for it. 13:13
Q. Okay. So we're looking now at the sparkling cider. First, the front label. It says "100 percent juice from U.S. grown fresh apples"; correct? 13:13
A. Yeah. I see it. 13:13
Q. And you have no reason to believe that is not true? 13:14
A. I have no reason to believe that's not true because you're telling me it's on the front of the bottom. 13:14
Q. Okay. And at the bottom, it says "Contains no alcohol." 13:14
That's true; correct? 13:14
A. Correct. 13:14
Q. And that is a reason that you purchased this product? 13:14
A. Back in the day, yes. 13:14

Page 174

Q. Yep. 13:14
And then let us flip to the back label. 13:14
You would have seen a label like this the day that you were in the store and you looked at the back of the sparkling bottle; correct? 13:14
Do you need the question again? 13:15
A. Oh, no. I'm just looking at -- I'm familiarizing myself with this thing because I've never seen it. 13:15
Q. So the question was is this what you'd have seen on the back of the sparkling bottle? 13:15
A. I would -- I would have saw a label, yes. 13:15
Q. Okay. 13:15
A. I'm not sure if it was this label, but I saw a label, yes. 13:15
Q. And you knew that this was, in fact, a sparkling product? 13:15
A. Yes. 13:15
Q. Carbonation added? 13:15
A. Yes. 13:15
Q. Okay. And that was one of the reasons you bought it; right? 13:15
A. Because it was -- yeah, it was non-alcoholic apple juice. 13:15
Q. And you can see here, same place we looked 13:15

Page 175

before, under the word "protein," it says "Vitamin C 90 milligrams 100 percent"; correct? 13:15
A. I see that. 13:15
Q. So this definitely has Vitamin C in it? 13:15
A. It does. 13:15
Q. And was that a problem for you when you purchased -- 13:15
A. I didn't -- 13:15
Q. -- this product? 13:15
A. I don't remember seeing that in the bottle that I looked at. 13:16
Q. Okay. And this label does not say "ascorbic acid"; correct? 13:16
A. I don't see anything "ascorbic acid" on this label. 13:16
Q. Okay. Is there anything on this label that you object to? 13:16
MR. KRIVOSHEY: Objection to form. 13:16
THE WITNESS: It's got a lot of vitamins. 13:16
BY MS. ORD: 13:16
Q. Which is not necessarily a bad thing; right? 13:16
MR. KRIVOSHEY: Objection. Lack of form. 13:16
THE WITNESS: Like I say, you got to take it in moderation. 13:16

Page 176

BY MS. ORD: 13:16
Q. Okay. You also testified that you bought some individual bottles of apple juice, so not the half gallon and not the sparkling bottle; right? 13:17
A. Single serves, yeah. 13:17
Q. Were those glass bottles? 13:17
A. They were. 13:17
Q. And those were for the kids? 13:17
A. Uh-huh. 13:17
Q. Do you recall if there were any labels on those, or was it just a glass bottle? 13:17
A. I don't recall. I just remember seeing the -- Martinelli's has a very unique style in the glass. 13:17
Q. The little shape of the bottle looks like an apple? 13:17
A. Yeah. That's -- 13:17
Q. Yeah. 13:17
And do you recall seeing anything on the front of that bottle that said "a hundred percent juice" or anything like that? 13:17
A. A hundred percent juice. 13:17
Q. On the glass one? 13:17
A. Yeah. It might have been in gold and red or something for a small bottle. 13:17

Page 177

And the question is going to be, for 13:21 Exhibit 13, have you ever purchased Martinelli's 13:21 products with this label? 13:21
MR. KRIVOSHEY: This one is just the 13:21 label; right? That's what we're supposed to be 13:21 seeing? 13:22
MS. ORD: Yeah. 13:22
MR. KRIVOSHEY: Hang on. 13:22
There's -- there's more than one label on 13:22 here. 13:22
BY MS. ORD: 13:22
Q. Do any of those look familiar, or is what 13:22 you remember the red and gold one on the little 13:22 round bottles? 13:22
MR. KRIVOSHEY: You can zoom in, too. 13:22
THE WITNESS: They don't look familiar. I 13:22 don't remember the green and stuff. I just remember 13:22 gold. 13:22
BY MS. ORD: 13:22
Q. Okay. So you're not sure -- 13:22
A. I'm not sure. 13:22
Q. -- but maybe you didn't buy these? 13:22
A. I'm not sure what labels those are for 13:22 what products you guys have. 13:22
Is that what you're saying? 13:22

