# Exhibit G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JOLY RAMIREZ and SORANGIE SANCHEZ, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

S. MARTINELLI & COMPANY,

Defendant.

Case No. 5:25-cv-07569-NC

VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

SORANGIE SANCHEZ

DATE: August 27, 2026

REPORTED BY: CHARLENE FRIEDMAN, CCR, RPR, CRR

TRANSCRIPT of the deposition of the SORANGIE SANCHEZ, called for Oral Examination in the above-captioned matter, said deposition being taken by and before CHARLENE FRIEDMAN, a Notary Public and Certified Court Reporter, a Registered Professional Reporter, and a Certified Realtime Reporter, at DLA PIPER, LLP (US), 1251 Avenue of the Americas, 27th Floor, New York, New York, on August 27, 2026, commencing at approximately 9:55 a.m., Eastern Standard Time.

A P P E A R A N C E S:

SMITH KRIVOSHEY, PC
867 Boylston Street
5th Floor, Suite 1520
Boston, Massachusetts 02116
(617) 377-7404
BY: JOEL D. SMITH, ESQ.
Attorneys for Plaintiffs

DLA PIPER, LLP (US)
1251 Avenue of the Americas
27th Floor
New York, New York 10020
(212) 335-4500
BY: KEARA M. GORDON, ESQ.
TIA NGUYEN, ESQ.
ATHENAIS ALCIBAR-ZUCKER, ESQ.
AMANDA COOPER, ESQ. - via Zoom
ISABEL ORD, ESQ. - via Zoom
Attorneys for Defendant

ALSO PRESENT: DEREK ROSE, Video Operator

I N D E X


| WITNESS NAME | PAGE |
|---|---|
| SORANGIE SANCHEZ | |
| By Ms. Gordon | 9, 285 |
| By Mr. Smith | 281 |


E X H I B I T S


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 20 | LinkedIn profile | 21 |
| EXHIBIT 21 | Resume | 27 |
| EXHIBIT 3 | Amended Class Action Complaint - previously marked | 63 |
| EXHIBIT 22 | Facebook Ad | 80 |
| EXHIBIT 23 | Printout from Walmart.com | 88 |
| EXHIBIT 24 | Photographs | 90 |
| EXHIBIT 25 | Photographs | 99 |
| EXHIBIT 26 | Photograph | 109 |
| EXHIBIT 27 | Plaintiff Sanchez's Responses and Objections to Defendant's First Set of Interrogatories | 112 |
| EXHIBIT 28 | Photograph | 123 |
| EXHIBIT 29 | Picture | 130 |

E X H I B I T S
(continued)



| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 30 | Printout from Martinelli's website | 134 |
| EXHIBIT 31 | Photograph | 135 |
| EXHIBIT 32 | Photograph | 142 |
| EXHIBIT 33 | Video | 144 |
| EXHIBIT 34 | Cash App history | 159 |
| EXHIBIT 35 | Cash App history | 167 |
| EXHIBIT 36 | Cash App history | 169 |
| EXHIBIT 37 | Cash App history | 171 |
| EXHIBIT 38 | Photograph | 178 |
| EXHIBIT 39 | Photograph | 186 |
| EXHIBIT 40 | Printout from BJ's website | 196 |
| EXHIBIT 41 | Printout from Walmart website | 201 |
| EXHIBIT 42 | Plaintiff Sanchez's Amended Responses to Defendant's First Set of Request for Production of Documents | 206 |
| EXHIBIT 43 | Verification | 207 |
| EXHIBIT 44 | Printout from product page | 249 |
| EXHIBIT 10 | Photograph - previously marked | 252 |
| EXHIBIT 45 | Complaint | 261 |
| EXHIBIT 46 | Letter | 265 |

E X H I B I T S
(continued)

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 47 | Printout from D&B | 269 |
| EXHIBIT 48 | Printouts from Facebook | 272 |
| EXHIBIT 49 | Printout from Facebook | 276 |
| EXHIBIT 50 | Printout from Facebook | 279 |

Zoom we have Isabelle Ord, O-R-D, who just joined.

MS. GORDON: Thank you.

BY MS. GORDON:

Q Did you bring any documents with you to the deposition today?

A No.

Q And can you please state and spell your full name, just for the record?

A Sorangie Sanchez, S-O-R-A-N-G-I-E, Sanchez, S-A-N-C-H-E-Z.

Q And is it okay if I just refer to you today while we're talking as Sorangie?

A Yeah, that's fine.

Q Okay. Thank you.

Have you ever gone by a different name?

A No.

Q What is your date of birth?

A 10/29/86.

Q What is your current address?

A 1706 Selwyn Avenue, Bronx, New York. ZIP code is 10457.

Q And how long have you lived there?

A My entire life.

Q And what is AutoCAD?
A AutoCAD is designed to build houses. It's like a 3-D model of the house or any -- even this building, somebody probably used AutoCAD to design.
Q Thank you.
Have you ever taken any classes in law?
A No.
Q Have you ever taken any classes in marketing?
A No.
Q Have you ever taken any classes in nutrition?
A No.
Q Are you currently employed?
A No.
Q And what -- when were you last employed?
A 2023.
Q And what was your position there?
A I was security manager.
Q So since 2023, you have not had a job?
A No.

Q Have you done any other type of work?
A No.
MS. GORDON: Tia, let's do Tab 50, please.
And we're going to mark this as 21 -- 20, I'm sorry.
(Above-mentioned document marked for Identification.)
BY MS. GORDON:
Q Sorangie, have you ever seen this document before?
A Yeah. This is my LinkedIn profile.
Q And you just produced this to us on Monday, a couple days ago?
A Umm-hmm.
Q Why did you produce this document?
MR. SMITH: Hold on.
You can answer that question only to the extent that it does not require disclosure of communications with me or Mr. Krivoshey.
A I'm not sure I am able to answer after what he said, so -- I would have to disclose communications with him.

paid for nine weeks.
Q And then, if you turn to the next page, that discusses your education, DeVry University, which we discussed a few minutes ago, and Everest University, which we discussed a few minutes ago.
Is this, what we just read and depicted on Exhibit 20, is this a true and complete listing of your employment history?
A Yes.
MS. GORDON: Let's go to Tab 14, please.
For the record, what we marked as Exhibit 21 is a three-page document printed off of LinkedIn.
(Above-mentioned document marked for Identification.)
BY MS. GORDON:
Q Have you seen this document before?
A Yes.
Q And what is it?
A My resume.
Q And you did not produce this document in this litigation, correct?
MR. SMITH: Answer as best you can

A Yes. Allied Barton is also known as Allied Universal.

Q Also known as what?

A Allied Universal.

Q Got you.

So that's the same job as the Allied Universal?

A Yes.

Q Okay, great.

Thank you for clearing that up.

A And that's when I first started.

Q Aside from the jobs that we've talked about today, do you have any other forms of income?

A No.

Q You can put that to the side. We're done with those.

So let's talk about apple juice, which this case is about.

Do you like apple juice?

A Yes.

Q And over the years, how many times do you think you've bought apple juice?

A I would say recent, yeah. A lot of times.

A I just do.
Q Do you like the taste of apple juice?
A I prefer it, yes.
Q Do you think that apple juice is good for you?
A Yes.
Q Why do you think apple juice is good for you?
A Because it's from apples, apple juice.
Q Is there any other reason why you think apple juice is good for you?
A Maybe the vitamins and stuff like that.
Q Do you know what kind of vitamins are in apples?
A No.
Q Do you know what kind of vitamins are in apple juice?
A No.
Q But you think that having vitamins in apples is a good thing?
MR. SMITH: Objection, form.
Object to form.

BY MS. GORDON:
Q You can answer.
A No, I don't -- I don't -- what was the question?
Q Sure.
So I asked you, "Is there any other reason why you think apple juice is good for you," and you said, "Maybe the vitamins and stuff like that."
So my question to you is, do you think it's a positive thing that apple juice has vitamins in it?
MR. SMITH: Objection, vague.
A I can still answer it?
Q Yes.
A I do think that it would be a positive thing, yes.
Q Are you currently buying apple juice?
A Yes.
Q And when you currently buy apple juice, what kind of apple juice do you buy?
A I have bought apple juice from Wells Farm and Great Value from Walmart.
Q And you said, "Wells Farm."

Where do you buy that from?
A BJ's.
Q And what do you like about Wells Farm?
A It was two packs.
Q What does that mean?
A It was two apple juice for the price of one.
Q Is it Wellsley Farm?
A Yes.
Q So you like Wellsley Farm because it has two -- it has two juices in the pack?
A Yes.
Q Any other reason why you like Wellsley Farm?
A It's apple juice.
Q But I mean that as compared to some other brand?
A Uh-huh.
Q When is the last time you bought Wellsley Farm Apple Juice?
A I don't recall the exact date.
Q That's okay. Just estimate it for me. Was it last week, three weeks ago, a month?