Page 182

Q. Yeah. 13:22
A. I don't know if I've bought any products 13:22 with those labels. I don't know. I don't recall. 13:22
Q. But to the best of your recollection, as 13:22 you sit here today, that doesn't look familiar? You 13:22 remember the red and gold? 13:22
A. Yeah, I don't. 13:22
MS. ORD: Okay. Let's mark as Exhibit -- 13:23
THE WITNESS: How often have you guys 13:23 changed your labels in -- in all the years that I've 13:23 purchased? 13:23
MR. KRIVOSHEY: You don't -- you don't -- 13:23
THE WITNESS: See? Bring up all those. 13:23
MR. KRIVOSHEY: Don't -- don't ask 13:23 questions. 13:23
MS. ORD: Let's mark as Exhibit 14, Tab 13:23 Number 4. 13:23
(Deposition Exhibit 14 was marked for 13:23 identification and is attached hereto.) 13:23
BY MS. ORD: 13:23
Q. When Tab 14 comes up -- Exhibit 14 comes 13:23 up, this is going to be "Plaintiff Ramirez's 13:23 responses and objections to defendants' first set of 13:23 interrogatories." 13:23
And I'm going to direct you to the very 13:23

Page 183

last page of that document. 13:23
Let me know when you are there. 13:23
A. I'm there. 13:23
Q. Okay. Do you see at the top of that page 13:23 it says "Verification"? 13:24
A. Uh-huh. 13:24
Q. Do you know what this is? 13:24
A. Something that I signed. 13:24
Q. Yeah. Is that your signature there? 13:24
A. Yep. 13:24
Q. And you signed it on June 24th, 2026? 13:24
A. Yep. 13:24
Q. And when you signed it, you understand 13:24 that you verified, under penalty of perjury, that 13:24 you have read the objections and responses to 13:24 defendants' first set of interrogatories, I believe 13:24 that the answers contained therein are true and 13:24 correct? 13:24
A. Correct. 13:24
Q. And that was, in fact, true when you 13:24 signed this? 13:24
A. Yes. 13:24
Q. Okay. What, if anything, did you do to 13:24 provide information in response to these questions? 13:24
A. What are the questions? 13:24

Page 184

Q. There's written responses in here. 13:24
What did you do, if anything, to provide 13:24 information that could be written down here? 13:24
A. I answered the best of my ability. I 13:24 don't have anything. 13:24
Q. Okay. Do you recall providing information 13:24 to your attorneys for these responses? 13:24
A. I did -- 13:24
MR. KRIVOSHEY: Objection -- objection. 13:24
Don't answer. 13:25
MS. ORD: Okay. What is the basis for the 13:25 instruction not to answer? 13:25
MR. KRIVOSHEY: It's attorney-client 13:25 privilege. 13:25
You are asking what my client provided to 13:25 her attorneys, and that is classic attorney-client 13:25 privilege. 13:25
BY MS. ORD: 13:25
Q. Is it your testimony that you provided no 13:25 information to your attorney in connection with 13:25 these interrogatory responses? 13:25
MR. KRIVOSHEY: Don't -- don't answer 13:25 that. 13:25
Attorney-client privilege. 13:25
MS. ORD: It's a yes-or-no question, 13:25

Page 185

Counselor. I think she can answer whether she 13:25
provided any information. I'm not going to ask her 13:25
what she provided. 13:25
MR. KRIVOSHEY: The answer is -- my 13:25
response is objection. Attorney-client privilege. 13:25
Do not respond. 13:25
BY MS. ORD: 13:25
Q. Will you follow your attorney's 13:25
instructions? 13:25
A. Yes. 13:25
Q. So if you don't answer that question, I 13:25
will never know if you provided any information to 13:25
help answer these questions. 13:25
Do you understand that? 13:25
A. I understand that. 13:25
MR. KRIVOSHEY: Don't -- 13:25
BY MS. ORD: 13:25
Q. Although, you did somehow manage to 13:25
confirm that the answers were true and accurate 13:25
under penalty of perjury; correct? 13:25
A. Correct. 13:25
Q. Do you recall making any changes to your 13:25
responses? 13:25
A. No. 13:25
Q. Okay. What, if anything, did you do 13:25



before you signed the verification to make sure that 13:26
the responses were true and accurate? 13:26
A. Gave them the answer to the best of my 13:26
ability. And I don't have no documents, no 13:26
evidence, no nothing. 13:26
Q. Anything else? 13:26
A. No. That's it. 13:26
Q. Did you review the responses before you 13:26
signed the verification? 13:26
A. I did. 13:26
Q. And to the best of your knowledge, they 13:26
were true and accurate? 13:26
A. Correct. 13:26
Q. Looking at Interrogatory Number 1, do you 13:26
see that there? 13:26
It says [as read]: 13:26
"Identify all persons who have 13:26
knowledge of facts relevant to the 13:26
allegations in the amended Complaint 13:26
and identify the issues on which you 13:26
believe they have knowledge." 13:26
Do you see that? 13:26
A. I do. 13:26
Q. And in response, you identified yourself; 13:26
correct? 13:26