A I know it was maybe last year or so. I don't recall.
Q Do you know whether it was after you filed this complaint?
A Yes.
Q And do you think that the Wellsley Farm label misled you in any way?
A No.
Q Do you remember how much it cost?
A Well, it's two packs, so it would be around $10 or so.
Q And did you think that price was fair?
A Yeah. I'm getting two.
Q Is there any other reason why you bought the Wellsley Farm?
A No.
Q And is Wellsley Farm a product that you would buy today?
A Yes.
Q You also said, "Great Value"?
A Yes.
Q Why did you buy that product?
A It's cheaper.
Q Than what?

A Most apple juice.
Q And when was the last time you bought the Great Value apple juice?
A I don't recall the exact date.
Q Can you give me a ballpark?
A Maybe this year or last year.
Q Okay. Was it after you filed the complaint in this case?
A Yes.
Q And do you think anything about the Great Value apple juice is misleading?
A No.
Q Do you remember how much that cost?
A Maybe about $3 or $4.
It's Walmart's product, so...
Q And is Great Value something that you would be comfortable buying today?
A Yes.
Q Do you know whether Wellsley Farms advertises itself as a hundred percent juice?
A I do not recall.
Q Would that be important to you if it was a hundred percent juice?
A Yes.
Q But you don't remember one way or

want apple juice.
Q Have you ever looked at the -- at the ingredient list on any apple juice product?
A An ingredient list, I do not recall, but I have looked at the back of the labels, yes.
Q And in what circumstances do you look at the back of the labels?
A The sugar.
Q You look at the back label to see how much sugar is in the product?
A Yes.
Q And why is that important to you?
A I'm diabetic.
Q So I would imagine that's quite important to you?
A Yes.
Q Do you generally then, as a practice, check to see the sugar content of a product before you buy it?
A Yes.
Q And the sugar content of the product is usually on the back label, correct?

A Yes, I believe so.
Q And when you're looking at the sugar content on the back label, do you generally read the entire back label?
A Not all the time, no.
Q Sometimes do you read the entire on the back label?
A Sometimes, yes.
Q Other than Wellsley Farm and Great Value, are there any other apple juices that you currently buy?
A Currently, no, but I used to buy you guy's product.
Q Other than Martinelli's, which you used to buy, Wellsley Farm and Great Value, have you ever bought any other type of apple juice?
A No.
Q And sparkling cider, do you like sparkling cider?
A Yes.
Q And why do you like sparkling cider?
A The taste.
Q And when you buy sparkling cider,

A I don't -- maybe -- I don't recall exactly the exact age, but I remember I was in my teenager years, maybe. I don't recall.
Q So --
A I don't remember.
Q -- when you were a teenager.
So you drank it in your teenage years, in your 20s, and now are you 39?
A Yes, I'm 39 now.
Q Do you consider sparkling cider to be nutritious?
A Yes.
Q And why do you think sparkling cider is nutritious?
A Because it's from apple juice.
Q Any other reason?
A From apples.
Q Any other reason?
A They don't have alcohol.
Q Any other reason?
A No.
Q And the vitamins that are in apples, you would expect those to be in sparkling cider, correct?
A I would believe so if you're using

apples.

Q Do you take any vitamins?

A No.

Q Are there any vitamins that you try and make sure you get by way of food or drinks?

A No.

Q Are you familiar with vitamin C?

A Yes.

Q And what do you know about vitamin C?

A You get it from juice and stuff like that. It's good for your immune system, excuse me.

Q And do you know that you get vitamin C from apple juice?

A Yes.

Q And how long have you known that you get apples -- that you get vitamin C from apple juice?

A Well, now and when I was younger, and I just -- no, my mother just gave it to me, gives it to me.

I would say -- I don't really recall when exactly. If I have to guess,

maybe while I was working, maybe 2020 and stuff.
Q So you've known since 2020 that vitamin C is in apple juice, correct?
A Yes, if I have to guess.
Q Okay.
And it was definitely before you filed this lawsuit, correct?
A Yes.
Q And do you view that as a good thing that there's vitamin C in apple juice?
MR. SMITH: Objection, vague.
A Can I answer?
Q You can answer.
A I believe so, yes.
Q And is the fact that vitamin C is in apple juice something that would make you not want to buy it?
A No.
Q Is it something that would affirmatively make you want to buy it?
MR. SMITH: Objection, vague.
BY MS. GORDON:
Q You can answer.
A Yes.

question a little bit to get to his objection.

Do you know whether you have ever bought a product that has vitamin C added to it?

MR. SMITH: Objection, vague.

A I'm not too sure.

Q Would you pay more money or less money if a product had vitamin C in it?

MR. SMITH: Objection, calls for speculation.

BY MS. GORDON:

Q It's not speculation, it's what you yourself would do. So you can answer me.

You can answer.

A Okay. Did you say if it would be more money?

Q So let's assume you're looking at a product, right, and it says that it has vitamin C in it.

Would that cause you to want to pay more money for that product or less money?

MR. SMITH: Objection, vague.

Objection, calls for speculation.

A I'm really not an expert to decide

that, but I wouldn't know how to answer that.
Q It's -- it's not asking for somebody else's opinion or for you to speculate on what somebody else would do.
A Okay.
Q I'm saying, if you were in the store and you see something and it says it has vitamin C in it, first of all, that would make you buy the product, correct?
A Correct.
MR. SMITH: Hold on.
Objection, vague, calls for speculation.
BY MS. GORDON:
Q Okay. So if you see something in the store and it says it has vitamin C in it, would you think like, okay, that's worth more money?
MR. SMITH: Hold on.
Objection, vague, calls for speculation.
BY MS. GORDON:
Q You can answer.
A I'm going to go and stick with my regular answer. I'm not an expert on vitamin

C, so I don't know if it would be worth more or less money. So I don't know how to answer that question.

Q Yeah, see, I'm not asking for like an expert opinion. I'm just asking for your opinion.

Like do you think that whether something has vitamin C in it is going to affect how much money you want to pay for it?

MR. SMITH: Same objections as before.

A Yeah, I'm not an expert to answer that.

Q So sitting here today, can you say that you would have paid more for a product that had vitamin C in it than you should have?

MR. SMITH: Hold on.

Objection, vague, calls for speculation and expert opinion.

A Yeah, you asked me that question already.

Q I asked you a slightly different question, and I'm not asking you to speculate about anything.

A Umm-hmm.
Q I'm just asking you if you think that you have ever paid more money than you should have for a product because it had or didn't have vitamin C in it?
A I don't know.
MR. SMITH: Objection, vague, calls for speculation.
A I'm not an expert on the matter, so I wouldn't know how to answer that.
Q So you have no opinion as to whether or not the presence of vitamin C in a product affects its price, is that what you're saying?
MR. SMITH: Objection, vague, calls for speculation, incomplete hypothetical.
A I won't answer that. I don't really know how to answer you because I'm not an expert on vitamin C, so I don't know how much vitamin C will be worth.
Q I'm not asking sort of in an expert capacity.
I'm saying you, is there a value to you of having vitamin C in a product?

MR. SMITH: Objection, vague, calls for speculation.

BY MS. GORDON:

Q You can answer.

A Yeah, but you keep asking me the same question in different words.

Q Yes, because I would like you to answer it.

A I would not answer that, because once again, I'm not an expert on vitamin C, so I don't really know its worth.

Q How did you first hear about Martinelli's?

A I didn't hear about you guys. I saw you guys on -- in a store, and I recognized your small little bottles.

Q And when was this?

A I do not recall the exact date.

Q That's okay. Just give me your best guess.

A Probably in my teenager years.

Q So a while ago?

A Yes, a while ago.

Q Okay. So what store were you in, do you remember?

A No.

Q And you said you recognized the small bottles.

So was it like a single serving bottle, is that what you saw?

A Yes, single serving, yes.

Q Okay. And did you buy it at that time?

A I believe so. That's the first time I tried it, the juice.

Q And why did you buy it?

A It was in a glass bottle.

Q And what about the glass bottle made you want to buy it?

A It was fancy.

Q Do you remember what the bottle said?

A Apple juice.

Q Do you remember anything else about what the bottle said?

A At that time, no.

Q And do you remember -- probably not because it was so long ago, but do you remember what you paid for it?

A No.