A. Correct. 13:26
Q. And then various people at Martinelli's? 13:26
A. Okay. 13:27
Q. Who is Mark Mizuki? 13:27
A. Who? 13:27
Q. Who is Scott Lee? 13:27
Don't know? Don't know who that is? 13:27
A. No. 13:27
Q. How about Spenser Russell? 13:27
A. No. 13:27
Q. You testified earlier today that you were 13:27
in the grocery store with your daughter? 13:27
A. One of them, yeah. 13:27
Q. How come her name is not listed here? 13:27
A. Because she is a minor at the time, I 13:27
guess. I don't know. 13:27
Q. She was a minor in 2025? 13:27
A. I don't know which child it was. I don't 13:27
know if it was a grandbaby or it was my kids. I was 13:27
always around the kids, so I can't particularly tell 13:27
you what child it was. I would -- I would imagine 13:27
it was one of my brainiac girls, which would be 13:28
Jolene. But I can't -- I can't be for certain if it 13:28
wasn't Leilah or Faith. I don't know. 13:28
Q. Who Googled the ingredient? 13:28



A. I don't know. It's one of my girls. 13:28
That's why I said earlier it was one of my girls. I 13:28
couldn't be certain. 13:28
Q. And did you ask any of them which one it 13:28
was? 13:28
A. No. I didn't talk to anyone about this 13:28
matter. Not even the kids. This is my -- my 13:28
recollection. I'm trying to recollect who was in 13:28
the store with me. I don't remember. 13:28
Q. But certainly one of those children does 13:28
have relevant knowledge because that is the person 13:28
who helped you look at the label and Googled it. 13:28
A. But I don't know which child it is. And 13:28
by my going and asking which child it is is 13:28
disclosing information about a case that is still 13:28
ongoing. That is not okay. So I don't bring 13:28
anybody involved in this. 13:28
Since my recollection, I don't know. It 13:28
was one of my babies. I don't remember which one. 13:28
Q. Were you instructed by anyone not to speak 13:28
to your children about this fact? 13:28
A. I was instructed not to speak to anybody 13:28
about this matter. 13:28
Q. So you did not investigate which one of 13:28
children was present with you at the grocery store? 13:28

been having massive headaches from taking half this 13:34
crap. I don't even know if it's -- I'm going to 13:34
have to go and have it checked to see what I'm 13:34
taking. 13:34
I don't know -- I don't know. I didn't 13:34
know I was taking any vitamins. I wasn't aware I 13:34
was taking vitamins. Black seed oil. It just says 13:34
"black seed oil" on it. I wasn't looking at the 13:35
back of the label. 13:35
Q. But these supplements have, generally, 13:35
been helpful to you? 13:35
MR. KRIVOSHEY: Objection to form. Asked 13:35
and answered. 13:35
THE WITNESS: I lost 30 pounds. I don't 13:35
know which one did it. 13:35
BY MS. ORD: 13:35
Q. I wish you'd tell me which one did it. 13:35
A. You got the pictures. I lost 30 pounds. 13:35
I don't know which one did it. I took them all in 13:35
that order. And it was only because of whatever was 13:35
ailing me. And now there's different things ailing 13:35
me. So I'm taking -- the -- the regimen changed. 13:35
I'm not taking vitamins. 13:35
Q. Okay. We're going to look at 13:35
Interrogatory Number 9. That one says [as read]: 13:35



"Identify all social media 13:35
platforms, e.g., Facebook, Twitter, 13:35
Instagram, LinkedIn, and your account 13:35
name used by you since September 5th, 13:35
2021." 13:35
Do you see that? 13:35
A. I see it. 13:35
Q. And in response to that, you made an 13:35
objection that this has nothing to do with 13:36
Martinelli's; correct? 13:36
A. Correct. 13:36
Q. And then in response to Interrogatory 13:36
Number 10, which asks for every online website, 13:36
social media vehicle, form, or platform where you 13:36
have sent or reviewed any content or communications 13:36
concerning the allegations of the Complaint. 13:36
And then it goes on to list a bunch of 13:36
different things like Facebook, Twitter, Instagram, 13:36
LinkedIn, messaging apps like WhatsApp, SnapChat, 13:36
et cetera. 13:36
Do you see that there? 13:36
A. I see them. 13:36
Q. And then in response to that you 13:36
identified Facebook; correct? 13:36
A. That's the only one I have. The only one 13:36



I'm on that I play on. 13:36
Q. And said you have no username or other 13:36
registration identity; correct? 13:36
A. What you do you mean "username," 13:36
"identity." 13:36
Q. You have a username for Facebook; right? 13:36
A. Yes. It's setfreeramirez@gmail.com or -- 13:36
that's the email we go under. Setfree -- 13:36
Q. Why didn't you list that here? 13:36
A. I don't know what you guys are asking of 13:36
me. I might -- I -- 13:37
Q. Well, ma'am, it's right here in the 13:37
question. It was specific. 13:37
A. It may be -- it may be -- 13:37
MR. KRIVOSHEY: Objection to form. 13:37
THE WITNESS: It may be back -- 13:37
MR. KRIVOSHEY: Argumentative. 13:37
Hang on. 13:37
Objection to form. Argumentative. 13:37
BY MS. ORD: 13:37
Q. We did ask you for the names that you 13:37
used; correct? 13:37
A. Joly Ramirez. 13:37
Q. And you didn't list it here; right? 13:37
A. You want to search me, look under "Joly 13:37