Q Do you remember thinking it was too expensive?
A I don't remember that, either.
Q And when you drank it, what did you think?
A I liked it. I continued buying it.
Q How many times do you think you've bought the small bottles?
A From that day on?
Q Yeah.
A Probably a lot.
Q And when you say, "a lot," can you ballpark that for me?
A I wouldn't know how exactly to ballpark that because you guys were one of my favorite juice. So I wouldn't know how to give you a ballpark on it.
Q So you started buying it when you were a teenager.
A Umm-hmm.
Q How often do you think you bought it?
Like you said you bought the sparkling cider on like holidays.
So was there some regular pattern

of buying it? Was it every time you went to the store? Was it a special treat? Like --

A It was like a special treat.

Q A special treat. Okay.

And do you think you bought it ten times a year?

A Probably a little bit more, if I had to estimate.

Q Sure. Yeah.

So let's -- just estimating, would you say you probably bought it 20 times a year?

A Maybe, yes --

Q Okay. More?

A -- if I had to guess.

Q Is it possible it was more than 20 times a year?

A At that time, no.

Q So would you say that you have been drinking apple juice -- or let me say this better. Strike that.

Have you bought Martinelli's small bottle apple juices for about 20 times a year since you were a teenager?

A I don't remember, but if I had to

food.
Q Okay. So what -- so the Martinelli's products that you purchased, can you list those for me?
A The sparkling cider, I have bought the half gallons and the small little apple juice.
Q And when you say the half gallon, that's the half gallon of the juice --
A Yes --
Q -- not the --
A -- the apple juice.
I don't think you guys carry a half gallon of cider.
Q Anything else that you've ever bought from Martinelli's?
A Not that I recall, no.
Q Sitting here today, do you know what the ingredients are in the sparkling cider?
A A hundred percent apples.
Q And sitting here today, do you know what the ingredients are in the apple juice half gallon?
A A hundred percent apples.

Q And then skipping down -- I'm skipping the next line, but then it says, "Within the past year," open paren, "and many times in the years prior," closed paren, "Plaintiff Sanchez purchased Martinelli's Apple Juice in half gallon size and Sparkling Cider in 750-milliliter size from multiple retail locations near her home in the Bronx, New York, such as Walmart, Dollar Tree and a local deli."
Do you see that?
A Yes.
Q And is all of that true?
A Yes.
Q Is that complete?
MR. SMITH: Objection, vague.
THE WITNESS: Do I still answer?
MR. SMITH: Yes, you still have to answer.
A I believe so.
Q So the complaint says that there were two products that you bought, the apple juice in the half gallon size and the sparkling cider in the 750 milliliters.
It doesn't talk about the

individual bottles that you just told me about.

A Umm-hmm.

Q Why didn't you include the individual small bottles in your complaint?

MR. SMITH: You can answer to the extent it doesn't require disclosure of any conversations with me or Mr. Krivoshey.

A I wouldn't be able to answer that. It was a closed conversation with him -- conversations.

Q When you filed this complaint, you did not list the individual bottles, correct?

A I do not recall. I don't --

Q It's not here on the page, correct?

A Yes, it's not there on the page.

Q And that was inaccurate, correct?

A Correct.

Q Let's start with the apple juice in the half gallon size.

When did you first buy that?

A When I first bought it?

Q Umm-hmm.

A I don't remember where I first

places?
A I have bought it in Dollar Tree as well.
Q Anywhere else?
A No.
Q Before you purchased the product, did you look on the back to see how much sugar was in it?
A Yes.
Q Do you remember how much sugar was in it?
A For the half gallon, I think it was 33 percent or 39 percent, somewhere around that, if I have to give you a ballpark because I don't remember.
Q And do you remember anything else about the back label of the half gallon?
A No.
Q Did you look to see how many calories it had?
A No.
Q Did you look to see how many servings it contained?
A No.
Q Did you look to see like how much

Q And do you remember how much you paid for any of these half gallon?
A I believe --
MR. SMITH: Hold on.
Objection, vague.
Go ahead.
Q You can answer.
A I believe the half gallon was about maybe $3 to $4.
Q And what is that based on that you think it's $3 to $4? Is that a memory or --
A Walmart.
Q When you say, "Walmart," what does that mean?
A If I bought it from Walmart, it would be about $3 to $4, yes.
Q And how do you know that? How do you remember that?
A I don't remember. I don't really know for certain. I'm just giving you a ballpark.
Q Did you go back and like look at any receipts or anything to figure out how much you paid?
A No.

Q Do you have any receipts of purchases from Martinelli's?

MR. SMITH: You can answer.

A No.

Q Why not?

A I didn't save them.

Q Did you think that $3 to $4 that you paid for the Martinelli's half gallon apple juice was a fair price?

MR. SMITH: Objection, vague.

A That kind of reminds me of the previous question with vitamin C establishing worth. I think it was a good price, yes.

Q Before you bought the Martinelli's half gallon apple juice, did you consider buying a different brand instead?

A No.

Q Before you bought the Martinelli's half gallon apple juice, did you compare the price of other types of apple juice available?

A No.

Q And generally, how did you pay for the half gallon apple juice that you bought?

A I used my Cash App card.

Q When was the last time that you purchased Martinelli's half gallon apple juice?
A I want to say maybe 2024.
Q And why did you stop buying the Martinelli's half gallon apple juice?
A It's not a hundred percent juice.
Q And what do you mean by that?
A You guys market as a hundred percent juice, but it's not a hundred percent juice.
Q What makes it not a hundred percent juice?
A You have preservatives in it.
Q What preservatives do you think are in it?
A I don't know the exact name. I know there's an acid.
Q Do you remember anything other than just acid?
A I know it starts with an "A." Ascorbic acid.
Q So it's not a hundred percent juice because it contains ascorbic acid.
Is that your testimony?

A Yes.
Q Do you know what ascorbic acid is?
A It's a preservative.
Q How do you know that?
A How do I know that?
Q Yeah.
MR. SMITH: You can answer to the extent you can do so without disclosing conversations with counsel.
A I will have to disclose conversation with my lawyer to answer that.
Q Has anybody other than your lawyers told you that ascorbic acid is a preservative?
A No.
Q I'm sorry?
A No.
Q How did you learn that the Martinelli's half gallon apple juice had ascorbic acid in it?
MR. SMITH: Same instructions.
A I won't be able to answer that on disclosed conversations with my lawyer.
Q So the only reason that you know that ascorbic acid is in Martinelli's is

because your lawyers told you?

MR. SMITH: I'm going to instruct you not to answer because that is requesting the content of our communications.

BY MS. GORDON:

Q Are you going to follow his instructions?

A I'm going to follow his instructions.

Q Did you ever -- independent of your lawyers and what they may or may not have said to you, did you ever observe that there was ascorbic acid in Martinelli's?

A I feel like that's the same question that he instructed me not to answer, so --

Q This is without anything to do with your lawyers. I'm not asking -- I don't want to get into your lawyer's conversation with you. I do not.

I just want to know if you ever saw anything and you said, Oh, wow, Martinelli's has ascorbic acid in it?

MR. SMITH: Same instruction. If

you're able to answer without disclosing content of your communications with me and Mr. Krivoshey, you can answer.
A I won't be able to answer that.
Q When did you decide to sue Martinelli's?
THE WITNESS: Am I able to answer that?
BY MS. GORDON:
Q Yes.
MR. SMITH: She was asking me, for the record, but go ahead.
A When I -- can you repeat the question again?
Q Sure.
When did you decide to sue Martinelli's?
A I saw an ad about you guys, and I realized that you guys are not a hundred percent juice, like your label says.
Q And when was that?
A I don't recall. I know it was last year.
Q Prior to seeing this ad, had you stopped buying Martinelli's products?

A The last time I bought it was in December 2024, which was your cider.
Q And how do you remember that?
MR. SMITH: To the extent you're able to answer, go ahead and do so.
A I just remember. I can't explain it.
Q Was it a holiday?
A Yes.
Q And did you see that ad about Martinelli's before or after you bought the cider in December of 2024?
A After. I saw the ad last year.
(Brief pause in proceedings.)
BY MS. GORDON:
Q While they're looking for that, sitting here today, do you know what ascorbic acid is?
A You asked me that already.
Q And what was the answer?
A I'm going to follow his instructions.
MR. SMITH: Oh, I think --
THE WITNESS: Or am I getting the question confused.

MR. SMITH: Well, you might be.
One moment. Let me just check the record here.
MS. GORDON: I don't remember that we had that exact question, but I could be wrong.
MR. SMITH: Yeah, it's fine. You can answer.
BY MS. GORDON:
Q Okay. So let me just -- let me reask it so that we are clear on the record.
A Okay.
Q Sitting here today, do you know what ascorbic acid is?
MR. SMITH: You can answer.
A It's a preservative.
Q And do you know what that does?
A No, I do not know what it does.
Q Do you know whether ascorbic acid is bad for you?
A I would assume it's bad since it's an acid.
Q Have you ever taken any steps to determine whether ascorbic acid is good or bad?