Ramirez." 13:37
Q. Well, you didn't list it; right? 13:37
A. You got my name. You guys know my name. 13:37
You went under Facebook. You found me. I mean, 13:37
I -- I don't know. I'm not tech savvy. I don't 13:37
know what social platforms -- what I'm aware of 13:37
social platforms is Instagram, Facebook, TikTok. 13:37
Q. But you didn't list Instagram or TikTok 13:37
here either, did you? 13:37
A. No. But they're there. They're -- 13:37
they're -- 13:37
Q. That's my point, yes. 13:37
A. Your Instagram is connected to Facebook. 13:37
MR. KRIVOSHEY: Jolly, listen to the 13:37
question. Answer the question -- 13:37
THE WITNESS: I -- I -- 13:37
MR. KRIVOSHEY: Answer -- answer the 13:37
question, please. 13:37
THE WITNESS: I didn't -- 13:37
MR. KRIVOSHEY: Let's just -- we're 13:37
getting sidetrack here. 13:37
THE WITNESS: I did not answer to the best 13:37
of my ability. I just shot through it. 13:37
BY MS. ORD: 13:37
Q. Uh-huh. 13:37

A. I only gave you Facebook. I didn't know why. Didn't put much thought process behind it. By sitting here with you today, and you're bringing up all this stuff about other websites, I am very -- a person with a lot of integrity. 13:38
I can tell you I got LinkedIn. There's -- there's other places that I go for web -- for jobs and to get -- I -- but I don't know -- what you call "social media" and what I call social media are different. It's just those are two different things. 13:38
Q. But we did miss a few things in this response? 13:38
A. We did miss a lot of things and apparent to this. 13:38
Q. Okay. Even though you did verify? 13:38
A. I verified by just signing my paperwork. I don't know if I even read half the crap in there. I'm trusting everything. 13:38
Q. Okay. 13:38
A. So my -- my apologies if you guys -- 13:38
MR. KRIVOSHEY: Hold on. You don't need to apologize for anything. There's accurate -- 13:38
MS. ORD: All right. 13:38
MR. KRIVOSHEY: -- and substantive 13:38



objections in here. 13:38
MS. ORD: All right. 13:38
MR. KRIVOSHEY: So -- 13:38
BY MS. ORD: 13:38
Q. We'll leave it there. 13:38
Is there anything else in these interrogatories that you would like to change? 13:38
A. I don't even know all the names I have to give you. Some have the kids found me some stuff. I don't know. 13:39
Q. What does that mean? 13:39
A. Like, the cancer -- like -- I got -- never mind. 13:39
Q. What did the kids find? 13:39
A. Some of the platforms they have me on, my kids got me on them. So I was, like, I'm looking for the names now of these things. 13:39
Q. Do you think we found them all now or have we missed some? 13:39
A. Well, the ones that I have in my phone, they're not even on here. 13:39
Q. All right. Can you think of any other than Facebook, Instagram, LinkedIn, and TikTok? 13:39
A. Well, I -- I found that résumé under the NerdWallet or Nerd -- Nerd thing. Nerd thingy. 13:39



Q. Anything else? 13:39
A. [Witness reviews document]. 13:39
There's, like, four other platforms for jobs. I don't know the name of them. 13:40
Q. Okay. And apart from the jobs, anything else? 13:40
A. EDD. 13:40
Q. Okay. 13:40
A. RCC. 13:40
Q. Anything else? That's it? 13:40
A. As far as my knowledge, yeah. 13:40
Q. Okay. How about YouTube? 13:40
A. Oh, yeah. I got YouTube. 13:40
Q. Okay. 13:40
A. Sorry. 13:40
Q. Anything else? 13:40
A. I use YouTube because it's my -- it my system. I play -- I bump my music on YouTube. 13:40
Q. Okay. 13:40
A. Name -- name some more. 13:40
(Laughter elicited.) 13:40
BY MS. ORD: 13:40
Q. Okay. 13:40
A. I don't know. I don't know if -- 13:40
Q. Would you agree that we could have put more things here? 13:40



A. I don't know if I have any. 13:40
You can give me what you -- what you -- "Hey, do you have any of these," and let me see if I -- if I do. 13:41
Q. Okay. 13:41
A. Because I don't know what you're looking for. I don't know where to look, and I apologize. I thought -- 13:41
Q. But we do agree we missed a few of things, yes? 13:41
A. There's a lot of things. 13:41
Q. Okay. All right. Let's look at Interrogatory Number 16 [as read]: 13:41
"Identify each and every legal proceeding" -- 13:41
MR. KRIVOSHEY: Hang on. 13:41
BY MS. ORD: 13:41
Q. [As read]: 13:41
-- "including appraisal proceedings, other administrative proceedings, arbitrations, investigations, civil or criminal lawsuits in which you have been involved in any manner. For each, identify the proceeding by case name, 13:41

caption, and jurisdiction." 13:41
A. Okay. 13:41
Q. Do you see that? 13:41
A. I see it. 13:41
Q. And then there is a response that says [as read]: 13:41
"Apart from occasional traffic violations, plaintiff has, on several times, consulted with a lawyer to pursue claims against the responsibile parties in traffic accidents. She is unsure whether the matter resulted in court filings or were resolved pre-filing." 13:41
Do you see that? 13:41
A. [Witness reviews document]. 13:41
Okay. 13:41
Q. You see that? That's the response you gave? 13:42
A. "I object." Yeah. 13:42
Q. Okay. So we talked a little bit earlier today about some of the criminal proceedings and the child guardianship proceedings and the fact that you had two divorces; correct? 13:42
A. Yes. 13:42