A No.

Q Okay.

MS. GORDON: So we're showing you now what's been marked as Exhibit 22.

(Above-mentioned document marked for Identification.)

A Okay.

Q And is that the ad that you saw about Martinelli's --

A Yes.

Q -- that you were just talking about?

A Yes.

Q And where did you see this?

A On Facebook.

Q How did you see it on Facebook? Did it just come up on your feed, or how did that happen?

A It just came up.

Q And what did you think when you saw it.

MR. SMITH: Objection, vague.

You can answer.

A What's going on?

Q It says, "Have you bought

Martinelli's 100 percent apple juice, Martinelli's Sparkling Blush or Martinelli's Sparkling Cider? If so, you may be entitled to compensation."

Do you see that?

A Yes, on the top.

Q And it said, "Why would you be owed money?"

Do you see that?

A Yes.

Q Before reading this ad, did you have any problem with Martinelli's?

MR. SMITH: Objection, vague.

THE WITNESS: Can I answer?

MR. SMITH: You can answer that.

A No.

Q Did you -- it says, "Free assessment," and then there's some information that you can fill out below.

Did you fill out this form?

A Yes.

Q Why did you fill out the form?

A Because I wanted to know what's going on.

Q And did you think that you would be

owed money, potentially?
A Well, potentially, yes.
Q And was that a factor in you filling out the ad?
A Yes.
Q Do you have any sense of how much money you could get if you're successful in this lawsuit?
MR. SMITH: Objection, vague.
You can still answer, but please don't disclose any communications that you've had with any of your attorneys.
A I won't be able to answer without disclosing that information.
Q All right.
MS. GORDON: Let's take a break.
MR. SMITH: Okay, sure.
Thank you.
VIDEO OPERATOR: The time is 11:08.
We are going off the record.
(Brief recess taken.)
VIDEO OPERATOR: The time is 11:31.
We're going back on the record.
BY MS. GORDON:
Q Did you substantively talk about

A Yes.
Q And is there anything particular that you remember about the label?
A A hundred percent juice.
Q Anything else?
A From fresh grown apples.
Q Anything else that you remember about the label?
A No.
Q Any other reason that we haven't talked about why you bought the sparkling cider?
A No.
Q Before you bought the sparkling cider, did you look on the back to see how much sugar it contained?
A Yes.
Q Do you remember anything else from the back label --
A No.
Q -- on the sparkling cider?
A No.
Q Do you remember where you bought the sparkling cider?
A Mostly Dollar Tree.

Q Any other place?
A Walmart, S & J Deli.
Q And can you ballpark for me how many times you bought the sparkling cider over the course of the last --
A If I have to guess, cider, mostly on holidays. So I bought it maybe three, four times, if I have to guess.
Q Three to four times a year or three to four times total?
A Three to four times a year.
Q And so three to four times a year since you were a teenager you've bought the sparkling cider from Martinelli's, correct?
A Yes, if I have to guess.
Q Do you remember how much you paid for the sparkling cider?
A Well, the last time I paid was about $4 or $5.
Q And what is that memory based on?
A Oh, that's on -- normally what it would cost on Walmart or Dollar Tree, $4 to $5.
Q Is the price the same when you buy it from Walmart as from Dollar Tree?

A I don't remember exactly. I think with tax, it will be a little bit more, but I don't remember.
Q Do you remember which one is more expensive, Walmart or Dollar Tree?
A I think they're about the same, 5 to $6, maybe $4 to $5.
Q And how about S & J Deli, are things more expensive there?
A Yes.
Q Do you remember the price that you paid at S & J Deli?
A The small little bottle, they have it for about $2 to $3.
Q Did you ever buy the sparkling cider from S & J Deli?
A Yes.
Q And how much was the sparkling cider?
A Maybe about five, six.
Q $5 to $6?
A Yes.
Q And would the fact that it was more expensive at S & J Deli deter you from buying Martinelli's Sparkling Cider there?

different bottle from the picture. I don't remember.

Like I said before, you guys was my favorite apple juice, so...

MS. GORDON: For the record, what we're marking as Exhibit 27 is Plaintiff Sanchez's Responses and Objections to Defendant's First Set of Interrogatories.

(Above-mentioned document marked for Identification.)

BY MS. GORDON:

Q Do you recognize this document?

A Yes.

Q What do you recognize it to be?

A My answers.

Q And did you -- well, when did you first see this document?

A I don't remember when exactly, but my lawyer showed it to me.

Q Did you write the answers to the questions or did your lawyers write them?

MR. SMITH: You can answer that.

A Well, my lawyers wrote them.

Q And did you check what your lawyers

wrote to make sure that it was accurate?

A Yes.

Q And do you remember making any edits to what they gave you?

A I think there was --

MR. SMITH: Hold on.

You can answer that question with a yes or a no, but I would like you not to disclose the content of any communications with myself or Mr. Krivoshey.

A Can you repeat the question again?

Q Of course.

I'm not asking for the substance of any conversation that you had with your lawyer, but I'm asking, when you got the answers that they wrote for you, do you remember making any changes to what they had wrote?

A No.

Q Now, if you can just look at the last page for me of the document.

That's a verification page, and it says, "I, Sorangie Sanchez, declare that I have read the objections and responses to

defendant's first interrogatories. I believe the answers contained therein are true and correct."

Do you see that?

A Yes.

Q And do you, sitting here today, still believe that the answers that you gave on -- or verified on June 24th of 2026 are true and correct?

MR. SMITH: Objection, vague.

BY MS. GORDON:

Q You can answer.

A Yes.

MR. SMITH: Go ahead.

A Yes.

Q Nothing you would change?

MR. SMITH: Objection, vague.

BY MS. GORDON:

Q You can answer.

A No.

Q Okay. And then it says, "I declare under penalty of perjury that the foregoing is true and correct."

Do you see that?

A Yes.

Q And you testified earlier that you know what "penalty of perjury" means, correct?

A Yes.

Q And what does "true and correct" mean to you?

A True. You're telling the truth.

Q And are these answers based on your personal knowledge?

A Yes.

Q Before signing these interrogatory answers, did you do anything to refresh your recollection about the facts related to this case?

A No.

Q Did you look for any receipts for your purchases?

MR. SMITH: You can answer.

A Yes.

Q Where did you look?

A I looked at my Cash App, and I did find a stack of paper receipts and I tried to look through those, but I couldn't find anything.

Q So you found a stack of paper

receipts, and where did you find that?
A My closet.
Q And you looked through them?
A Yes.
Q And did any of them pertain to a Martinelli purchase?
A No.
Q Did any of them pertain to a purchase of any other apple juice?
A No.
Q Did any of them pertain to a purchase of any other sparkling cider?
A No.
Q Okay. Before signing the interrogatory answers, did you look at any credit card receipts?
A I don't have credit cards.
Q You just use the Cash App?
A Yes.
Q Before signing these interrogatory answers, did you review any e-mail?
A E-mail regarding to?
Q Did you look at your e-mail to see if there was anything in there that pertained to the allegations you're making in this

case?

MR. SMITH: You can answer, other than any communications with counsel.

A Yeah, I wouldn't be able to answer because it was just e-mails.

Q No. My question is, did you look at any e-mails -- don't tell me what they said, but did you look at your e-mail to see if there was anything in there, not with your lawyers, that was relevant to the allegations in your complaint?

A No, just my lawyers.

Q I guess the question is, did you look at your e-mails for purposes of these interrogatories separate and apart from any e-mail with your lawyer?

MR. SMITH: You can answer.

A Yeah, I don't know how to answer that because it's just e-mails with my lawyers.

Q Do you use e-mail often?

A Not often, no.

Q Before signing these interrogatories, did you talk to anybody other than your lawyers?

A No, just my lawyers.
Q Did you do any investigation into your purchases of Martinelli's before signing these interrogatories?
MR. SMITH: Objection, vague.
THE WITNESS: Answer?
MR. SMITH: Yes.
A If I did any investigations?
Q Yeah.
A What do you mean by that?
Q What efforts, if any, did you take to make sure that the answers you were giving were true?
A I guess just based on my experience with the product.
Q Did you look at anything to refresh your memory to make sure these answers were truthful?
A No.
Q All right. Let's go to page 2.
A Of?
Q The interrogatory answers --
A Okay.
Q -- Exhibit 27 that we were just looking at.

Q And you won't tell me why?
A I don't remember why.
Q Then let's go to the next bullet point. "Plaintiff purchased Martinelli's Apple Juice in half gallon size and Sparkling Cider in 750-milliliter size. She also bought single count small glass bottles of apple juice."
Is that a true and correct statement?
A Yes.
Q We looked earlier at your complaint --
A Umm-hmm.
Q -- and the complaint didn't mention the single count small glass bottled apple juice.
When did you realize that you had purchased that, also?
MR. SMITH: Objection, vague.
You can answer.
A Well, I don't remember when I actually purchased them. I've been purchasing your product since I was younger, so...