Page 206

Q. And you didn't list those there; right? 13:42
A. I didn't know I was supposed to. The first one I just divorced him on paper and he didn't even have to go to court. 13:42
Q. Well, it says "each and every legal proceeding"; right? 13:42
So you agree that those were legal proceedings where you went to court? 13:42
MR. KRIVOSHEY: Objection to form. 13:42
THE WITNESS: Yeah. So -- yeah. 13:42
BY MS. ORD: 13:42
Q. And they're not listed here; right? 13:42
A. No. 13:42
Q. And they probably should have been? 13:42
A. Yes. 13:42
MR. KRIVOSHEY: Objection to form. 13:42
BY MS. ORD: 13:42
Q. Okay. Is there any reason that you didn't list them? We've been very candid about them today. 13:42
A. I'm -- I'm -- my understanding of what a legal proceeding is not what -- the same as yours, I guess. 13:42
Something that requires me to be in court to speak with a judge, I gave you all the ones that -- I remember doing that with every criminal 13:42

Page 207

conviction of myself and a guardianship court with my kids. 13:43
The divorce packet, I -- I filled that sucker out my myself, and it went through eight months later. Didn't even have to step a foot in court. I went to -- 13:43
Q. But not listed here; correct? 13:43
A. No, it's not listed in there. 13:43
Q. Okay. And you're not sure why those aren't listed? 13:43
A. I didn't name them to be listed. I was thinking of myself in front of a judge. So... 13:43
Q. Weren't you in front of a judge for the divorce proceedings and the guardianship proceedings? 13:43
A. Only the guardianship, but not the -- not the divorce. The divorce went through because I just filled it out. And eight months later, it went through. 13:43
Q. And same thing with the criminal stuff, there was a judge present; correct? 13:43
A. I was in custody. 13:43
Q. Yeah. 13:43
A. Of course there was a judge present. 13:43
I -- I guess I'm not sure -- 13:43

Page 208

MR. KRIVOSHEY: There's no -- 13:43
THE WITNESS: I'm not knowing what you guys are wanting. 13:43
MR. KRIVOSHEY: There is no question. There is no question. 13:43
BY MS. ORD: 13:43
Q. And then at some point after giving these initial interrogatory responses, you did provide us with some updated responses; correct? 13:43
A. I did. 13:43
Q. And do you remember verifying those earlier this week? 13:44
A. Yeah. 13:44
MS. ORD: Okay. So let's go to Tab 53. We're going to mark as our next exhibit, Exhibit 15, the document entitled "Verification As to Interrogatories." 13:44
(Deposition Exhibit 15 was marked for identification and is attached hereto.) 13:44
MR. KRIVOSHEY: Do you -- we've been going, like, an hour, 15. 13:44
Do you need a break? 13:44
THE WITNESS: Yeah. 13:44
MS. ORD: You want a break? We're kind of winding down. We can push through, or we can -- 13:44

Page 209

"Facebook; no username or other registration identity was used to communicate; the substance of the communication produced at" 13:53
And then it gives the number of the document you did produce, which was the advertisement you saw on Facebook. 13:54
Do you see that there? 13:54
A. You said on 10? 13:54
Q. Yeah, your amended answer. 13:54
A. Yes. I received and reviewed... 13:54
Q. That's at the bottom of Page 1. 13:54
A. You are talking about the answer to -- 13:54
Q. And then beneath it you'll see something that says "amended answer to Interrogatory Number 10." That's the one we are looking at. 13:54
A. Oh, the amended one. 13:54
Q. Yeah. You see that one? 13:54
A. Okay. I see it. 13:54
Q. Okay. So I think we can agree that, like the previous one, we missed a few things here? 13:54
MR. KRIVOSHEY: Objection. Mischaracterizes testimony. There's valid objections here. It's fully responsive. 13:54
///

Page 214

BY MS. ORD: 13:55
Q. You do agree that we didn't list Instagram, TikTok, LinkedIn, some of the other things that we've been through; correct? 13:55
A. Correct. 13:55
Q. And we could have maybe done better? 13:55
A. Yes, ma'am. 13:55
Q. Okay. Then let's go to Interrogatory Number 16. This is the one that asked about the legal proceedings, and you've given an amended response here which begins at the bottom of Page 2 and identifies the traffic matters that you had provided before. And then adds the following language [as read]: 13:55
"In addition, plaintiff was involved in various criminal proceedings between roughly 1989, when she was 15 years old; and in 2004, including a 13-month prison sentence ending in 2004. 13:55
"Plaintiff's understanding is that these records have been expunged, and given the lengthy passage of time, she does not have the requested case-identifying information." 13:55
Do you see that? 13:55