Q The question was, when did you realize that you had purchased the single count small glass bottles?
MR. SMITH: Objection, vague.
A I don't remember the exact date.
Q Have you ever purchased any other sizes of Martinelli's apple juice?
A Not that I remember.
Q Do you remember ever purchasing the 33.8 fluid ounce glass bottle apple juice?
A You mean the small size?
Q No.
A Or like this?
Q No, a larger size.
A No, I don't remember.
MS. GORDON: All right. For the record, what we've marked as Exhibit 28 is a one-page document that is Bates labeled SANCHEZ_00018, and it appears to be a picture of Martinelli's Apple Juice 1 liter in the 33.8 fluid ounce size.
(Above-mentioned document marked for Identification.)
BY MS. GORDON:
Q Do you recognize this document?

A Yes.
Q What is it?
A A picture.
Q Did you take this picture?
A Yes.
Q When?
A I believe it was this year.
Q When this year?
A I don't remember when this year. Yeah, I don't remember when this year.
Q Was it within the last month?
A I don't remember the exact date.
Q Can you remember whether it was in the last month?
A If I had to guess, maybe.
Q And why do you think that?
A I won't be able to answer without disclosing information that I spoke with him about.
Q Did your lawyer ask you to go take this picture within the last month?
MR. SMITH: Hold on.
Don't answer that question. I'm instructing you not to answer.
BY MS. GORDON:

Q So did you take this picture for purposes of this litigation?
I think that's fair.
MR. SMITH: You can answer that.
A Well, yes.
Q And where -- well, did you use your Android again?
A Yes.
Q And does this picture still reside on your phone?
A I don't think so.
Q Did you delete it?
A No.
Q So why wouldn't it be on your phone?
A I know I may have to do like memories -- not memories. I don't have enough memory on my phone since Android doesn't have that sim card thingy, the SD cards.
So I'm not sure, but I -- it may be still on my phone. I don't remember.
Q Do you know whether you have an obligation to preserve evidence related to your lawsuit?

A Yes.

Q And what is your understanding of that obligation?

MR. SMITH: Hold on.

You can answer that to the extent you can without disclosing information you received from your lawyer.

Q I'm not asking you to tell me about what your lawyers told you. I'm just asking if you have an understanding of what you need to do to preserve evidence related to this lawsuit.

MR. SMITH: Same instruction.

A I do have understanding, yes.

Q Can you tell me what that understanding is without telling me the conversations with your lawyers?

A I won't be able to do that.

Q Okay.

Why is this picture relevant to your case?

A This is from S & J Deli.

Q Okay. And why is that relevant to your case?

A Because it is one of the locations

I bought juice.

Q Okay. Did you ever buy this size apple juice?

A I don't remember.

Q It's not listed in your interrogatory answers and it's not listed in your complaint.

Does that refresh your recollection?

A No, I don't remember.

Q So -- so within probably the last month, you went and took a picture of this apple juice, right?

A I took the picture, but I don't remember if it was last month. I remember it was this year.

Q Okay. So did you buy this apple juice when you took the picture?

A No.

Q And sitting here today, you have no idea whether you actually purchased the bottle of juice that is in this picture?

A I stopped buying you guy's product after December of 2024.

Q Sitting here today, do you know

whether you ever bought the one-liter glass bottle of Martinelli's Apple Juice?
A Sitting here today, I do not remember if I bought this, no.
Q Why would you take a picture of a -- of a product you didn't buy?
A I won't be able to answer without disclosing information with him.
Q Do you think that this label on the Martinelli's one-liter apple juice, Exhibit 28, is misleading?
A Maybe.
Q Why?
A From U.S.-grown apples, drink your apple a day.
Q Do you have any facts that would demonstrate that the Martinelli's one-liter apple juice was not from U.S.-grown fresh apples?
A Well, I know you guys have preservatives, so I'm assuming it's in all your product.
Q But if there's preservative, does that mean that it's not from U.S.-grown fresh apples?

A Can you repeat the question again?
Q Sure.
I'm going to represent that you produced this document on June 30th of 2026, and I can show you the e-mail from your lawyer, if you'd like me to do that.
But by the date that you produced this, June 30th of 2026, you knew that you had purchased the Martinelli's Sparkling Apple Juice Northwest Blend in the 10 fluid ounce bottle, correct?
A Correct.
Q How did you realize that?
A It was one of my favorite juice, so -- my favorite apple juice, so I probably went and bought it.
Q No, no, how did you realize that you had bought it?
A Wait, when I bought it?
Q Well, no.
My question is, when did you realize that this is one of the products that you had bought?
A I don't remember.
I would say I bought it because I

took a picture, but I don't remember.
Q So going back to your interrogatory answers, which are Exhibit 27 --
A Umm-hmm.
Q -- we looked before, and it says, "Plaintiff purchased Martinelli's Apple Juice in half gallon size and Sparkling Cider in 750-milliliter size. She also bought single count small glass bottled apple juice."
That answer does not include the sparkling apple juice in 10 fluid ounces, correct?
A Correct.
Q Why not?
A You have to ask my lawyer why not.
Q So do you still think that your interrogatory answers are true and accurate?
MR. SMITH: Objection, vague.
Q You can answer.
MR. SMITH: You can answer.
A Yes.
Q You think these interrogatory answers are true, even though you didn't list the sparkling apple juice northwest blend 10 fluid ounces?

A You will have to ask my lawyer that question.
Q Well, these are interrogatories that you verified under penalty of perjury based on personal knowledge. Why can't you answer my question?
A Because they would disclose conversation with my lawyer, so you have to ask my lawyer since he's the one that did my answers and stuff like that on the paper.
Q But you told me that you understood that it was important that they be true and accurate and that you did read them before they were -- before you verified that they were true, correct?
A Yes.
MS. GORDON: All right. We can take a break now.
VIDEO OPERATOR: The time is 12:34. We are going off the record.
(Luncheon recess taken.)
VIDEO OPERATOR: The time is 1:18. We're going back on the record.
BY MS. GORDON:
Q Okay. Can we -- well, welcome back

it.

Did you not produce anything after October 2025 because you didn't buy Martinelli's products after October 2025?

A Well, the last time I purchased you guys was December 2024, but I'm not sure what happened to October 2025.

Q So let's take a look at the second page, 13, which has purchases that you made from Walmart in May of 2024.

A Umm-hmm.

Q And there's three in particular here, May 9th, May 10th and May 10th.

Do you see that?

A Yes.

Q Do any of those three purchases -- were any of those three purchases of Martinelli's products?

A I don't remember to be exact.

Q Is there any way from looking at Exhibit 33 where -- whether we can tell on what date you bought a Martinelli's product at Walmart?

A Can you rephrase the question?

Q I'm just going to repeat it.

Is there any way from looking at Exhibit 33 whether we can tell on what date you bought a Martinelli's product at Walmart?

A No.

Q So that was May of 2024. You're not sure if any of those purchases were Martinelli's product, right?

A Yes, I'm not sure.

Q And same, then, with the purchases on page SANCHEZ_12, the purchase in March 2025, June 2025 and October 2025, do you know whether or not any of those purchases were of Martinelli's products?

A I'm going to say yes, I would know because the last time I purchased you guys was December of 2024.

Q So are you saying yes because you're confident the answer is yes or are you just guessing?

A I'm confident the answer is yes.

Q Okay. So tell me --

A The last time I purchased you guys was December 2024.

Q That wasn't my question.

My question is, are you confident

that you purchased a Martinelli's product from Walmart on March 16th of 2025, June 4th of 2025, and/or October 8th of 2025?

A I did not purchase in 2025.

Q Okay. Do you know whether you purchased a Martinelli's product from Walmart on March 16th of 2025 or June 4th of 2025?

MR. SMITH: Objection, asked and answered.

A I didn't purchase in 2025.

Q Oh, I see. Sorry. Okay.

So there is nothing on this page, then, SANCHEZ_12, that represents any purchases of Martinelli's products, correct?

A Correct.

Q Okay. And on your Cash App, can you tell which Walmart you made purchases at?

A I don't know.

Q What information do you see when you go to your -- well, how did you get this? Like was this on your computer? How did you get this document?

A It's in my history.