Page 215

A. Yeah. We are missing the children. 13:55
Q. Yes. So you've correctly anticipated my question. 13:56
You have added that there were some criminal proceedings which you testified about earlier today, but we missed the divorce and the kids; right? 13:56
A. The divorce and the kids, yeah. 13:56
Q. Did we miss anything else? 13:56
A. Are you talking about anything that has to do with the court? 13:56
Q. Yeah. Any legal proceedings? 13:56
A. A guy died on my truck. 13:56
Q. Was there a lawsuit? 13:56
A. Through an -- through an insurance -- through my insurance in 2019 of October. 13:57
Q. But you don't recall a lawsuit being filed? 13:57
A. Nothing that -- nothing got us into court. I've never stepped in a court, in front of a judge, but there's a death on my vehicle. I mean, I don't -- I don't know if that's what you're looking for. If you are wanting -- or if it's just me being in front of the judge. 13:57
I'm trying to play my whole life. 13:57

Page 216

Q. Any kind of proceeding, whether civil, criminal, arbitration, demand. 13:57
A. I mean, you're -- the two -- the two divorces, I never even was in front of a judge, paperwork only. But there's those. 13:57
Probate court for both babies. 13:57
Q. And the divorces; right? 13:57
A. Yeah, but the -- the two paperworks that we done. 13:57
Q. Plus the traffic stuff, which you testified about and put here? 13:58
A. My whole record. 13:58
Q. And the criminal stuff? 13:58
A. The criminal stuff, yeah. 13:58
Q. And then you said that you thought those criminal things were so old and that the records were expunged. So you didn't have any information about those; right? 13:58
A. 21 years that I've -- it happened when I was -- 21 years ago. 21 years of sobriety. 21 years of recovery. 21 years walking with the lord. That 21 years -- 13:58
Q. Did you make any effort to look for records of those proceedings? 13:58
A. I contacted my parole agent. 13:58

Page 217

Q. What was the outcome of that conversation? 13:58
A. He said "And your W99036 number has been discharged, like, two months after you got out." So that's what I gave you guys. 13:58
Q. Okay. You -- 13:58
A. That's what I had. 13:58
Q. You provided us with a parole certificate? 13:58
A. I provided it to my attorney. I gave him the information. 13:58
MS. ORD: We'll be wanting those also, please because I don't think that was produced. 13:58
MR. KRIVOSHEY: I'm not -- I'm honestly not sure what she's referring to. So -- but -- 13:58
MS. ORD: Okay. 13:58
MR. KRIVOSHEY: I'm not the attorney on the case, so I don't want to make any representations. 13:58
THE WITNESS: I had provided it, and went to parole department and I asked them. I mean, they had to go into the archives to find my stuff because it's not something that's recent. It's, like, 21 years old. I got the paperwork saying that it is discharge, my W number. What num- -- name I was under, Joly Soleia Jones [phonetic] I think. Joly Soleia Jones. 13:59



BY MS. ORD: 13:59
Q. Okay. We did do a public records search and we were able to find some of these records. 13:59
A. Yeah. 13:59
Q. Did you also make such a search? 13:59
A. I did. 13:59
Q. And what did you find, if anything? 13:59
A. They gave me the history of everything, and I think I gave it to my attorney. 13:59
MS. ORD: That also was not produced. So we'll be wanting that as well. 13:59
MR. KRIVOSHEY: We'll take a look. We'll take a look. 13:59
BY MS. ORD: 13:59
Q. Okay. I'm not going to show you all the stuff that we were able to pull back from public records. 13:59
A. Yeah. I have stuff from 15 years old. 13:59
Q. Yeah. So we were able to get a lot of it. So my point is we would like to receive whatever you were able to get publicly. 13:59
A. Yeah. I got -- I got it. 13:59
MR. KRIVOSHEY: We'll -- we'll take a look. 13:59
MS. ORD: Okay. 13:59



MR. KRIVOSHEY: I was not involved in any of that. So... 13:59
MS. ORD: Okay. 13:59
BY MS. ORD: 13:59
Q. So the answer here that suggests that there are no records because they've all been expunged and you don't have case-identifying information is not correct, is it? 14:00
A. No. I gave dates -- I gave my attorney dates. 14:00
Q. Okay. 14:00
A. When I was able to remember them. 14:00
Q. Okay. 14:00
A. And the outcomes are convicted and -- and I did my time. 14:00
Q. Yeah. For sure. We talked about that earlier. Yeah. 14:00
A. Yeah. I did my time. I even told my attorney -- been -- 14:00
MR. KRIVOSHEY: Hang on -- hang on. Any sentence that starts with "I told my attorney," you should not finish. 14:00
THE WITNESS: Okay. 14:00
MR. KRIVOSHEY: Okay. 14:00
///