Q Okay. I don't use the app, so can you just explain to me how that works and

and a Walmart in Pennsylvania, correct?
A Correct.
Q Do you know how many approximately and what percentage of purchases you made in New York?
A What do you mean percentage?
Q Yeah. So were most of the products that you purchased, purchased in New York, New Jersey or in Pennsylvania?
A I don't remember, so I don't want to guess.
Q Sitting here today, you don't know how many of the products that you bought were purchased in New York as opposed to New Jersey or Pennsylvania, correct?
A Correct.
Q So let's go to the last bullet, which says, "Plaintiff has no receipts for her purchases that identify Martinelli's products and is -- and therefore is unable to identify them."
That's correct, you said before you have no receipts, correct?
A Correct.
Q And then, "Plaintiff has records of

purchases from her Cash App that would potentially include purchases of the products and they are being produced."

We just looked at those, correct?

A Correct.

Q Is there anything else that you have in your possession that would demonstrate the purchase of a Martinelli product?

A No, ma'am.

Q All right. So other than Martinelli's, you told me earlier that you bought stuff from Wellsley Farm and Great Value, correct?

A Correct.

Q And if we go to interrogatory number 3 -- oh, I'm sorry, interrogatory number 4 on page 4, that asked you to identify any product containing the statement a hundred percent juice on the label.

And you responded, "To the best of plaintiff's recollection, she's aware of purchasing Wellsley Farm hundred percent apple juice from BJ's Wholesale Club sometime in 2025 and Great Value a hundred percent

Q And this label says, "100 percent apple juice from concentrate with added vitamin C."
Do you see that?
A Umm-hmm.
Q Did that statement make you want to buy the product?
A Yes.
Q Why?
A Because it said 100 percent juice with concentrated vitamin C added.
Q So it's 100 juice, but added to that juice, there's concentrate, correct?
A Correct.
Q And added to that juice, there's vitamin C, correct?
A Correct.
Q And we talked earlier that vitamin C is generally you think a good thing, right?
A Yes.
Q So was the fact that this product had vitamin C one of the reasons why you wanted to buy it?
A I don't remember as being vitamin C as one of the reasons, but I remember it's

because it's an apple juice -- a hundred percent apple juice from the concentration, and it had the vitamin C.

Q But the fact that it said that it was made with vitamin C didn't make you not buy it, correct?

A No.

Q Under the 100 juice statement, it actually says, "Excellent source of vitamin C."

Do you see that?

A Yes.

Q And that's in all caps.

A Yes.

Q It also says that this Wellsley Farms Apple Juice is made from concentrate.

Do you know what that means?

A Not too sure. I don't know the -- like is that meaning the definition of it?

Q You know, when you saw it "from concentrate," did you have any understanding of what that meant?

A No.

Q Do you know whether Martinelli's products that you purchased are from

A It's a hundred percent juice from -- concentrated with vitamin C.

Q Do you remember how much you paid for the Wellsley Farm juice?

A I don't know -- I don't remember the exact number, but I think it's probably around $10, just because if it's two packs.

Q Do you know whether vitamin C has any other name that it goes by?

A With the -- no.

Q Do you have any receipts that demonstrate when you bought the Wellsley Farms Apple Juice?

A I don't remember to be exact. I don't think I do.

Q You don't remember if you have any receipts or not?

A No.

Q Did you look?

A I did look, but I don't remember if I do or not.

Q If you had found any, would you have provided them to us in this litigation?

THE WITNESS: I can answer that?

MR. SMITH: Yes.

Q And where they would say whether there was ascorbic acid is in the ingredient list, right?
MR. SMITH: Objection, calls for speculation.
BY MS. GORDON:
Q If you wanted to know whether a product that you were about to buy had an ingredient in it, where would you look?
MR. SMITH: Go ahead and answer.
THE WITNESS: I can answer?
MR. SMITH: Yes, you can answer.
A I would say the ingredient list, yes.
Q So do you ever look at the ingredient list of products that you buy to see if they have ascorbic acid in them?
MR. SMITH: Objection, vague as to the time.
THE WITNESS: I can answer?
MR. SMITH: Umm-hmm.
A No.
Q Why not?
A I usually just look at the sugar levels in the ingredients, not all the time.

Q So if you wanted to avoid ascorbic acid, you could just look at the ingredient list, but you choose not to, correct?

MR. SMITH: Go ahead.

A Correct.

MS. GORDON: I'd like to show you what we are going to mark as Exhibit 40.

Okay. For the record, what we've marked as Exhibit 40 is a printout from BJ's of the product page for Wellsley Farms hundred percent apple juice.

(Above-mentioned document marked for Identification.)

BY MS. GORDON:

Q Do you see this?

A Yes.

Q And is this the purchase -- pardon me. Let me -- let me strike that.

Is this the product that we were just talking about you purchasing, Wellsley Farm 100 percent apple juice?

A Yes.

Q And I'd like to direct your attention to the fifth page.

Well, actually, let's go to the

ascorbic acid, open paren, vitamin C, closed paren?

A Yes, I see it here.

Q And did you know that ascorbic acid is just another name for vitamin C?

A No, I didn't know that.

Q Will you -- do you still believe that the Wellsley Farm hundred percent apple juice from concentrate with added vitamin C statement is telling you that the Wellsley Farm product is 100 percent apple juice?

MR. SMITH: One moment.

Objection. I think that question --

MS. GORDON: Objection, objection form. You've been doing speaking objections all day.

MR. SMITH: No, I have not, actually. I'm not --

MS. GORDON: Yeah, but if you're starting to do one, that would be inappropriate.

MR. SMITH: This question misstates the prior testimony.

That is not a speaking objection,

what we're going to mark as Exhibit 41, which is Tab 26.

What were marked as 41, for the record, is a printout of a Walmart -- oh, no -- yeah, Walmart website for Great Value Apple Juice.

(Above-mentioned document marked for Identification.)

BY MS. GORDON:

Q Is this the same Great Value Apple Juice that you have purchased?

MR. SMITH: Objection, lacks foundation.

Q Let me ask it this way.

Do you recognize this label as the same as the one that you purchased?

THE WITNESS: I can answer?

MR. SMITH: Umm-hmm.

A It looks like it, yes.

Q And here, it says on the front, 100 percent juice, correct?

A That's correct.

Q Now, let's take a look at the ingredient list, which is on the fifth page.

A Okay.

Q And can you read the ingredient list?
A It says, "Apple juice from concentration, water" --
(Reporter clarification.)
A "Apple juice concentration, ascorbic acid, parenthesis, vitamin C."
Q Have you ever looked at that ingredient statement before?
A No.
Q And do you believe that the 100 percent juice statement on the front of the Great Value product is accurate?
THE WITNESS: I can answer that?
MR. SMITH: Umm-hmm.
A Yes.
Q Why do you believe that the 100 percent juice statement on the front of the Great Value product is accurate?
A Because it says vitamin C on it, and it says apple juice from concentration.
Q And does it concern you that the fact that ascorbic acid is not stated on the front of the label?
A What was the question again? I'm

sorry.

Q Does it concern you that the fact that Great Value has ascorbic acid in it is not stated on the front label?

A Well, it's stated as vitamin C.

Q So when you see vitamin C on the front label, you know that means ascorbic acid?

THE WITNESS: I can answer that?

MR. SMITH: Umm-hmm.

A You told me the definition that it goes by vitamin C as well. So now I do know that, yes.

Q So are you going to continue to buy Great Value Apple Juice?

A Most likely no.

Q When you say, "Most likely no," under what circumstances would you continue to buy Great Value Apple Juice?

A Maybe if I can't find anything more natural.

Q So if you can't find anything more natural, you'll continue to buy Great Value Apple Juice?

A Yes.

Q And when you say if you can't find anything more natural, are you saying that you want apple juice that doesn't contain vitamin C?
MR. SMITH: Objection, vague.
Go ahead.
A It's not that I don't want the vitamin C because it's apple juice. I just don't want the acid part be added to it.
Q So I thought you said that you understood that ascorbic acid and vitamin C are the same thing?
A That's how you explained it, yes. That's the part I understood.
Q And before today, you had no idea that ascorbic acid and vitamin C were the same thing.
Is that your testimony?
THE WITNESS: I can answer that?
MR. SMITH: Yes, you can.
A Yes.
Q And do you know whether it's possible to make apple juice that contains no vitamin C?
A No, I do not know.

Q Okay. Let's go back to the amended complaint, if we could, that is previously marked as Exhibit 3.
And just to refresh, before this complaint was filed in Federal Court under your name, you read it, right?
THE WITNESS: I can answer that?
MR. SMITH: Umm-hmm.
A Yes.
Q Okay. I'd like to direct your attention to paragraph 13.
And do you see there, it says, "Here each of the products contain ascorbic acid, open paren, vitamin C, closed paren, as a preservative."
Do you see that?
A Yes.
Q Okay. So when you allowed this complaint to be filed on your behalf, did you understand that ascorbic acid and vitamin C were the same thing?
A I thought it was a preservative.
Q That's not my question.
When you had this complaint filed on your behalf, did you understand that

ascorbic acid and vitamin C were the same thing?