BY MS. ORD: 14:00
Q. Okay. All right. So we're missing a few things. We'll figure out what to do about that separately. 14:00
Other than what we have just talked about, do you want to make any further changes to these amended responses? 14:00
A. Just all those. 14:00
Q. Okay. And any changes to your testimony today that we have not already discussed? 14:00
MR. KRIVOSHEY: Objection to form. 14:00
THE WITNESS: If I file -- if I miss anything, you can add it. 14:00
BY MS. ORD: 14:00
Q. Okay. 14:00
A. Platforms, records, courts. 14:00
MS. ORD: We are at Tab 43, Tia. We're going to mark as our next exhibit a document entitled "Demand Letter Pursuant to California Civil Code 1782" dated August 27th, 2025, which will be 17. 14:01
(Deposition Exhibit 17 was marked for identification and is attached hereto.) 14:01
BY MS. ORD: 14:01
Q. While that is coming up, do you recall 14:01

A. That's -- yeah. That's a class action lawsuit. That was -- that's something that I -- what am I getting in trouble for? 14:05
Q. You were a named plaintiff in that lawsuit, and you did not disclose it? 14:05
A. I didn't appear in court. So I'm not -- 14:06
Q. That's the difference? You don't have to tell me if you didn't appear in court. 14:06
A. Oh, no. I -- I asked you, "What terminology are we using. Is it something where I'm supposed to be in front of the judge?" I'm giving you all these things of where I was in front of a judge and the times that I wasn't. I didn't step foot in a courtroom. All I did is put my name down on something, and I -- I'm part of that class action lawsuit, just like this could be. So it's like -- for other people who are doing the same thing, keeping you and your integrity for your company doing the right thing when no one is looking. So I'm supposed to give you all the things that I've done? 14:06
Q. Yes. Under penalty of perjury, every civil proceeding you have ever been involved in, whether you saw a judge or not. 14:06
A. Oh. Well, that's -- 14:06

Page 226

Q. A lot more? 14:06
A. Yeah. 14:06
Q. How many more? 14:06
A. I can't even count. 14:06
Q. Let's start. There's Monster; right? 14:06
A. There's Monster. 14:06
Q. And Monster was what? A class action? 14:06
A. Yeah. 14:06
Q. And you were a named plaintiff? 14:06
A. No. 14:07
Q. Are you aware that you were sued by Monster in a countersuit? 14:07
A. No. 14:07
Q. Because it was a mass arbitration? 14:07
A. No, I was not aware of that. 14:07
Q. You -- nobody ever told you that there was a lawsuit against you by Monster in Orange County Superior Court? 14:07
A. No. 14:07
MS. ORD: Let's mark our next exhibit, please. It's going to be Tab 16. 14:07
(Deposition Exhibit 18 was marked for identification and is attached hereto.) 14:08
BY MS. ORD: 14:08
Q. Do you have in front of you what we're going to mark as our next exhibit, Exhibit 18, a "Complaint for Declaratory and Injunctive Relief Filed in the Superior Court of the State of California for the County of Orange by Monster Energy Company against a number of individuals, including Joly Ramirez"? 14:08

Page 227

A. Yeah. I wasn't aware of that. 14:08
Q. Nobody ever told you that you'd been sued? 14:08
A. No. I -- I haven't been sued. I haven't received no paperwork. 14:08
Q. Who was -- 14:08
A. Who's the attorney on this? 14:08
Q. That's my next question. 14:08
Who was your attorney in the Monster dispute? 14:08
A. I didn't have one. It was just some little paper that I filled out. It didn't -- it didn't go after an attorney or anything. It was another thing on the website. This one was given to me by TikTok. 14:08
Q. And what was it for? 14:08
A. I -- I don't recall. I just -- I drink Monsters. So I -- 14:09
Q. So it has to do with consuming -- or the product Monster? 14:09

Page 228

A. Yeah. 14:09
Q. Okay. And you don't recall who your attorney was in that case? 14:09
A. No. It was just a piece of paper. I signed in, and you signed your name on it. And that's it. 14:09
Q. Was that a demand for arbitration? 14:09
A. No. It was, like, a little -- little tab opens. I sign my name on it, and I sent it in. And then that was it. That's... 14:09
Q. What happened to that case? Your Monster claim? 14:09
A. I think it paid out. 14:09
Q. Do you remember earlier when I asked you if you've ever gotten any money from any legal proceedings and you said "No"? 14:09
A. No, I don't remember. 14:09
Q. Did you forget to tell us that you got some money out of the Monster proceeding? 14:09
A. No. I didn't -- didn't remember, first of all. I mean, I -- it's not something that I went to court for; so it's like I don't even -- I didn't go to court. I didn't -- I didn't hire anybody. 14:10
Q. Did you get a settlement? 14:10
A. I did. 14:10