A No.

MS. GORDON: Okay. Let's go to -- all right.

What we have marked as Exhibit 42 are Plaintiff Sanchez's Amended Responses to Defendant's First Set of Request for Production of Documents, and then it lists the numbers and supplemental response to interrogatory number 4.

(Above-mentioned document marked for Identification.)

BY MS. GORDON:

Q Do you see that?

A Yes, I do.

Q And have you seen this document before?

A Yes.

Q What is it?

A My response to your questions.

Q And these are amended and supplemental responses, correct?

A I believe so.

label change?
A Yes. Be truthful.
Q And do you expect to get any money?
A I hope so.
Q Do you have any expectation, leaving aside what you talked about with your lawyers, of what you might get if you win this case?
A I won't be able to disclose that without the conversation with my lawyer.
Q Do you know who Joly Ramirez is?
A I do not know her personally, no, but I see the name on the paperwork.
Q Have you ever talked to her?
A No.
Q Do you know how many complaints have been filed in this case?
A Just, I guess, mines.
Q Let's go back to what was previously marked as 3, which is the amended complaint.
A Okay.
Q And just take a look for me at page 3.
A Okay.

remember.

Q Did you ever buy organic sparkling apple juice from Martinelli's?

A No.

Q Do you know what the label says on the organic apple juice?

A I don't know what the label says on the organic. I never bought the organic.

Q And do you know what the label says on the sparkling rose?

A No, because I never bought that one, either.

Q Do you know what the label says on the Heritage Label Sparkling Cider?

A I don't remember if I bought that one or not, so I do not know, no.

Q Sitting here today, do you know what the label says on the Heritage Label Sparkling Cider?

A Sitting here today, I do not remember what -- if I bought it or not, so I do not remember the label, no.

Q And sitting here today, do you know what the label says on the Classic Heritage Label Sparkling Cider?

A It would be my same answer, I do not remember if I bought it or not, so I don't remember the label.

Q Same question with regard to the organic sparkling cider, do you know, sitting here today, what that label says?

A No. I did not buy any of the organic products.

Q And the sparkling apple juice and the organic sparkling apple juice, do you know what those labels say?

A I don't recall the sparkling one, but I know most of you guys label the apple juice and the sparkling cider, it says a hundred percent juice.

But I don't recall the organic sparkling apple juice. I never bought the organic products.

Q Have you been injured by any product that you didn't buy?

MR. SMITH: Objection, vague, calls for a legal conclusion.

BY MS. GORDON:

Q You can answer.

MR. SMITH: Go ahead.

A With that being said, I know vitamin C helps your immune system, but that's about it.

Q So here, you said, "Customers want a hundred percent juice because of its health benefits."

My question is, what were you referring to when you said "health benefits" here?

A The hundred percent juice.

Q What benefits to somebody's health are you alleging here they would get if there was a hundred percent juice without vitamin C versus a hundred percent juice with vitamin C?

A Can you say those -- the question again?

Q Do you think that there is a difference in the health benefit that you would get if you drank apple juice that was a hundred percent juice without vitamin C that is different from drinking a hundred percent juice that contains vitamin C?

MR. SMITH: Objection, calls for speculation.

Q What is a price premium?
You can answer.
THE WITNESS: I can answer?
MR. SMITH: Umm-hmm.
A I'm not -- I don't understand what's a price premium, to be honest.
Q Do you know whether you paid a price premium in this case?
MR. SMITH: Objection, calls for speculation.
A I do not know, no.
Q Do you know how much more -- well, let me put it this way.
Is it your contention that the Martinelli's juice that you bought was -- you know what? Strike it.
Do you ever intend to buy another Martinelli's product in the future?
A If you guys change the label, yes.
Q What does that mean?
A I guess once the label is changed to where you guys add the truth to it, I would, yes.
Q So if there was a label that -- on Martinelli's products that said a hundred

Q So you look at this ad, Exhibit 22, and you filled out the form?

A Yes, ma'am.

Q And then without telling me what you said to your lawyers, what happened next?

MR. SMITH: You can say.

A I'm not able to say what happened next because I was talking to my lawyer after that.

Q When did you decide that you were going to sue Martinelli's?

MR. SMITH: If you -- if you know the answer, you should answer.

A Well, I don't remember the exact day or when.

Q Was it after you had a conversation with one of your lawyers?

MR. SMITH: You can answer.

A Yes.

Q And who is your counsel in this case?

A Joel Smith.

Q And do you know the names of any of the other lawyers who are working on your case?

A In my personal opinion, we're arguing about the hundred percent juice. I do not remember about drink your apple a day.

Q And this little gold seal at the top, is there anything misleading, in your opinion, about that?

A Well, I do not know if it's coming from the --

(Reporter clarification.)

A The California State or Cultural Society. It stated that it was awarded by them to be the best apple cider.

Q Do you have any reason to believe that's not true?

A If I have any reason to believe if it's not true?

Q Yep.

A If you guys are the best apple cider?

Q Do you have any reason to believe that this seal here and the information contained in it is untrue?

A No.

Q And how about since 1868, do you contend that's untrue?

A No.
Q So let's turn to the -- the next page, which is the back of the label.
And I know you said earlier that you would often look at sugars.
A Umm-hmm.
Q So if you look at the nutrition facts section, there's the sugars.
Do you see that?
A Yes.
Q And then below that, it says, "Ingredients," and the ingredients are pasteurized 100 percent apple juice and vitamin C, correct?
A Correct.
Q So the label of Martinelli's Apple Juice discloses that it contains vitamin C --
MR. SMITH: Objection --
Q -- correct?
MR. SMITH: Objection, vague.
Go ahead.
A What was your question?
Q The label of Martinelli's Apple Juice discloses that it contains vitamin C, correct?

MR. SMITH: Objection, vague.
THE WITNESS: I can answer?
MR. SMITH: Umm-hmm.
A It does not contain the acid part of vitamin C.
Q So that's not my question.
My question is, the label of Martinelli's Apple Juice tells you that there is vitamin C in it, correct?
MR. SMITH: Objection, vague.
A Correct, it does contain vitamin C in the label, but it does not contain the acid part of vitamin C.
Q Do you think ascorbic acid is part of vitamin C or do you understand that they're the same thing?
A To my understanding, I understand they're the same thing, but it's not disclosed in the label.
Q The vitamin C is disclosed, correct?
A Yes.
Q Okay. So let's go, then, to -- back to your interrogatory answers, which are 27, and now we're going to go to page 9.

A You said 27?

MR. SMITH: Exhibit 27.

BY MS. GORDON:

Q Exhibit 27, yeah.

A Page 9.

Q Page 9.

And specifically, I would like you to look at interrogatory number 16.

A Okay.

Q And that says, "Identify each and every legal proceeding, including appraisal proceedings, other administrative proceedings, arbitrations, investigations, civil or criminal lawsuits, in which you have been involved in any manner."

Do you see that?

A Yes.

Q And then your answer says, "None, excluding traffic infractions to the extent those are intended to be covered by this interrogatory."

Do you see that?

A Yes.

Q And is that a true and complete answer?

You can answer.
A Correct.
Q So sitting here right now, can you think of any other legal proceedings in which you've been involved?
A Not that I recall, no.
Q And the T-Mobile data breach class action that we talked about before --
A Umm-hmm.
Q -- why didn't you mention that here?
A I didn't see it as a -- a -- I didn't see it as a case, and I don't remember much because you mentioned the number that was associated to it.
Q You knew it was a class action, right?
A Yes.
Q So you knew it was a class action case, correct?
A Correct.
Q And you knew that it was a class action case that was a legal proceeding, correct?
A Correct.

MS. GORDON: And let's mark as 45 Tab 34.

For the record, what we're marking as Exhibit 45 is a complaint filed in the Superior Court of California, County of Santa Clara. The first plaintiff's name is Valerie Noble and it's versus Google, LLC.

(Above-mentioned document marked for Identification.)

BY MS. GORDON:

Q Have you ever seen this document before?

A No.

Q If you could turn to the second page.

The first page starts a list of all the plaintiffs and then that list finishes on the second page?

A Umm-hmm.

Q Do you see right at the -- where the 11 is, it says, "Sorangie Sanchez."

Is that you?

A Yes.

Q Okay. And let's look at page 10,

paragraph 51.
And paragraph 51 on page 10 says, "Plaintiff Sorangie Sanchez is an adult domiciled in the Bronx, New York."
That's you, right?
A Yes.
Q And the defendant is Google, LLC?
A It says Google, so I'm assuming, yes.
Q So are you currently in a -- are you currently a plaintiff in a case against Google?
A To my knowledge, no.
Q Did you file -- did you allow this complaint to be filed on your behalf?
A I have no knowledge of this complaint.
Q How is it that you are named in a complaint that you have no knowledge of?
A (Indicating.)
Q So your testimony is that you've never seen this before and while this is you, you don't know how you got in this complaint?
A I don't recall this complaint. I don't remember this.