Page 229

And then at the lunch break, you did, in fact, locate and have your counsel produce a résumé? 14:31
A. Yes. 14:31
Q. Is the document that you're looking at, Exhibit 19, the résumé that you've produced? 14:31
A. Let me get it bigger. 14:31
Yes. 14:31
Q. And to the best of your knowledge, as you sit here today, is this your current résumé? 14:31
A. That's the last one I produced, yes. 14:31
Q. Anything that you want to change on here? 14:31
A. Well, it's not updated. So that's -- that's got only IHSS on there. I'm -- I've worked for Adora Care since November of last year. 14:31
Q. So this is probably dated back to when? Sometime last year? 14:31
A. It's only got -- hold on. It's only got a do- -- 14:32
MR. KRIVOSHEY: You need me to zoom in more? 14:32
THE WITNESS: I'm trying to see what the -- what I have in there. 14:32
MR. KRIVOSHEY: Where did the mouse go? 14:32
THE WITNESS: Oh, yeah. This is old. This is that I -- this is the one that I have in my 14:32

Page 242

files, though. This is showing 3861 10th Street. This is when I went into the ministry. 14:32
BY MS. ORD: 14:32
Q. Okay. 14:32
A. When I came out of prison, that's actually -- this is when I -- I created this after I got out of prison. 14:32
Q. Might you have a more current version? 14:32
A. I probably do. I just -- I -- I mean, on short -- short notice and then my phone died already. 14:32
Q. Yeah. 14:32
A. I -- I wasn't able to really look one up, but I can -- I know I have another one. This is actually pretty good to have because I didn't -- I won't even know half this crap. 14:32
Q. Well, thank you for looking for this one today. We will follow up with your counsel to see if you have a more recent version. 14:32
A. But I would just add the Adora Care and the IHSS for the clients that I have. 14:33
MS. ORD: Okay. With those questions, I am finished. 14:33
Do you have any questions for the witness? 14:33
MR. KRIVOSHEY: Just give me one second. 14:33

Page 243

MS. ORD: Okay. 14:33
THE WITNESS: Oh. It's got the address on it, though. It's got my new address on it. 14:33
14:33
EXAMINATION 14:33
BY MR. KRIVOSHEY: 14:33
Q. Okay. I want to ask a couple of questions of you. 14:33
There was brief testimony at the end of the deposition today about your relationship with attorney Swigart. 14:33
Do you recall that? 14:33
A. Yeah. 14:33
Q. Are you -- do you know any of the case, like, matter names that he's filed on your behalf? 14:34
A. No. 14:34
Q. Have you seen any of the Complaints that may have been filed on your behalf -- 14:34
A. No. 14:34
Q. -- by Mr. Swigart? 14:34
A. No. I've never been in to a courtroom. I've never been handed a court document like you guys given me. I have never handed in one of those. 14:34
All I had was a signature where I signed my name, and I hired him, and he did the reverse 14:34

Page 244

search for me off Facebook. I gave him my username and password -- 14:34
Q. Don't -- don't -- don't tell me what you gave him. 14:34
A. Yeah. 14:34
Q. That's, again, attorney-client privilege. 14:34
A. But I've never -- I've never been handed any type of legal matter. 14:34
Q. How many times have you talked to this attorney? 14:34
A. Just the one time. And that was to get him to -- 14:34
Q. No, don't. Not about what, just how many times. 14:35
A. One time. 14:35
Q. When? 14:35
A. In 2024, around September or August. August or September is when I hired him. 14:35
But he doesn't -- we don't talk -- 14:35
Q. Wait. Wait. 14:35
Have you been on the phone with anybody else from his office? 14:35
A. No. 14:35
MR. KRIVOSHEY: That's all the questions I have. 14:35

Page 245



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

MS. ORD: Okay. 14:35
THE WITNESS: We only reached out through 14:35 emails. 14:35
MR. KRIVOSHEY: That -- that -- I -- no 14:35 more questions for me. 14:35
MS. ORD: I have no further questions for 14:35 the witness at this time. I am going to keep the 14:35 deposition open because there are a few documents 14:35 that we would like to receive from you. So we'll 14:35 just reserve that right. It may not be necessary, 14:35 but I am going to leave it open. 14:35
So with that, thank you, Ms. Ramirez. We 14:35 appreciate your time today. And he we're all done. 14:35
THE WITNESS: Okay. 14:35
MR. KRIVOSHEY: All right. I'm going to 14:35 object on the record to the deposition being open. 14:35 That's all. 14:35
MS. ORD: Okay. We are off the record. 14:35 Thank you. 14:36
THE VIDEOGRAPHER: Time is 2:36 p.m., and 14:36 we are off the record. 14:36
(Whereupon, at 2:36 p.m., the deposition of JOLY RAMIREZ, Volume 1, was adjourned.)

--- oOo ---

Page 246

I, JOLY RAMIREZ, hereby certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _________________ day of _________________, 2026, at ___________________, California.

___________________________________

JOLY RAMIREZ
VOLUME 1

Page 247

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES ) SS.

I, Dayna Hester, C.S.R. No. 9970, in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was { } was not required;

I further certify that I am not interested in the event of the action.

W[illegible] of Septemb[illegible]

Certified Shorthand Reporter
for the State of California

Page 248

ISABELLE L. ORD, ESQ.
ISABELLE.ORD@US.DLAPIPER.COM

September 4, 2026

RE: Ramirez v. Martinelli
8/19/2026, Joly Ramirez , Volume 1, (#8293859).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 249

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 250