Q So you can look at the last -- the second-to-last page. The second-to-last page, the date is April 9th of 2024.
Does that refresh your recollection as to when you were suing Google?
A You said what page?
Q The second to last, date, April 9, 2024.
A Umm-hmm.
Q Does that refresh your recollection as to when you sued Google?
A No.
Q Have you ever heard of the law firm Boies, Schiller?
A No.
Q Have you ever heard of the law firm Morgan & Morgan?
A No -- well, I have seen the commercials, Morgan & Morgan commercials.
Q Without telling me the substance of any conversations you've had, have you ever had a conversation with Morgan & Morgan?
A To my knowledge, no.
Q And without telling me the substance, have you ever had a conversation

A No.
Q Was anybody else present --
A No.
Q -- at those meetings?
Separate and apart from Mr. Smith, did you talk to anybody else about this deposition today?
A His team.
Q Do you drive for Instacart?
A I used to, yes.
Q When did you drive for Instacart?
A During COVID.
Q Have you driven for Instacart since COVID?
A No.
Q And do you drive for Uber?
A I used to, yes.
Q When did you drive for Uber?
A During COVID.
Q Okay. And is there any reason why you didn't disclose earlier your work for Instacart or Uber?
A I probably forgot since I no longer do it.
Q And do you have any other similar

types of jobs like that that you've not mentioned?

A Uh-huh.

Q Are you familiar with a company called Jolly Smoke, LLC?

A Yes.

Q And what is Jolly Smoke, LLC?

A It's a virtual smoke shop, but it's mostly my girlfriend's.

Q Do you have any role in Jolly Smoke, LLC?

A No.

Q Do you do any work for Jolly Smoke, LLC?

A No.

We haven't really used it, so...

MS. GORDON: Okay. I'm pretty close to done.

Let's just take five minutes and then I'm just going to look at my notes and then we'll come back and finish up, okay?

THE WITNESS: Okay.

VIDEO OPERATOR: The time is 4:57. We're going off the record.

(Brief recess taken.)

VIDEO OPERATOR: The time is 5:17. We're going back on the record.

MS. GORDON: Okay. I'm going to show you what we are marking as Exhibit 47.

And for the record, Exhibit 47 is a printout from the D&B business directory regarding Jolly Smoke, LLC.

(Above-mentioned document marked for Identification.)

BY MS. GORDON:

Q Now, this document lists the key principal of Jolly Smoke, LLC as Sorangie Sanchez.

Do you see that?

A Umm-hmm.

Q And the address is 1706 Selwyn Avenue, Bronx, New York.

Is that correct?

A Correct.

Q And is it still your testimony that you have nothing to do with Jolly Smoke, LLC?

A Correct.

Q Do you know why D&B is listing you

as the key principal?
A Uh-uh.
Q Are you going to do anything about the fact that you say that somebody is suing Google in your name and you have no knowledge of it?
A Am I going to do something about that?
Q Yeah.
A Yeah. I already spoke to him about it.
Q And don't tell me the substance of that conversation.
Are you going to do anything about the fact that D&B Business Directory is listing you as the key principal of Jolly Smoke, LLC?
A Yes.
Q What are you going to do?
A Talk to him about it.
Q Have you ever gone by the name Daniel Sorangie Sanchez?
A Yes.
Q And during what period of time did you go by Daniel Sorangie Sanchez?

A I don't remember the exact dates or anything, but I remember when I started my transition as trans, so I don't -- I don't remember the exact dates. I don't want to give you a guess.
Q You don't remember when you started transitioning as trans?
A Well, no, because I was on and off it.
Q And is there any reason why, when I asked you if you used any other name this morning, you didn't tell me that you've also gone by Danielle -- I mean, Daniel Sorangie Sanchez?
A I always go by my legal name, so I don't remember it, you know, being Daniel Sorangie Sanchez.
Q Do you have a Facebook account?
A Yes.
Q Under Daniel Sorangie Sanchez?
A Yes.
Q And you use it for that purpose, correct?
A Correct.
VIDEO OPERATOR: I apologize. This

is the videographer. We're experiencing a technical difficulty.
The time is 5:20. We're going off the record.
(Brief recess taken.)
VIDEO OPERATOR: The time is 5:23. We're going back on the record.
BY MS. GORDON:
Q Okay.
MS. GORDON: I am now going to show you what we've marked as Exhibit 48.
And for the record, what we've marked as Exhibit 48 are two pages of printouts from Facebook.
(Above-mentioned document marked for Identification.)
BY MS. GORDON:
Q And I'd like to direct your attention to the first page, and do you see the second entry to the bottom, it says, "Instacart Shoppers of the Northeast."
A Umm-hmm.
Q And it's dated May 1, 2025, correct?
A Correct.

Q And it says, "Let's welcome our new members," and the first new member in 2025 that's being welcomed is Daniel Sorangie Sanchez, correct?
A Correct.
Q Okay. So is it still your testimony that you did not have an affiliation with Instacart since COVID?
A I haven't done it in a while. I don't remember the last time I done it, but I started doing it in COVID.
Q So here where it says, "Let's welcome our new members, Daniel Sorangie Sanchez, Instacart shoppers," that's you, right?
A Correct.
Q And is it your testimony that in May of 2025, you were not an Instacart shopper?
A Correct.
Q Do you have any explanation as to why this Facebook page would identify you as one?
A Well, it seems like a group thing. I do join different groups.

Q Did you ever join Instacart Shoppers of the Northeast?
A I guess so, if it shows I'm a new member.
Q Why did you join Instacart Shoppers of the Northeast in or around May of 2025 if you were not shopping for Instacart?
A I don't remember. I don't want to guess why I joined.
It was most likely is just to see what other people post.
Q Well, why would it matter what other people post on Instacart Shoppers if you were not an Instacart shopper?
A Just to see, curiosity, I guess.
Q How much of your time do you spend looking at Facebook posts about Instacart shoppers?
A I guess whenever it pops up.
Q And if you look at the second page, also the second to the bottom, there's a post by Daniel Sorangie Sanchez, April 29th of this year, that is a post under the group Uber Drivers.
Do you see that?

A Yes.
Q And is that also you?
A Yes, that's all me.
Q And do you belong to the group Uber Drivers?
A Yes.
Q And you posted on April 19th, "Does Uber not know that gas prices out here giving out $4.63 for ten miles. It's wild."
Is that your post?
A Yes, it is my post.
Q And is it still your testimony under oath that in 2025, you did not drive for Uber?
A Yes, it's still my testimony.
Q So what were you complaining about here?
A I was trying to just make the post. I know that other people was complaining about Uber not being able to give money out, and I complained about how I seen, you know, 4.63 for ten miles.
Q Was Uber paying you $4.63 for ten miles?
A I don't remember. I don't think I

was active. I think I just saw it on another post.

Q So you decided to post on Uber Drivers even though you say you haven't driven for Uber in several years?

A Yes.

Q And --

A I did Uber Eats.

Q I'm sorry?

A I did Uber Eats.

Q When did you do Uber Eats?

A COVID. I started in COVID.

Q So who told you that Uber was giving people $4.63 for ten miles?

A I think I might have seen it on another post. I don't remember.

MS. GORDON: So let's mark as 49.

(Above-mentioned document marked for Identification.)

BY MS. GORDON:

Q 49 is another Facebook post from Daniel Sorangie Sanchez from -- this one's from May 15th of 2024.

Do you see this?

A Yes.

Q Okay. And to whom were you referring?
A My girlfriend's daughter. She's not biologically my daughter.
Q And do you consider her your daughter?
A I do consider her, yes, my daughter.
Q Do you collect disability payments?
A Yes, I do.
Q Okay.
MS. GORDON: I'm going to leave the deposition open because there are a number of documents that we are going to want to follow up on, and including we're going to want to get the dates off your phone of the pictures that you provided.
So we will make a request to your counsel on that. We will have a conversation about that.
MR. SMITH: Okay.
MS. GORDON: And so for that purpose and to the extent that there's anything else that was not produced,

C E R T I F I C A T E

I, CHARLENE FRIEDMAN, a Certified Court Reporter and Notary Public, qualified in and for the State of New Jersey do hereby certify that prior to the commencement of the examination SORANGIE SANCHEZ was duly sworn by me to testify to the truth the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER certify that I am neither a relative of nor employee nor attorney nor counsel for any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

CHARLENE FRIEDMAN, RPR, CRR, CCR of the State of New Jersey
License No: 30XI00204900
Date: August 27, 2027